# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| ALLIED WASTE NORTH AMERICA, INC., a Delaware corporation; and BFI WASTE SERVICES, LLC, a Delaware limited liability company, | ) ) ) ) ) | JURY DEMAND<br><br>No. 3:13-cv-00254 |
| Plaintiffs, | ) ) | |
| v. | ) ) | Judge Sharp<br>Magistrate Judge Griffin |
| LEWIS, KING, KRIEG & WALDROP, P.C., a Tennessee professional corporation; LINDA HAMILTON MOWLES, an individual; DEBORAH STEVENS, an individual; LEVINE, ORR & GERACIOTI, PLLC, a Tennessee limited liability company; ROBERT ORR, JR., an individual; WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC, a Georgia limited liability company; and TERRANCE SULLIVAN, an individual, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' CONSOLIDATED MEMORANDUM IN RESPONSE TO MOTIONS FOR SUMMARY JUDGMENT OF DEFENDANTS TERRANCE SULLIVAN, WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC, LEWIS, KING, KRIEG & WALDROP, P.C., LINDA MOWLES, DEBORAH STEVENS, LEVINE, ORR & GERACIOTI, PLLC AND ROBERT ORR, JR.

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................ iv

I. FACTS .................................................................................................................. 1

    A. The impetus for the underlying lawsuit: the facility and fire ................................. 1

    B. Discovery, pre-trial proceedings and trial of the underlying lawsuit .................... 2

        1. Facts related to the trial court's imposition of an adverse inference instruction because Orr failed to produce an appropriate 30.02(6) witness ....................................................... 3

        2. Facts related to Orr's failure to retain a qualified expert ........................... 5

        3. Facts related to Lewis King's and Orr's failure to object to the language of the adverse inference instruction ................................ 8

    C. The jury verdict ................................................................................................ 9

    D. Post-trial proceedings: motion for new trial ...................................................... 9

    E. Lewis King handles the appeal ...................................................................... 14

    F. The Court of Appeals' decision ...................................................................... 17

    G. Events after the Court of Appeals' decision ................................................... 18

II. ARGUMENT ...................................................................................................... 18

    A. Defendants' statute of limitations argument fails. .............................................. 18

        1. Plaintiffs were not injured until the Court of Appeals' ruling on March 22, 2012. ............................................................................ 20

            a. Defendants' failure to include Held's exclusion in the motion for new trial did not injure Plaintiffs until the Court of Appeals held that such omission precluded Plaintiffs' right to appeal that issue. ........................................... 20

            b. Lewis King's work to remedy its own negligence in waiving the issue of Held's exclusion cannot operate to its benefit. .......................................................................... 24

2.      Plaintiffs did not have requisite knowledge until the Court of
        Appeals' ruling on March 22, 2012. ......................................................... 26

        a.      Plaintiffs did not detect, and could not reasonably have
                detected, evidence of Lewis King's negligence in Lewis
                King's bills............................................................................... 27

        b.      Plaintiffs did not read, and could not reasonably have read,
                Metro's appellate brief arguing waiver........................................ 29

        c.      Assuming *arguendo* that Plaintiffs had knowledge of the
                waiver argument in Metro's appellate brief, such
                knowledge does not mean that Plaintiffs knew they
                suffered an injury as a result of Defendants' negligence............. 34

        d.      As a matter of law, Lewis King's and Weinberg Wheeler's
                knowledge of their own malpractice cannot be imputed to
                Plaintiffs.................................................................................. 35

3.      Equitable estoppel tolls the statute of limitations until the Court
        of Appeals' opinion................................................................................ 39

B.      Weinberg Wheeler's committed malpractice........................................................ 41

1.      Causation is an issue for the jury and cannot be resolved on
        summary judgment................................................................................. 44

        a.      The trial court excluded Held's valuation opinion because
                he was not a licensed appraiser under the statute. ...................... 46

        b.      *City of Pulaski* is on-point case law, and the trial court
                abused its discretion in excluding Held. ..................................... 49

        c.      Weinberg Wheeler and Lewis King failed to preserve
                additional issues in the motion for new trial............................... 52

2.      Lewis King's and Plaintiffs' standard of care experts will testify
        that Weinberg Wheeler's conduct fell below the standard of
        care....................................................................................................... 55

3.      There is no evidence in the record that Weinberg Wheeler
        intentionally decided, rather than negligently omitted, the issue
        of Held's exclusion from the motion for new trial. .................................. 59

4.      Weinberg Wheeler cannot take advantage of the professional
        judgment defense where it failed to conduct any legal research
        on an issue before "deciding" not to include that issue in the
        motion for new trial. .............................................................................. 64

- ii -

9675762

5.   Weinberg Wheeler never advised Plaintiffs of either the "decision" not to include the Held issue in the motion for new trial or of the potential for waiver given the arguments in the appellate briefing. ..................................................................... 66

6.   Weinberg Wheeler admitted that negligence had occurred and advised Plaintiffs to sue. ..................................................................... 67

C.   Defendants' damages argument fails. ..................................................................... 69

1.   The damages argument incorrectly assumes that a re-trial would focus only on damages, not liability. ..................................................................... 69

2.   Stipulated damages would not be in play upon re-trial. ..................................................................... 71

3.   The collateral source rule bars admission of Plaintiffs' insurance policy. ..................................................................... 72

a.   The Tennessee Legislature's statutory abrogation of the common law rule only in claims involving health care liability shows an intent to allow the common law to apply the collateral source rule in other contexts. ..................................................................... 73

b.   Courts in other jurisdictions that apply the collateral source rule do not distinguish legal malpractice actions from other claims. ..................................................................... 75

D.   Levine Orr cannot satisfy the professional judgment defense on summary judgment. ..................................................................... 78

1.   Orr's retention of Held is not protected by the professional judgment defense. ..................................................................... 78

2.   Orr's failure to seek a continuance is not protected by the professional judgment defense. ..................................................................... 80

3.   Orr negligently drafted the adverse inference instruction and failed to object to the problematic language. ..................................................................... 82

III.   CONCLUSION ..................................................................... 83

9675762

# TABLE OF AUTHORITIES

**CASES**

*Arena Football League, Inc. v. Roemer*, 9 F. Supp. 2d 889 (N.D. Ill. 1998) ........................ 75, 76

*Batchelor v. Heiskell, Donelson, Bearman, Adams, Williams & Kirsch*,
 828 S.W.2d 388 (Tenn. Ct. App. 1991) .................................................................... 37

*Beal Bank, SSB v. Arter & Hadden, LLP*, 167 P.3d 666 (Cal. 2007) ......................................... 40

*Becker v. Ford Motor Co.*, 431 S.W.3d 588 (Tenn. 2014) .......................................... 18

*Bellar v. Baptist Hosp., Inc.*, 559 S.W.2d 788 (Tenn. 1978) ......................................... 36

*Bloome v. Wiseman, Shaikewitz, McGivern, Wahl, Flavin & Hesi*, 664 N.E.2d 1125
 (Ill. App. 1996) ........................................................................................ 74, 75, 76

*Bradson Mercantile, Inc. v. Crabtree*, 1 S.W.3d 648 (Tenn. Ct. App. 1999)............................. 25

*Bruce v. Olive*, No. 03A01-9509-CV-00310, 1996 WL 93580 (Tenn. Ct. App.
 Mar. 4, 1996)......................................................................................................... 45

*Cardiac Anesthesia Services, PLLC v. Jones*, 385 S.W.3d 530 (Tenn. Ct. App. 2012).............. 25

*Carvell v. Bottoms*, 900 S.W.2d 23 (Tenn. 1965) ......................................................... 19

*Chambers v. Dillow*, 713 S.W.2d 896 (Tenn. 1986)........................................................ 25

*Cherry v. Williams*, 36 S.W.3d, 78 (Tenn. Ct. App. 2000)................................................... 20, 21

*City of Brentwood v. Cawthon*, No. M200902330COAR3CV, 2010 WL 1931095
 (Tenn. Ct. App. May 13, 2010).............................................................................. 49

*City of Pulaski v. Morris*, No. M2010-00047-COA-R3-CV, 2010 Tenn. App.
 LEXIS 591 (Tenn. Ct. App. Sept. 23, 2010)....................................................... 11, 49-50

*Conatser v. Ball*, No. M1999-00583-COA-R3-CV, 2001 WL 873457
 (Tenn. Ct. App. Aug. 3, 2001) ............................................................................... 5, 46

*Davidson v. Baydoun*, No. M200802746COAR3CV, 2009 WL 2365563
 (Tenn. Ct. App. July 31, 2009) ........................................................................... 21, 34

*Energy Automation Sys., Inc. v. Saxton*, 618 F. Supp. 2d 807 (M.D. Tenn. 2009) ...................... 2

*Fahey v. Eldridge*, 46 S.W.3d 138 (Tenn. 2001)................................................................ 22, 24

*Fye v. Kennedy*, 991 S.W.2d 754 (Tenn. App. 1998) ..................................................... 73, 74, 75

9675762

*Gay & Taylor, Inc. v. Am. Cas. Co. of Reading, Pa.*, 381 S.W.2d 304
(Tenn. Ct. App. 1963) ................................................................................. 45

*Gibson v. Trant*, 58 S.W.3d 103 (Tenn. 2001) ........................................................ 44

*Guidry v. Coregis Ins. Co.*, 896 So. 2d 164 (La. App. 2004) ................................ 75, 77

*Heil Co. v. Evanston Ins. Co.*, No. 1:08-CV-244, 2010 WL 3064037
(E.D. Tenn. 2010) ....................................................................................... 73

*Honeycutt v. Wilkes, McCullough & Wagner*, No. W2007-00185-COA-R3CV,
2007 WL 2200285 (Tenn. Ct. App. Aug. 2, 2007) .......................................... 25, 26

*Horn v. Moberg*, 844 P.2d 452 (Wash. App. 1993)................................... 74 75, 76

*Houghton v. Leinwohl*, 376 A.2d 733 (Vt. 1977) ................................................. 76, 77

*In re Woods*, 13 S.W.2d 800 (Tenn. 1929) ...................................................... 64

*Jessup v. Tague*, No. E2002-02058-COA-R3-CV, 2004 WL 2709203
(Tenn. App. Nov. 29, 2004)........................................................................ 44, 45

*John Kohl & Co. P.C. v. Dearborn & Ewing*, 977 S.W.2d 528 (Tenn. 1998) .................... passim

*Johnson v. Baker*, 719 P.2d 752 (Kan. App. 1986) ............................................. 76, 77

*Johnson v. Nissan N. Am., Inc.*, 146 S.W.3d 600 (Tenn. Ct. App. 2004)................. 51

*Johnston v. Johnston*, No. E2013–00525–COA–R3–CV, 2014 WL 890758
(Tenn. Ct. App. Mar. 6, 2014) .................................................................. 2, 12

*JPMorgan Chase Bank, Nat. Ass'n. v. Fifth Third Bank, N.A.*, 222 F. App'x 444
(6th Cir. 2007)............................................................................................ 36

*Lane-Detman, L.L.C. v. Miller & Martin*, 82 S.W.3d 284 (Tenn. Ct. App. 2002)....... 37

*Lee v. Royal Indem. Co.*, 108 F.3d 651 (6th Cir. 1997)................................... 74

*Lufkin v. Conner*, 338 S.W.3d 499 (Tenn. Ct. App. 2010)................................... 37

*Lusk v. Consol. Aluminum Corp.*, 655 S.W.2d 917 (Tenn. 1983) .......................... 39

*McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn. 1992), *abrogated, in part, by statute
as explained in Marler v. Scoggins*, 105 S.W.3d 596 (Tenn. App. 2002) ................ 72

*Mehler v. Larkin*, No. CA 1287, 1989 WL 128493 (Tenn. Ct. App. Oct. 25, 1989) ............ 36

*Memphis Aero Corp. v. Swain*, 732 S.W.2d 608 (Tenn. Ct. App. 1986)..................... 25

9675762

Case 3:13-cv-00254   Document 99   Filed 11/17/14   Page 6 of 93 PageID #: 2255

*Metro. Gov't v. BFI Waste Servs.*, No. M2011-00586-COA-R3-CV,
2012 Tenn. App. LEXIS 189 (Tenn. Ct. App. Mar. 22, 2012) ......................................... passim

*Muse v. St. Paul Fire & Marine Ins. Co.*, 328 So. 2d 698 (La. Ct. App. 1976) .......................... 65

*Nat'l Mortgage Co. v. Washington*, 744 S.W.2d 574 (Tenn. Ct. App. 1987) ........................ 30, 34

*Ne. Knox Util. Dist. v. Stanfort Const. Co.*, 206 S.W.3d 454 (Tenn. Ct. App. 2006).................. 39

*Norton v. Superior Court*, 30 Cal. Rptr. 2nd 217 (Cal. App. 1994) ................................. 75, 76, 77

*Ocean Ships, Inc. v. Stiles*, 315 F.3d 111 (2d Cir. 2002)........................................................ 75, 76

*Porter-Metler v. Edwards*, No. 03A01-9709-CV-00393, 1998 WL 131515
(Tenn. Ct. App. Mar. 25, 1998) ......................................................... 23, 26, 30, 31

*Rich v. Warlick*, No. M2013-01150-COA-R3CV, 2014 WL 1512821
(Tenn. Ct. App. Apr. 15, 2014)......................................................................21, 24-25

*Singh v. Larry Fowler Trucking, Inc.*, 390 S.W.3d 280 (Tenn. Ct. App. 2012),
appeal denied (Dec. 11, 2012) ............................................................................ 54

*Smith v. Petkoff*, 919 S.W.2d 595 (Tenn. Ct. App. 1995)........................................ 22, 37, 38, 39

*State ex rel. Department of Transp., Bureau of Highways v. Brevard*,
545 S.W.2d 431 (Tenn. Ct. App. 1976) ................................................................... 49

*Steele v. Ft. Sanders Anesthesia Group, P.C.*, 897 S.W.2d 270 (Tenn. App. 1994) .............. 74, 75

*Stueve Bros. Farms, LLC v. Berger Kahn*, 222 Cal. App. 4th 303,
166 Cal. Rptr. 3d 116 (2013) ........................................................................... 35, 36

*Sun Valley Potatoes, Inc. v. Rosholt, Robertson & Tucker*, 981 P.2d 236 (Idaho 1999).............. 64

*Tenn. DOT v. Wheeler*, No. M1999-00088-COA-R3-CV, 2002 Tenn. App.
LEXIS 727 (Tenn. Ct. App. Oct. 11, 2002) .......................................................... 6, 79

*Wilkins v. Dodson, Parker, Shipley, Behm & Seaborg*, 995 S.W.2d 575
(Tenn. Ct. App. 1998) ...................................................................................... 32, 37

*Wilson v. Mathes*, 15 S.W.3d 865 (Tenn. Ct. App. 1999) ........................................................ 31

*Woodruff v. Tomlin*, 616 F.2d 924 (6th Cir. 1980) ...................................................... 43, 45, 64, 81

*Woods & Woods v. Lewis*, 902 S.W.2d 914 (Tenn. Ct. App. 1994)............................................ 34

9675762

## STATUTES

T.C.A. § 20-1-119 ................................................................................... 18

T.C.A. § 28-3-104(c) .............................................................................. 19

T.C.A. § 29-26-119 ................................................................................. 74

## RULES

Tenn. R. App. Proc. 3 .............................................................................. 22

Tenn. R. Evid. 103(a)(2) ..................................................................... 53-54

Tenn. R. of Professional Conduct 1.5 ............................................... 26, 27

## OTHER AUTHORITIES

Restatement (Second) of Tors § 920A (1977) ......................................... 73

Restatement (Third) of Agency § 5.03 cmt. B (2006) ............................. 36

Restatement (Third) of the Law Governing Lawyers, § 20, cmt. 2 (2000) ................................. 40

9675762

This legal malpractice lawsuit arises from the actions of three law firms in their representation of Plaintiffs, Allied Waste North America, Inc. ("Allied") and BFI Waste Services, LLC ("BFI") (collectively, "Plaintiffs"). Defendants'[1] representation of Plaintiffs in the underlying lawsuit was riddled with serious errors by all three firms, two of which were hired to help remedy problems the first firm created. The end result was an unexpected and unwarranted $7.2 million jury verdict against Plaintiffs that never should have occurred. This verdict would have been reversed on appeal but for Defendants' additional errors.

Plaintiffs appreciate the density of their lengthy response but such a response was necessitated by Defendants' 76 pages of memoranda, not a single page of which raises any issues appropriate for resolution on summary judgment. Plaintiffs respectfully request that the Court deny Defendants' motions.

## I.     FACTS

### A.     The impetus for the underlying lawsuit: the facility and fire

In 2005, the Metropolitan Government of Nashville ("Metro") and Travelers Insurance, Metro's insurer, sued, BFI, among other defendants, in Tennessee state court in connection with a May 23, 2002 fire that occurred at a Nashville waste-to-energy facility (the "Underlying Lawsuit").[2] Plaintiffs' Consolidated Concise Statement of Additional Facts ("CSOF") ¶ 1. The facility, which began operating in 1974, used "solid waste as an energy source for both heating

---

[1] Defendants are Terrance Sullivan and Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC (collectively "Weinberg Wheeler"), Lewis, King, Krieg & Waldrop, P.C., Linda Mowles, Deborah Stevens (collectively, "Lewis King"), Levine, Orr & Geracioti, PLLC and Robert Orr, Jr. (collectively, "Levine Orr").

[2] Allied was later added as a defendant.

and cooling[] . . . to generate steam, which was then used to heat downtown buildings, or to produce chilled water to cool the buildings."  CSOF ¶ 2.[3]

By 2001, "[d]espite several expansions and updates to improve operations and to increase its capacity during its 30-year life span, the NTTC [which was the non-profit created to run the facility] struggled to meet pollution restrictions and to remain economically viable[]" and, as a result, "Metro Council voted in December to close the NTTC plant by 2004 . . . ."  CSOF ¶ 3. To that end, Metro intended to convert the facility in October 2002 "from a solid waste-fired system to a fossil fuel system . . . ."  CSOF ¶ 4.  Due to the May 23, 2002 fire, that conversion "process was accelerated" and **"*[t]he plant was back in operation only one business day after the fire***, and continued to operate as a gas-fired facility, producing steam and chilled water as before."  CSOF ¶ 5 (emphasis added).  By January 2004, the plant had ceased even gas-fired operations, a new energy generation facility at a different location was put into service and the old plant was torn down.  CSOF ¶ 6.

### B.     Discovery, pre-trial proceedings and trial of the underlying lawsuit

Michael Geracioti of Levine Orr was hired to defend BFI.  CSOF ¶ 7.  Within a month of being engaged to defend BFI, Geracioti transferred primary responsibility for defending the lawsuit to Robert Orr.  CSOF ¶ 8.

---

[3] This particular Concise Statement of Fact itself cites to a web site. *Energy Automation Sys., Inc. v. Saxton*, 618 F. Supp. 2d 807, 810 (M.D. Tenn. 2009) ("A court may take judicial notice of the contents of an Internet website."); *Johnston v. Johnston*, No. E2013–00525–COA–R3–CV, 2014 WL 890758, *22 n. 6 (Tenn. Ct. App. Mar. 6, 2014) (taking judicial notice of population from U.S. Census Bureau official website)

9675762

1. **Facts related to the trial court's imposition of an adverse inference instruction because Orr failed to produce an appropriate 30.02(6) witness**

Levine Orr's negligence resulted in, among other things, the trial court imposing an adverse inference instruction against BFI and Allied. CSOF ¶ 9. Early in the case, Metro sought a 30.02(6)[4] witness who could testify about BFI's and Allied's hiring and management of contractors and fire safety policies. CSOF ¶ 10. Orr designated Michele Casey, an employee in the Risk Department, as the corporate representative even though she Levine Orr as early as Spring 2008 that she did not have the knowledge to testify about the policies and procedures. CSOF ¶ 11. At her October 13, 2008 30.02(6) deposition, which Geracioti, not Orr, defended, Casey testified that she was ***not*** familiar with BFI's and Allied's policies and procedures. CSOF ¶ 12. Casey testified, however, that the proper person to respond to these questions was Eileen Schuler. CSOF ¶ 13.

Shortly thereafter, Geracioti told Orr to address Metro's concerns with BFI's and Allied's 30.02(6) witness. CSOF ¶ 14. On December 19, 2008, Orr wrote that he had reviewed Casey's deposition to determine the appropriate 30.02(6) witness. CSOF ¶ 15. Moreover, Casey and Orr discussed Schuler's identity as the proper corporate representative on several occasions. CSOF ¶ 16. At the latest, as of March 11, 2009, both Orr and Geracioti (who attended Casey's deposition when she identified Schuler) knew that Schuler was the proper 30.02(6) witness. CSOF ¶ 17. Notably, Orr never communicated with Geracioti about which person could satisfy the 30.02(6) notice. CSOF ¶ 18.

On March 20, 2009, the Court ordered Orr to identify a corporate representative within 21 days. CSOF ¶ 19. On April 27, 2009, although Orr had been told that Schuler was the

---

[4] Tennessee Rules of Civil Procedure Rule 30.02(6) is the state counterpart to F.R.C.P. 30(b)6.

9675762

appropriate witness, Orr (for some unknown reason) identified David Murphy as the 30.02(6) witness. CSOF ¶ 20. Murphy's deposition occurred on August 5, 2010. CSOF ¶ 21. Following Murphy's deposition, Metro complained that Orr "STILL [had] not produced a competent witness who can testify definitively regarding the areas set forth" in the deposition notices. CSOF ¶ 22.

Orr explained in an August 9, 2010 letter to Casey that four days earlier he "had an epiphany, the scales fell from my eyes and, at long last, I understood" that Schuler was the correct 30.02(6) witness. CSOF ¶ 23. Although the email traffic makes clear that Orr read Casey's deposition in December 2008 (Exhibit 10), Orr claimed he had not read Casey's deposition until after his "epiphany" on August 5, 2010, discovering that Schuler was the proper 30.02(6) witness. CSOF ¶ 24. On September 1, 2010, Orr disclosed Schuler who had been "hiding in plain sight all along." CSOF ¶ 25. Orr's September 2010 identification of Schuler came too late because it was too close to the trial set for September 27, 2010 and was not until after Metro moved for sanctions based on the 30.02(b) issue on August 29, 2010. CSOF ¶ 26.

Orr repeatedly admitted to the trial court that this discovery failure was solely ***his*** fault and ***not*** his clients' fault. CSOF ¶ 27. At his deposition, Orr admitted that the discovery sanction was entirely his fault. CSOF ¶ 28. Orr negligently failed to respond to Metro's discovery requests, and it was this failure that "directly caused the filing of a motion for Rule 37 sanctions . . . ." CSOF ¶ 29.

In granting Metro's motion, the trial court sanctioned BFI and Allied for failing to timely present a 30.02(6) deponent, imposing the following adverse inference instruction at trial:

> The Court instructs you that BFI was required by Court Order to
> produce certain corporate policies and procedures and a witness to
> testify about them in this lawsuit. Those policies and procedures
> relate to fire safety and the hiring and management of

- 4 -

subcontractors. BFI failed to comply with the Court's Order. Accordingly, the Court instructs you that you may infer that the evidence that BFI failed to produce would have been unfavorable to it. You are not, however, required to determine in what respect it would have been unfavorable nor to give this adverse inference any particular weight in comparison with other facts and circumstances. The inference to be drawn from the conduct of BFI may well be a persuasive factor in the process of weighing and interpreting the testimony offered by BFI.

*Metro. Gov't v. BFI Waste Servs.*, No. M2011-00586-COA-R3-CV, 2012 Tenn. App. LEXIS 189, at *29-30 (Tenn. Ct. App. Mar. 22, 2012); CSOF ¶ 30.

The lawyers involved in defending the case acknowledged that adverse inference instructions are rare and harm a party's case. CSOF ¶ 31. Here, in particular, because the instruction was presented to the jury after the close of plaintiff's case-in-chief, it certainly impacted the jury's impression of BFI and Allied. CSOF ¶ 32.

### 2. Facts related to Orr's failure to retain a qualified expert

In cases involving damage to real property, "evidence of diminution of value after a loss event is a central issue where it is presented because it is an alternative measure of damages to the cost of repair." CSOF ¶ 33, *citing* Exhibit 5, Smith Report at 32. The appropriate measure of damages for injury to real property is ***the lesser of*** the cost of repair or diminution in market value. *See Conatser v. Ball,* No. M1999-00583-COA-R3-CV, 2001 WL 873457, at *12 (Tenn. Ct. App. Aug. 3, 2001).

The cost of repairing the facility was far higher than the diminution in value due to the fire and was not the proper measure of damages. CSOF ¶ 34. To avoid a windfall to Metro (which would result if cost of repair was used), Orr intended to show that the facility actually had a "negative value" given that it was scheduled to close. CSOF ¶ 35. As such, presenting evidence related to the diminution in value was critical to BFI's and Allied's defense.

- 5 -

Orr's expert was Jonathon C. Held. *Metro. Gov't*, 2012 Tenn. App. LEXIS 189 at *9.

Held was to testify at trial not simply about the costs of repair but also as to "the amount of loss"

to the facility from the May 2002 fire (*i.e.*, diminution in value testimony). *Id.* Held's April 12,

2010 report set forth his diminution in value opinion:

> The building was a special purpose property which was
> substantially obsolete at the date of the loss, and as such, only had
> utility for a limited period of time, and thus has ***negligible value***.

*Id.* at *3 (emphasis added).

On August 23, 2010, Metro filed a supplemental motion to strike Held. CSOF ¶ 36. The

motion sought to exclude Held's testimony concerning the facility's diminution in value,

contending that Held was not a licensed appraiser and thus was prevented from offering an

"appraisal report" pursuant to Tennessee Code Annotated ("T.C.A.") § 62-39-103. CSOF ¶ 37.[5]

The trial court granted Metro's motion in limine, excluding Held. CSOF ¶ 38. The basis

for the trial court's ruling was that Held was not a licensed real estate appraiser under T.C.A.

§ 62-39-102. CSOF ¶ 39. The trial court read the statute into the record in ruling on the motion.

CSOF ¶ 40. Metro argued during oral argument that Held's lack of "the license is critical[.]"

CSOF ¶ 41. After reading the definition of "appraisal" in the statute, the trial court ruled "[h]e's

not an appraiser and without being an appraiser, he can't give an appraisal opinion." CSOF

---

[5] Under *Tenn. DOT v. Wheeler*, No. M1999-00088-COA-R3-CV, 2002 Tenn. App. LEXIS 727, at *9-10 (Tenn. Ct. App. Oct. 11, 2002), which existed before Orr retained Held, it was questionable whether Held's testimony would be admissible:

> [W]e conclude that persons seeking to give an expert opinion regarding the value
> of real property located in Tennessee must meet both the specific statutory
> requirements of Tenn. Code Ann. § 62 39-103(a) and the general requirements of
> Tenn. R. Evid. 702 at the time they are called upon to testify regarding their
> expert opinion. Accordingly, the trial court erred by permitting Mr. Harris to give
> an expert opinion regarding the value of the Wheelers' farm because Mr. Harris
> was no longer a licensed real estate broker when he testified.

- 6 -

¶ 42.  Similarly, the trial court's September 20, 2010 written order stated: "Held is precluded from testifying about the value of Thermal because this constitutes an appraisal opinion, which he is not qualified to give."  CSOF ¶ 43.

Orr testified that Held's exclusion

> was based on a statute [T.C.A. § 62-39-103] that basically, because Mr. Held was not a licensed real estate agent, I believe the word is, in Tennessee there was a provision and a statute that, at least in Judge Binkley's interpretation, rendered him unable to testify or express an opinion.

CSOF ¶ 44.  Within a day of Held's exclusion, Orr explained the basis for the trial court's reasoning to Casey, namely, that T.C.A. § 62-39-103 was the reason the trial court found Held could not testify.  CSOF ¶ 45.  Orr testified that he was unaware of the statute until Metro raised it.  CSOF ¶ 46.

The exclusion of Held's testimony created a domino effect that led to the exclusion of other evidence critical to BFI's and Allied's defense.  CSOF ¶ 47.  Due to the fact that he ruled that Held could not testify about the facility's value because Held was not a real estate appraiser, Judge Binkley further precluded any evidence about the future plans for the facility, its obsolescence or its negative value because such evidence was irrelevant to the remaining cost of repair damages.  CSOF ¶ 48.  The trial court also ruled that even if the evidence was relevant, "the probative value of the evidence, if any, is outweighed by its prejudicial effect."  *Metro. Gov't*, 2012 Tenn. App. LEXIS 189 at *4; CSOF ¶ 49.  Further, because Orr had no admissible evidence to support a diminution in value calculation, the trial court determined that the only damages calculation available to the jury would be cost of repair.  *Metro. Gov't*, 2012 Tenn. App. LEXIS 189 at *4.  Simply stated, Held's exclusion resulted in the jury never hearing that Metro planned, in the near future, to close the facility and tear it down and the jury was led to

- 7 -

believe that Metro had to pay to repair all of the fire damages when, in fact, Metro had received a huge windfall.  CSOF ¶ 50.

After the trial court's ruling, Orr did not seek leave of court to obtain a qualified appraiser or move for a continuance, even though the trial judge almost certainly would have granted either leave or a continuance.  CSOF ¶ 51.  Orr admitted in his deposition that he did not research the statute even after the ruling because he "trusted the Judge." CSOF ¶ 52.

### 3.    Facts related to Lewis King's and Orr's failure to object to the language of the adverse inference instruction

In light of the sanctions ruling,  Held's exclusion and the related exclusions of evidence, BFI and Allied, along with AIG, hired another law firm, Lewis King, to participate in the trial and post-trial proceedings "to protect and preserve appellate issues and to monitor the trial for appellate issues."  CSOF ¶ 53.  To that end, Lewis King attorneys Deborah Stevens and/or Daniel Olivas attended every day of the trial in the Underlying Lawsuit except the day that the jury returned the verdict.  CSOF ¶ 54.  Stevens and Olivas assisted Orr with the adverse inference instruction.  CSOF ¶ 55.  Lewis King was substantially involved in reviewing Metro's proposed instruction.  CSOF ¶ 56.  For example, Stevens prepared a draft response to Metro's adverse inference instruction.  CSOF ¶ 57.

Orr and the Lewis King attorneys drafted an objection to the instruction proposed by the plaintiffs and then submitted their own version of the instruction to the court through Orr.  CSOF ¶ 58.  This language was nearly identical to the instruction the court ultimately gave.  CSOF ¶ 59.  Even after submitting the instruction, Orr testified he did not object to language he had himself submitted.  CSOF ¶ 60.  Orr further testified "what else are you going to object to other than the fact that it's being given at all."  CSOF ¶ 61.

- 8 -

The problem with the adverse inference instruction "was that while it said that the jury *may* infer that the non-produced evidence would have been unfavorable, it omitted the caveat that the jury was *not required* to infer that the testimony would have been unfavorable." CSOF ¶ 62 (emphasis added). The instruction therefore created a *presumption* that the evidence not produced was unfavorable. CSOF ¶ 63.

> In short, as written and submitted by Orr, Stevens, and Olivas, the jury was told the Court was giving this "adverse inference" and the jury was not required to assess whether the non-produced testimony or evidence would have been favorable. But the jury was *not told* that they did not have to infer anything adverse at all.

CSOF ¶ 64.

On appeal, Lewis King's appellate attorneys identified the legal error with the instruction, arguing that the instruction was "overbroad and unrebuttable." *Metro. Gov't*, 2012 Tenn. App. LEXIS 189 at *30. Thus, the law firm on the appeal brief was attacking on appeal as *error* the jury instruction that its own lawyers had helped prepare. Even after drafting the instruction with the problematic language, the failure to object to the language of the instruction waived any chance for an appeal on this issue. *Metro. Gov't*, 2012 Tenn. App. LEXIS 189 at *29-30; CSOF ¶ 65.

### C. The jury verdict

The jury found BFI and Allied 100% liable for the negligence claim and also found that BFI and Allied had breached the contract with Metro, awarding total damages of $7.2 million, which was the full amount Metro had requested. CSOF ¶ 66.

### D. Post-trial proceedings: motion for new trial

A third firm, Weinberg Wheeler, was engaged after the trial to help: (1) prepare post-verdict offers of proof to address the trial court's evidentiary exclusions; (2) prepare the appropriate post-trial motions; (3) retry the case if the post-trial motions were ultimately

- 9 -

successful; and (4) participate in the appeal.  CSOF ¶ 67.  The Weinberg Wheeler attorneys involved in the matter were Terrance Sullivan, Scott Witzigreuter and Josh Wood.  CSOF ¶ 68.

Notwithstanding the addition of Weinberg Wheeler, Lewis King was nonetheless expected to be involved in the post-trial motion practice—the firms' joint responsibility for the motion for new trial is set forth in Mowles' email to Tim Owens: "Terry's office [Weinberg Wheeler]" would handle the drafting of the new trial motion, which would be reviewed by Mowles "especially focusing on Tennessee law and the *scope of issues on appeal.*"  CSOF ¶ 69.

The motion for new trial for which all Defendants were responsible failed to include a critical issue for appeal—namely, the exclusion of Held's diminution of value opinions.  CSOF ¶ 70.  By failing to include this issue in the motion for new trial, Plaintiffs lost not only the opportunity for Judge Binkley to order a new trial, but also waived the issue on appeal.  As explained below, this error in failing to preserve such an important issue resulted from a total lack of attention, diligence, and supervision.  CSOF ¶ 71.

Long before the motion for new trial was even due, Mowles warned Stevens "we need to be sure that these issues are included in a motion for new trial since we will not be able to raise them in a jury trial appeal . . . ."  CSOF ¶ 72.  Orr reiterated the same warning to Sullivan.  *See* CSOF ¶ 73.

Well before even beginning work on the new trial motion, Lewis King and Weinberg Wheeler knew that the Held issue was important to preserve for appeal.  On September 30, 2010, Stevens noted in an email the issue of Held's exclusion under T.C.A. § 62-39-103, writing that Orr "has done what he can to preserve the issue for appeal."  CSOF ¶ 74.  On November 22, 2010, Sullivan noted in an email that he had reviewed Held's deposition and noted that "[t]he bigger issue, in my view, about Held, is the threshold question of whether he is allowed, under

- 10 -

Tennessee law to testify (absent his appraiser's license) which appears to be dictated by statute. If we can't get over this hurdle, his valuation testimony is inadmissible." CSOF ¶ 75.

Significantly, had anyone who participated in drafting the motion for new trial researched the appraisal statute issue of which they clearly were aware, they would have discovered a case that was squarely on point, which the Tennessee Court of Appeals issued just days before the trial commenced: *City of Pulaski v. Morris*, No. M2010-00047-COA-R3-CV, 2010 Tenn. App. LEXIS 591 (Tenn. Ct. App. Sept. 23, 2010). This case held that the appraisal statute at issue does not preclude an expert without an appraiser's license from offering a real property valuation opinion. *Id.* at *12-13. Unfortunately, however, no one even researched the statute in connection with the motion for new trial or learned of *City of Pulaski* until long after the trial court denied the motion for new trial. CSOF ¶¶ 99-101, 164-166.

The process of drafting the motion for new trial ended up being a rush job; the lawyers did not begin work in earnest until mid-December 2010 and scrambled to produce a brief that was almost entirely drafted by a first-year lawyer. CSOF ¶ 76. The first time entries related to the critically important motion for new trial are not found until mid-December despite the fact that the motion was due on January 3, 2011. CSOF ¶ 77. On December 17, 2010, a call between Lewis King and Weinberg Wheeler occurred regarding the motion for new trial. CSOF ¶ 78. It was on this call that Weinberg Wheeler contends that it told Lewis King of Weinberg Wheeler's "decision" not to include the exclusion of Held's valuation opinions from the motion for new trial. CSOF ¶ 79. Not only are there are conflicting reports as to who from each firm was on the call, but Lewis King denies Weinberg Wheeler ever informed Lewis King of such a decision. CSOF ¶¶ 196-201. Further, Mowles testified that she never would have agreed to such a decision. CSOF ¶ 204.

- 11 -

December 21, 2010 is the first time there is written communication about the actual arguments that would be made in the motion for new trial.[6] On that date, Wood—a first-year associate who had only been admitted to the bar the previous month—sent an "outline of our arguments for new trial" to Witzigreuter that "will be a start from which we can work when you return." CSOF ¶ 82.

On Thursday December 30, 2010 at 4:28 p.m., Witzigreuter forwarded Wood's draft brief to Stevens, Mowles, Orr, Sullivan and Wood, noting the draft was "very rough" and he had not reviewed it but was sending it along "for everyone to put in their input." CSOF ¶ 83.

Mowles sent comments at 10:19 p.m. the day before the motion for new trial was due. CSOF ¶ 84. At 10:31 p.m. that Sunday night, Witzigreuter responded to Mowles, copying Orr, Stevens, Sullivan, Olivas and Wood, that he "made some major changes over the weekend" and that they would "incorporate your redline changes into the new brief where possible." CSOF ¶ 85. At 11:07 p.m. on January 2, 2011, Mowles emailed the motion for new trial that she drafted to accompany the brief in support of the motion for new trial. CSOF ¶ 86. Mowles drafted the motion because none of the Weinberg Wheeler attorneys were even aware that a motion, in addition to the supporting memorandum of points and authorities, needed to be filed. CSOF ¶ 87. In response to Mowles' request to see the latest brief "that has the major changes so I know where we are going on this[,]" Wood emailed Mowles a draft at 11:56 p.m. that night. CSOF ¶ 88.

---

[6] Sullivan, who apparently became concerned about the January 3 deadline, asked for an extension of time from plaintiffs' counsel, which was granted. CSOF ¶ 80. Mowles informed Sullivan at 6:04 p.m. on December 29, 2010 (Wednesday) that the extension was not possible and that the drop dead date was January 3 (the following Monday). Id. Mowles asked that she be copied on any emails "regarding the appellate issues in this matter." CSOF ¶ 81.

On the due date, January 3, 2011, Wood thanked Mowles for "explaining" and added "I am learning much from this appellate practice." CSOF ¶ 89. Wood then emailed the final drafts of the motion and brief at 12:34 p.m. on January 3, 2011 that Orr was supposed to sign and file. CSOF ¶ 90. Mowles then emailed Owens (insurance company representative): "We have been working with Terry Sullivan's office in preparing the motion for new trial, for jnov and/or remittitur and supporting brief" and the motion and brief are with Orr "who is to review, sign and file it today." CSOF ¶ 91. Orr signed and filed the motion for new trial. CSOF ¶ 92.

Based on the billing records, Sullivan, the most senior lawyer for Weinberg Wheeler, only first reviewed the motion for new trial ***on the morning that it was due***. CSOF ¶ 93. Even Orr, who signed the motion, did not provide his thoughts on the motion until long after it had been filed and indicated that he failed to participate in the briefing even though he was sent several drafts of the motion. CSOF ¶ 94. Neither Stevens nor Olivas, the Lewis King lawyers who attended the trial for the purpose of preserving appellate issues assisted on the motion for new trial. CSOF ¶ 95. Stevens testified she relied entirely on Weinberg Wheeler to prepare the motion for new trial and relied on Mowles to represent BFI and Allied after the trial. CSOF ¶ 96. Stevens testified that she had nothing to do at all with the case after the verdict:

> I didn't review much of anything after the trial had occurred. I was asked to monitor. The understanding was that Linda was always going to handle the appellate work and the post-trial work. In between, there was another change, and that involved the Weinberg Wheeler firm becoming involved. So, I still, my knowledge at – probably into late October would have been limited to what I heard at trial, because I never saw any transcripts or depositions after the trial was over.

CSOF ¶ 97. The motion for new trial did not properly raise the Held issue. *Metro Gov't*, 2012 Tenn. App. LEXIS 189.

- 13 -

### E.    Lewis King handles the appeal

The trial court's exclusion of Held was a major issue on appeal.  On March 31, 2011, Lewis King filed its statement of issues with the court of appeals, identifying the Held issue: "The trial court erred in its exclusion of Defendants' expert witness on the basis that he was not a licensed appraiser in the State of Tennessee."  CSOF ¶ 98.

On April 14, 2011, Mowles tasked Olivas with reviewing the transcripts on the Held exclusion and researching the appraiser statute legislative history.  CSOF ¶ 99.  On April 30, 2011, Olivas emailed Mowles that she should read *City of Pulaski*.  CSOF ¶ 100.  Olivas testified there was a "surprise surprise" moment when he found *City of Pulaski*.  CSOF ¶ 101.  He "discovered" the case, realized that Judge Binkley was "wrong" and that the trial court had been "forced into" an incorrect ruling.  *Id.*

Mowles also understood that *City of Pulaski* was a critical case—it had direct bearing on the Held exclusion issue.  CSOF ¶ 102.  Mowles was surprised the case was not brought to Judge Binkley's attention in the motion for new trial.  CSOF ¶ 103.  "It [*City of Pulaski*] was there to be found."  CSOF ¶104.  Mowles testified that *City of Pulaski* was controlling and she was surprised that it was not in the motion for new trial:

> Q     You found, later in the spring, or Mr. Olivas, I believe, testified, the City of Pulaski case?
>
> A     After I got back to the office in the beginning of the year and it became clear that we were going to be involved in working on this, I asked him to look at the appellate history on the statute, the license statute, appraiser license statute, and update the research on it.
>
> Q     And was that to make sure that you had the most up-to-date case law to cite in the appellate court?
>
> A     Well, actually I wanted -- what I wanted was the legislative history.  And I think that's what I requested him to get me, was the legislative history on the statute, because I wanted to see if we

could make an argument that the legislative history didn't support the construction that Judge Binkley used or applied. And when he got into it, right away he found the City of Pulaski and said, well, not only do we not have to look at the legislative history, but here's this decision that happened to come out after Judge Binkley ruled and two days or three days before the trial began. So, it is the authoritative decision that would be applicable to this issue in this case.

Q       So, your reading of the City of Pulaski case was it was controlling on the issue of Mr. Held's exclusion?

A       Yes.

Q       And you certainly didn't read it and say, oh, this is just totally irrelevant, it's not even worth messing with.

A       Right.

Q       And if Mr. Wood testified something to that effect yesterday, that, yeah, you know, we read it later, but it just has no bearing on the issue, it doesn't sound like you would agree with that?

A       I would not agree with that.

Q       Did the legislative history lend any support one way or the other?

A       We didn't really even get to the legislative history, because the language in Pulaski dealt with it.

Q       And it sounds like Pulaski was a condemnation case, but it sounds like you didn't consider that to be the controlling distinction, what type of case it was?

A       No.

Q       It was the Court's language that the broker could testify and didn't have to be a licensed appraiser?

A       Right.

Q       Did you realize when that case was found, that it hadn't been cited in the motion for new trial?

A       Yes.

- 15 -

Q       And were you surprised that that case, having come out several months after, at least a couple of months after the trial, was not brought to Judge Binkley's attention?

A       Yes. Umm, yes.

CSOF ¶ 105.

Mowles realized how central *City of Pulaski* was to the appeal and took the unusual step of filing a special motion with the Court of Appeals on June 7, 2011 to stay further proceedings and to remand the case to the trial court in light of newly discovered precedent. CSOF ¶ 106. Mowles asked the Court of Appeals to remand the case because "[i]f Judge Binkley had had the benefit of the decision in *City of Pulaski* when he was deciding Metro's motion to exclude Mr. Held's testimony, it is BFI's sincere belief that his ruling would have been to allow Mr. Held to testify." CSOF ¶ 107. The court of appeals denied the motion without explanation. *Metro. Gov't*, 2012 Tenn. App. LEXIS 189 at *6.

Lewis King's opening appellate brief for Plaintiffs specifically raised the issue of Held's exclusion as a point of harmful error. CSOF ¶ 108. Before ever receiving the responsive appellate brief from Metro, however, Mowles suspected that waiver had occurred:

Q.       Counsel just asked you about this research on waiver that occurred before the response brief came in. Do I understand you correctly that you were just anticipating that that might be raised?

A.       It would appear so, by the time entries. It also appears, by that time entry, that there was attempt at a mediation to be scheduled. And most likely, this was research, again, trying to consider what value the case had, if there was waiver, and how affect that -- what affect that  would have on the value in the mediation.

Q.       Why -- why were you thinking that a waiver issue would be made, when you hadn't even seen the respondent's brief?

A.       If I were the other side, that's what I would say. I said that before.

- 16 -

> Q. I thought you said before, in the context of, that's what you would say. I didn't realize it was before you even saw them make the argument. So just looking at your brief and the motion for new trial, if you were an appellate lawyer on the other side, you would argue waiver?
>
> A. (Witness moves head up and down.)
>
> Q. Yes?
>
> A. Correct.

CSOF ¶ 108.

### F. The Court of Appeals' decision

On March 22, 2012, the Court of Appeals issued its decision, affirming the trial court and holding that a number of key issues had been waived. *See Metro. Gov't,* 2012 Tenn. App. LEXIS 189. The court held that the issue of Held's valuation testimony was waived due to the failure to include it in the motion for new trial. *Id*. at *16-17. The court further held that waiver occurred with respect to the exclusion of evidence related to the facility's pre-fire condition and the exclusion of demolition cost testimony (*i.e.*, Harvey Gershman) because the motion for new trial failed to challenge the exclusion of evidence regarding the facility's current condition and demolition costs. *Id*. at *18-24. The court also held that because there was no evidence admitted at trial regarding diminution in value, it was appropriate for the trial court to instruct the jury to find only repair cost damages. *Id*. at *21-22. The court noted Lewis King's argument on appeal that "Defendants contend that such exclusions allowed the jury to hear only a 'truncated version of the evidence' and that the exclusions 'form the basis of a virtual directed verdict for the Plaintiffs.'" *Id*. at *9. Finally, with respect to the adverse inference instruction, the court held that BFI and Allied had waived the right to challenge the instruction's language by failing to object to such language at trial. *Id*. at *30.

- 17 -

### G. Events after the Court of Appeals' decision

Shortly after the Court of Appeals' ruling, Weinberg Wheeler's Sullivan flew to Arizona to meet personally with David Spruance (Casey's supervisor) and Casey. CSOF ¶ 109. At this meeting, Sullivan told Casey: "He wanted to apologize to myself and Dave [Spruance] for the errors that were made in the brief – in the briefing. He then suggested that we file malpractice actions against everyone." CSOF ¶ 110. Indeed, only as a result of that conversation with Sullivan did Spruance understand that the Court of Appeals' holding of waiver meant that negligence had occurred. CSOF ¶ 111.

Thereafter, Lewis King filed an application for permission to appeal to the Tennessee Supreme Court. CSOF ¶112. The insurance adjuster did not wait for the Supreme Court to rule on the application, instead settling for $8 million in July 2012. CSOF ¶ 113.

The factual recitation above is not exhaustive and additional material facts are presented below in the context of the argument to avoid repetition.

### II. ARGUMENT

### A. Defendants' statute of limitations argument fails.

The only statute of limitations analysis before the Court is whether Plaintiffs' March 20, 2013 complaint against Lewis King was filed before the one-year statute of limitations for a legal malpractice action expired.[7] Levine Orr Brief at 3; Lewis King Brief at 10; Weinberg Wheeler Brief at 16-17.

---

[7] Lewis King's answer named several non-parties at fault, allowing Plaintiffs under T.C.A. § 20-1-119, which permits non-parties at fault to be named in a lawsuit notwithstanding the statute of limitations, to file an amended complaint bringing in the additional Defendants. *See Becker v. Ford Motor Co.*, 431 S.W.3d 588, 594 (Tenn. 2014) (holding that a plaintiff may rely on T.C.A. § 20-1-119 to add a previously known non-party tortfeasor after the running of the statute of limitations even if a plaintiff knew of the tortfeasor when the complaint was filed).

The statute of limitations for legal malpractice is one year from the time the cause of action accrues. T.C.A. § 28-3-104(c). The discovery rule governs when the cause of action accrues. *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1965). "In legal malpractice cases, the discovery rule is composed of two distinct elements: (1) the plaintiff must suffer legally cognizable damage—an actual injury—as a result of the defendant's wrongful or negligent conduct, and (2) the plaintiff must have known or in the exercise of reasonable diligence should have known that this injury was caused by the defendant's wrongful or negligent conduct." *John Kohl & Co. P.C. v. Dearborn & Ewing*, 977 S.W.2d 528, 532 (Tenn. 1998).

Defendants' statute of limitations argument, if accepted, would result in a negligent attorney retaining sole control over when the statute of limitations commences. For example, Defendants argue that their own billing records (which Plaintiffs never received or reviewed) reflecting time spent researching waiver constitutes injury. If accepted, this means that any attorney can undertake research of his own negligence to establish an injury, burying it in his daily time entries. With respect to knowledge, Defendants argue that because Weinberg Wheeler was aware of Lewis King's negligence and because Lewis King was aware of Weinberg Wheeler's negligence, that knowledge of one another's negligence should be imputed to Plaintiffs, even though neither firm notified Plaintiffs of the other firm's negligence until Sullivan flew to Arizona after the Court of Appeals' ruling to recommend to Plaintiffs that malpractice actions be filed against Defendants.

As explained in more detail below, neither the injury nor knowledge element was satisfied until the Court of Appeals' ruling on March 22, 2012. Plaintiffs' action was timely filed on March 20, 2013, and Defendants' statute of limitations argument fails.

1. **Plaintiffs were not injured until the Court of Appeals' ruling on March 22, 2012.**

An "injury" occurs when the plaintiff suffers "the loss of a legal right, remedy or interest, or the imposition of a liability" or is "forced to take some action or otherwise suffer some actual inconvenience, such as incurring an expense, as a result of the defendant's negligent or wrongful act." *Id.* (citations and internal quotations omitted). The injury requirement is not satisfied if injury is contingent upon the actions of some third party or amounts to a "mere possibility." *Id.* at 532 (citation omitted).

Here, any "loss of a legal right" arising from Defendants' omission was but a "mere possibility" until March 22, 2012 when the Court of Appeals rendered its opinion holding that Plaintiffs had indeed waived various issues.

a. **Defendants' failure to include Held's exclusion in the motion for new trial did not injure Plaintiffs until the Court of Appeals held that such omission precluded Plaintiffs' right to appeal that issue.**

Lewis King and Weinberg Wheeler argue that the injury requirement was satisfied on January 3, 2011, when Lewis King filed the motion for new trial (failing to raise the issue of Held's exclusion). *See* Lewis King Memo at 14; Weinberg Wheeler Memo at 18-19. They argue that it was then that waiver operated to deprive Plaintiffs of their right to appeal the issue. *See id.* Weinberg Wheeler also argues that Plaintiffs were injured "when Lewis King prepared a principal [appellate] brief that relied on an allegedly waived argument." Weinberg Wheeler Memo at 19.

However, "[i]n litigation, the most easily identifiable time when rights, interests, and liabilities become fixed is when a court enters judgment." *Cherry v. Williams*, 36 S.W.3d, 78, 84 (Tenn. Ct. App. 2000) ("A judgment, after all, is 'an adjudication of the rights of the parties in respect to the claim[s] involved.'"). Although injury may occur before judgment in limited

- 20 -

circumstances, a final judgment affirmatively "decrees the loss of a right or remedy or imposes a legal liability." *See id.* at 85.[8]  Here, there was no injury until March 22, 2012, when the Court of Appeals decreed the loss of Plaintiffs' right to appeal the issue of Held's exclusion.

In *Rich v. Warlick*, an attorney representing a doctor subject to a disciplinary proceeding before the Tennessee Board of Medical Examiners failed to disclose his proposed witnesses despite the judge's order that he do so by a certain date.  *See* No. M2013-01150-COA-R3CV, 2014 WL 1512821, at *7 (Tenn. Ct. App. Apr. 15, 2014).  The court specifically noted that the doctor had not at that point lost any rights—"[a]t that point, his ability to utilize expert testimony was only ***potentially*** threatened by [his attorney's] failure to disclose his witnesses." *Id.* (emphasis added).  The court reasoned that it was not until the judge entered an order prohibiting the doctor from calling any witnesses that the doctor was deprived of any legal rights—"[t]hus, that order satisfied the injury component of a claim for legal malpractice." *Id.* at *8; *see also Davidson v. Baydoun*, No. M200802746COAR3CV, 2009 WL 2365563, *7 (Tenn. Ct. App. July 31, 2009) (although attorney's negligence occurred during trial and judge rendered an oral bench ruling, client's injuries "were not incurred during the trial, but, rather . . . when the trial court entered the Final Order that decreed the loss of [the client's] right to recover" from the defendant in the underlying lawsuit).

As in *Rich*, Defendants' failure to raise the issue of Held's exclusion in the motion for new trial only ***threatened*** Plaintiffs' ability to raise that issue on appeal.  It was not until the

---

[8] Although *Cherry* held that the plaintiff could not wait until the appellate court affirmed the judgment, such a holding was appropriate because the negligence occurred in connection with the trial of the case.  The plaintiff alleged that the attorney failed to apprise the plaintiff of the extent of the potential damages that could be imposed against him through the trial.  *See Cherry*, 36 S.W.3d at 82.  Here, the situation is different in that the negligence at issue with the statute of limitations argument did not occur during the trial but rather occurred in post-trial motion practice, the effect of which was unknown until the Court of Appeals' ruling in March 2012.

Court of Appeals held that Plaintiffs indeed waived that issue that Plaintiffs were injured by Defendants' omission.

Lewis King and Weinberg Wheeler cite the Tennessee Court of Appeals' decision in *Smith v. Petkoff* for the proposition that Plaintiffs were injured when the motion for new trial was filed. *See* Lewis King Memo at 13-14; Weinberg Wheeler Memo at 19. In *Smith*, the court merely held that a client whose attorney misses the statute of limitations on his claim is injured as of the time the statute of limitations period expired, because the client's claim "could ***never*** be brought into a suit and [the client] could ***never*** recover . . . damages . . . ." *Smith v. Petkoff*, 919 S.W.2d 595, 597 (Tenn. Ct. App. 1995) (emphasis added).

Waiver, however, is a distinct legal concept. If an appellant fails to raise an issue in the trial court, the standard is permissive in that the Court of Appeals ***may*** decline to consider it on appeal. *See* Tenn. R. App. Proc. 3, Advisory Comm'n Comment to Subdivision (e) ("Failure to present an issue to the trial court . . . will ***typically*** not merit appellate relief.") (emphasis added). "[W]hen an appellate court reviews a motion for a new trial under Rule 3(e), it should view the motion in the light most favorable to the appellant," resolving doubts in favor of preserving the issue rather than holding that the issue is waived. *Fahey v. Eldridge*, 46 S.W.3d 138, 143 (Tenn. 2001). Courts are advised against the sort of "strict or technical operation of Rule 3(e)" that would result in absolute waiver akin to that absolute injury suffered when a claim is definitively lost at the moment the statute of limitations expires. *See id.* at 143-44. "Any other method of review would result in needlessly favoring technicality in form over substance, a practice specifically discouraged by the comments to [Appellate] Rule 1." *Id.* at 143 (internal quotations omitted) ("[C]ourts may not deem a motion for a new trial insufficient to preserve errors for appeal merely because it fails to enumerate specific issues.").

Perhaps for this reason, Mowles testified that it was not until the Court of Appeals rendered its opinion on March 22, 2012 that the impact of the Held issue's omission from the motion for new trial was actually known. CSOF ¶ 114. Indeed, Plaintiffs' standard of care expert will testify that waiver is complex, and the standard by which issues need to be stated in motions for new trial to preserve them for appeal and the nuanced concept of waiver are legal topics that only experienced attorneys comprehend. CSOF ¶ 115, *citing* Exhibit 5, Smith Declaration, ¶¶ 1-2. The various attorneys involved here apparently were not even clear about how to properly preserve the appellate issues.

Significantly, in finding injury upon expiration of the applicable limitations period, the Court of Appeals has taken care to distinguish its holding from those situations where, as here, the issue addressed in the court's final order or judgment was "less clear" or more "open to reasonable legal debate" than the simple issue of whether the client's underlying lawsuit was time-barred. *See Porter-Metler v. Edwards*, No. 03A01-9709-CV-00393, 1998 WL 131515, at *2 (Tenn. Ct. App. Mar. 25, 1998) ("But in this case, where service of process was not timely reissued, it was ***patently clear*** that plaintiff's claim . . . had become time-barred and there was ***nothing that could have been done*** to revive her action.") (emphasis added).

Given the rules favoring preservation (rather than waiver) of issues on appeal, it cannot be said that the motion for new trial or the raising of the waiver issue in Metro's appellate brief was injury sufficient to satisfy Tennessee's discovery rule. When that motion was filed in January 2011 and when Metro's appellate brief argued waiver, injury resulting from the motion's failure to raise the Held issue remained contingent on whether the Court of Appeals would agree with Metro's argument that such issue was waived. *See Kohl*, 977 S.W.2d at 532 (injury

- 23 -

requirement is not yet satisfied if injury is contingent upon the actions of some third party or amounts to a "mere possibility.") (citation omitted).

        **b.**    **Lewis King's work to remedy its own negligence in waiving the issue of Held's exclusion cannot operate to its benefit.**

Defendants argue that the injury requirement was satisfied when Plaintiffs incurred legal fees due to Lewis King researching and responding to Metro's waiver argument in its appellee brief. *See* Lewis King Memo at 14-16; Weinberg Wheeler Memo at 18-19; Levine Orr Memo at 4. Defendants rely specifically on the fact that Mowles conducted research regarding waiver at the end of August 2011 to establish injury to Plaintiffs. Contrary to Weinberg Wheeler's statement of facts, Mowles' research was not performed ***after*** receiving Metro's response appellate brief but was, in fact, performed ***before*** that brief was even filed when Mowles "anticipated" that Metro would raise the argument. CSOF ¶ 116. In other words, Defendants are arguing that Plaintiffs' malpractice claim against them should be barred because Lewis King charged Plaintiffs for work that Lewis King conducted to assess its own potential malpractice.

It defies reason to permit an attorney to hasten the expiration of the statute of limitations by satisfying the discovery rule's "injury" requirement through billing her client for her efforts to assess or remedy her own firm's negligence. Under Tennessee law, however, when a client is "injured" for purposes of the discovery rule by fees or expenses incurred as a result of its attorney's malpractice, such fees or expenses only constitute an "injury" when the work is by an attorney or professional ***other than the attorney whose negligence necessitated the fees or expenses.***

For example, in *Kohl*, the court held that the clients had suffered an injury when their accountant had to respond to an IRS inquiry as a result of their former attorney's conduct. *See* 977 S.W.2d at 533. In *Rich*, the client was injured when he "incurred additional expenses by his

- 24 -

decision to hire **another** attorney" because of his previous attorney's conduct. *See* 2014 WL 1512821 at *8 (emphasis added). In *Memphis Aero Corp. v. Swain*, the client was injured when it had to pay **another** attorney to represent it after it was sued as a result of its previous attorney's negligence. 732 S.W.2d 608, 612 (Tenn. Ct. App. 1986). In *Chambers v. Dillow*, the client suffered injury when, having hired **another** attorney to write to his former attorney regarding the former attorney's negligence, he was then "faced with the necessity to incur additional attorneys' fees" as a result of the former attorney's negligence. *See* 713 S.W.2d 896, 897, 898-99 (Tenn. 1986); *see also Bradson Mercantile, Inc. v. Crabtree*, 1 S.W.3d 648, 658 (Tenn. Ct. App. 1999) (client injured when it hired a different attorney).

*Cardiac Anesthesia Services, PLLC v. Jones*, which Lewis King and Weinberg Wheeler rely on, is consistent with this principle. There, the expenses that sufficed to "injure" the client took the form of attorneys' fees paid to **another** attorney to defend the legality of a contract drafted by the negligent attorney. *See Cardiac Anesthesia Services, PLLC v. Jones*, 385 S.W.3d 530, 534, 543 (Tenn. Ct. App. 2012).[9]

*Honeycutt v. Wilkes, McCullough & Wagner* (relied on by Lewis King) likewise supports Plaintiffs because the attorneys' fees that sufficed as the "injury" in that case were incurred by a **different** attorney than the attorney who had committed the malpractice.[10] Although the court noted that the client "began to incur additional fees when [her former husband] filed the petition," at which point she was still represented by the negligent attorney, the negligent

---

[9] The court also based its injury determination on expenses paid to an expert witness who was hired to defend the legality of the contract. *See id.* at 543.

[10] Although the opinion does not make this distinction clear, the summary judgment briefing filed in *Honeycutt* confirms that the fees were incurred by the subsequent attorney who was hired to remedy the first attorney's malpractice. The summary judgment briefing available on Westlaw is attached in the appendix for the Court's convenience.

9675762

attorney never actually responded to the petition, and the client had to hire **another** attorney to defend the petition. *See* No. W2007-00185-COA-R3CV, 2007 WL 2200285, *1-2, *7 (Tenn. Ct. App. Aug. 2, 2007).

None of the above cases stand for the proposition advanced by Defendants here—that an attorney who has committed malpractice may quickly create an injury to her client so as to start the running of the statute of limitations by simply deciding to bill her client for researching issues related to an eventual basis for a malpractice claim.[11]

> **2. Plaintiffs did not have requisite knowledge until the Court of Appeals' ruling on March 22, 2012.**

Regardless of when Plaintiffs suffered injury resulting from waiver, Plaintiffs' suit also is timely because they neither knew nor reasonably should have known that injury was caused by Defendants' conduct before March 22, 2012. *See Kohl*, 977 S.W.2d at 532.

"Tennessee courts have recognized and held that *questions involving whether a person's behavior conforms to a standard of reasonable and diligent conduct, such as the second part of the [legal] malpractice discovery rule test, are questions of fact for a jury*, unless the facts and the inferences drawn therefrom are so clear that reasonable persons could not disagree on the answer." *Porter-Metler*, 1998 WL 131515 at *3 (citations omitted and emphasis added). Here, numerous questions of fact exist and summary judgment on the statute of limitations is completely inappropriate.

---

[11] These cases are manifestations of the principle that under Rule 1.5 of the Tennessee Rules of Professional Conduct, an attorney cannot ethically bill her client to remedy the attorney's own negligence but must instead consider "the results obtained" in billing. *See* Sec. II(a)(2)(a), *infra*. To permit an attorney to hasten the expiration of the statute of limitations (causing "injury") by billing her client for work which she cannot ethically bill violates the principle underlying Rule 1.5.

### a. Plaintiffs did not detect, and could not reasonably have detected, evidence of Lewis King's negligence in Lewis King's bills.

Weinberg Wheeler argues that Plaintiffs knew or should have known they were injured when Lewis King billed Plaintiffs for Mowles' time researching waiver. *See* Weinberg Wheeler Memo at 21.

Unless Defendants are taking the position that they are entitled to bill clients for their own negligently performed services, which is a position that cannot be reconciled with an attorney's ethical duty to consider "the results obtained" in charging a client,[12] the fact that Plaintiffs were charged for research on the waiver issue was not "notice" to Plaintiffs of negligence by those attorneys. On the contrary, in accordance with Rule 1.5 of the Rules of Professional Conduct, it was a representation to Plaintiffs that work was being performed for which Plaintiffs could be billed in light of Defendants' ethical obligation to take the results obtained into account when charging a fee. Lewis King's billing for this research had the effect of camouflaging the negligence. Plaintiffs cannot be charged with knowledge of negligence for services for which they were billed and for which they paid believing that they were proper in light of the "results obtained." Because Rule 1.5 prohibited Lewis King from ethically billing to remedy its own negligence, Lewis King's bill for researching waiver cannot be interpreted to put Plaintiffs on notice of negligence.

Separately, Plaintiffs did not receive or review legal bills. CSOF ¶ 117. Defendants did not send their bills to Plaintiffs but rather sent them to AIG, Plaintiffs' insurer and claims adjuster. CSOF ¶ 118.

---

[12] Rule 1.5(a)(4), Tennessee Rules of Professional Conduct (Rule 8, RPC 1.5 of the Rules of the Tennessee Supreme Court).

9675762

Reading time entries for which AIG had paid an attorney representing Plaintiffs somewhere in the country was simply not part of this framework—to the extent Plaintiffs had access to the details of AIG's payments on their behalf, such access was limited to verifying the *fact* that payment had been made by AIG, rather than the details of what individual attorneys all over the country were indicating in their time entries sent to AIG. CSOF ¶ 119. At her deposition, Casey described in detail an AIG payment history spreadsheet of the sort used by Plaintiffs to track what AIG had paid on Plaintiffs' behalf. CSOF ¶ 120. Not even the "transaction description" column on these spreadsheets provided any detail of the sort that would indicate what attorneys worked on during their billable time. CSOF ¶ 121. AIG's own invoices to Plaintiffs indicated payments made by AIG to vendors ("losses") without indicating the particular dates on which vendors' work was actually performed (*e.g.,* without indicating when Lewis King may have performed a specific task) and without any description of the particular work performed. CSOF ¶ 122.[13] Casey did not review those invoices and in fact has never even seen one—she does not know if she even had access to them. CSOF ¶ 123.

Of course, this is through no fault of Plaintiffs—any other method would result in Plaintiffs' employees being overrun with the task of reviewing each and every bill or invoice sent by attorneys and other service providers paid by AIG on Plaintiffs' behalf. CSOF ¶ 128. Plaintiffs, like insurance customers all over the world, entrust their insurer with such minutiae.

---

[13] Critically, the very exhibit used by Weinberg Wheeler to argue that Plaintiffs processed Lewis King's bill for research evidences that Plaintiffs were reimbursing Allied for amounts paid to Defendants, but that there is *no way* to identify what legal services Defendants performed. CSOF ¶ 124. There is no description of the tasks being performed. CSOF ¶ 125. For example, even in the "Transaction Description" column, most entries simply indicate "Partial Payment on a Open Reserve." CSOF ¶ 126. Other columns indicate "Payment Type" (for payments to law firms, "Legal") and a "Minor Code Desc[ription]" which provides no additional insight (simply providing such descriptions as "Panel Counsel (on approved list)," "Court Reporters," or "Bottomline Fees."). CSOF ¶ 127.

CSOF ¶ 129. Casey testified that Plaintiffs "rely on AIG to do that as part of their service to our company." *Id.* Neither Spruance nor Casey would be able to review those matters personally without it consuming literally their entire workweek. CSOF ¶ 130.

Even if Plaintiffs had reviewed the bills, they would not have known that malpractice occurred based on two time entries buried amid several months of time because Lewis King apparently only billed AIG every few months based on all of the time aggregated in the statement. CSOF ¶ 131. In fact, the statement containing the two time entries contains all time entries from mid-April through the end of August, 201—containing nearly 200 time entries. CSOF ¶ 132. The two time entries, in particular, that are alleged to have caused the "injury" simply stated: "Research regarding waiver and precedent to respond to anticipated position of plaintiff in brief and at possible mediation" and "[c]ase law analysis and review regarding waiver and anticipated arguments and rebuttal for reply brief to court of appeal[.]" CSOF ¶ 133. In addition to the fact that these two entries were among nearly 200 entries, the text of the time entries is insufficient to put a reasonable person on notice of malpractice such that the reader would realize that legal negligence had occurred.

In short, there is no way Plaintiffs could reasonably be expected to have seen Lewis King's bill for Mowles' waiver research or understand its significance. At a minimum, there is a material factual dispute as to the reasonableness of their actions in not doing so.

> **b.  Plaintiffs did not read, and could not reasonably have read, Metro's appellate brief arguing waiver.**

Defendants argue that Plaintiffs knew or should have known they were injured as a result of Defendants' omission on September 23, 2011, when Plaintiffs received a copy of the appellee and reply briefs. *See* Lewis King Memo at 16-18; Weinberg Wheeler Memo at 20-21; Levine Orr Memo at 4. Significantly, Mowles simply forwarded the briefing to Casey without any

discussion of the substance therein.  CSOF ¶ 134.  Mowles did not in any way flag the waiver

issue in her cover email when forwarding the briefs.  CSOF ¶ 135.  Further, Mowles forwarded

all briefing at the same time after realizing that no one had sent the briefing to Plaintiffs.  CSOF

¶ 136.  Thus, Casey received approximately two hundred pages of briefing all at once.   The

evidence here compels the conclusion that Plaintiffs acted reasonably in not reading those briefs.

At a minimum, this issue cannot be resolved on summary judgment.  *See Nat'l Mortgage*

*Co. v. Washington*, 744 S.W.2d 574, 580 (Tenn. Ct. App. 1987) ("Whether the plaintiff's

employee should have known the legal effect of the order calls for a determination of the

reasonableness of the employee's conduct. Whether any kind of behavior conforms to a legal

standard of reasonable conduct is a mere fact question for the jury . . . .").  This is particularly

true where counsel has made affirmative representations regarding the case posture on appeal.

For example, in *Porter-Metler*, the client hired the attorney to file a lawsuit to obtain damages

due to a car accident.  1998 WL 131515 at *1.  After the attorney sent the client a copy of a

motion to dismiss for lack of service, the client called the attorney to inquire about the motion.

The client testified that the attorney reassured her that "'it's not a big deal' and that '[h]e

expressed this is not unusual, that we've been there before, I didn't have to be there [for the oral

argument on the motion to dismiss].'"  *Id*. at *3.  When the lawsuit was dismissed for a failure to

serve the complaint and summons, the client sued the attorney for malpractice.  *Id*. at *1.  In

reversing the trial court's grant of summary judgment in favor of the attorney on the statute of

limitations, the Court of Appeals noted:

> [W]e cannot say, as a matter of law, that the plaintiff should have
> discovered she had suffered an injury due to the defendant's
> negligence . . . In this regard, it is particularly important that,
> according to plaintiff's testimony, she called the defendant to find
> out what was happening, and received assurances that everything
> was all right and she did not have to show up at the motion

- 30 -

hearing.  **To dismiss this action on summary judgment would be tantamount to holding that a lay person, exercising due diligence, should have immediately mistrusted her attorney and began an independent investigation of his actions, despite his assurance that all was well with her case.**

*Id*. at *4 (emphasis added).

The same is true here.  After receiving the appellate briefing from Mowles, Casey reached out to Sullivan, asking for an update and inquiring as to Weinberg Wheeler's participation in the appeal, writing:

> I received the attached [briefs] from Linda Mowles.  Did your firm review all of the briefs?  Who is going to do the oral arguments?  Have you heard anything more from Chartis on what how they plan to proceed. Finally, can you please give me an update on what dates are upcoming and what we should expect going forward[?]

CSOF ¶ 137.  Sullivan responded by reassuring Casey that Weinberg Wheeler had reviewed the briefs, stating that he believed "we will be in better shape after the arguments, which should lay waste to Mr. Warren's puffery about their appellate position being a 'lock.'  Only a fool would make such a ststement [sic] . . . ."  CSOF ¶ 138.  Thereafter, Sullivan had a conference call with Casey and Spruance.  Significantly, at no point did Sullivan tell Plaintiffs about the possibility of waiver.  CSOF ¶ 154.  Even after oral argument, Sullivan continued to espouse confidence in Plaintiffs' appellate position—he emailed Spruance and Casey on February 10, 2012 stating, "I would expect an appellate opinion within 30 days.  Here's the latest – Chartis offered 2.5 million and plaintiffs' responded with a full judgment demand including interest.  They offered to waive pre-judgment interest!!  Confidence is good, arrogance isn't."  CSOF ¶ 140.

In short, just as in *Porter-Metler*, there is a question of fact regarding Plaintiffs' reasonable reliance on Sullivan's statements.  *See also Wilson v. Mathes*, 15 S.W.3d 865, 872 (Tenn. Ct. App. 1999) (affirming denial of summary judgment on the statute of limitations in a legal malpractice action where the attorney's "actions and assertions" to the client "could cause

'reasonable persons' to disagree as to whether [the client] knew or should have known that he suffered an injury due to [the attorney's] negligence . . . .").

Defendants rely on *Wilkins v. Dodson, Parker, Shipley, Behm & Seaborg*, 995 S.W.2d 575, 583 (Tenn. Ct. App. 1998). *Wilkins* did not hold that it is *per se* unreasonable for a client not to read filings made by its attorneys on its behalf, but rather concluded that the plaintiff-client knew or should have known of the malpractice based on the evidence in that particular case. *See id.* at 581-85. In *Wilkins*, the court dedicated several pages of its opinion to recounting the client's "revealing . . . knowledge concerning the importance of the statute of limitations," which was the crux of the malpractice he was alleging. *See id.* at 581-83. The client "testified that he knew what a statute of limitations was and how it operated . . . He further testified that he received a copy of the . . . answer which raised as an affirmative defense that the underlying lawsuit was barred by the statute of limitations, and he was in attendance" at a deposition that used the answer as an exhibit. *Id.* at 583. He knew "what a statute of limitations was" because he had talked to his attorney about it. *Id.* at 582. He "understood that one possible effect of the successful statute of limitations defense was that you could lose your claim . . . ." *Id.* at 583. Basically, he agreed that had he read the answer, he would have understood the significance of the statute of limitations defense. *Id.* The facts in this case are wholly dissimilar.

Here, just as they did not personally review the bills for Defendants' services, Spruance and Casey could not feasibly review every appellate brief that was filed. CSOF ¶ 141. Each was responsible for overseeing a large number ongoing legal disputes and to require them to have read the pleadings, motions, and briefs in each and every lawsuit (or any particular lawsuit) is unreasonable. CSOF ¶ 142. Casey estimates that she normally oversaw roughly a hundred cases in 2010-11. CSOF ¶ 143. Unsurprisingly, Casey testified that it was not her practice to read

appellate briefs in the matters she oversaw. CSOF ¶ 144. Again, this is something for which AIG was hired. CSOF ¶ 145. Casey's job was to oversee AIG, and AIG's job was to manage the day-to-day work on the cases. CSOF ¶ 146.

Spruance testified that, even if he had read the brief, he would not have understood the significance of the waiver argument as it was raised in Metro's brief. CSOF ¶ 147. Although he attended law school, his rudimentary concept of the waiver doctrine was limited to its usage in the criminal context—he thought of it "more probably on the criminal side in waiving your rights under the Miranda principle . . . ." CSOF ¶ 148. His experience as a practicing lawyer, which was several jobs before he was hired to work for Plaintiffs, was limited to a few years' experience practicing "[a] fairly basic program of family law, some real estate, a little . . . corporate work, and some criminal defense" in Connecticut. CSOF ¶ 149. It is not surprising that his knowledge of the concept of waiver was focused "more probably on the criminal side" than in the civil appellate context in which waiver occurred in the Underlying Lawsuit. Even Mowles herself, with significant appellate experience, explained that when filing the motion for new trial she did not think there was even "potentially" a waiver issue as to Held, because she thought that issue was included (though not raised explicitly) in the issues the motion raised. CSOF ¶ 150.

Spruance testified that he would not have understood that he needed to take the issue up with Defendants. CSOF ¶ 152. He simply was unaware that the waiver issue "was something that [he] should be concerned about" until Sullivan met with him in Phoenix to explain the ramification of the Court of Appeals' decision. CSOF ¶ 153.

- 33 -

c. **Assuming *arguendo* that Plaintiffs had knowledge of the waiver argument in Metro's appellate brief, such knowledge does not mean that Plaintiffs knew they suffered an injury as a result of Defendants' negligence.**

Even if Plaintiffs ***had*** detected from the briefs that the Held issue had been omitted from the motion for new trial, the knowledge requirement would not be satisfied, because knowledge that an attorney "was negligent does not establish the requisite element that [the client] knew or should have known that he suffered an ***actual injury*** as a consequence of that negligence." *See Davidson*, 2009 WL 2365563 at *5 (noting that the dispositive issue is knowledge of actual ***injury*** rather than mere negligence) (emphasis added).

In *Kohl*, although the clients were "injured" when they had to hire their accountant to respond to an IRS letter due to the defendant-attorney's negligent advice, the clients did not have "knowledge" that the negligence caused the clients an actual injury until later. Specifically, the clients did not have the requisite knowledge until the date of a letter from the client's subsequent attorney to the negligent former attorney wherein there was an acknowledgement that the client understood the former attorney's advice was problematic. 977 S.W. 2d at 533-34.

In fact, Mowles herself—the very attorney who litigated the waiver issue on appeal—did not believe that the Court of Appeals would agree with Metro to hold that the Held issue had been waived. CSOF ¶ 151. It is therefore unreasonable to charge Plaintiffs, who relied on their attorneys' expertise, with the knowledge that they would be injured by the waiver, particularly here where Plaintiffs were wholly unaware of the waiver issue. *See Nat'l Mortgage Co.*, 744 S.W.2d at 580 ("If the lawyer . . . was unaware of the ramifications . . . is it reasonable to charge the layman relying on the attorney with such knowledge? We think not."); *see also Woods & Woods v. Lewis*, 902 S.W.2d 914, 917 (Tenn. Ct. App. 1994) ("The negligence . . . was governed by technical rules of law and procedure, and the ultimate disposition of the case did not occur

- 34 -

until after May 23, 1991. Cross-plaintiff-appellant was a layman without expertise . . . and was not subject to any startling development in the proceedings which would suggest negligence of his counsel . . . A jury might find that appellant knew or reasonably should have known that his defense was being neglected, but this Court is unable to hold that this is true as a matter of law.").

> **d.** **As a matter of law, Lewis King's and Weinberg Wheeler's knowledge of their own malpractice cannot be imputed to Plaintiffs.**

Neither Spruance nor Casey was informed by any of the Defendants prior to March 22, 2012 that the Held issue had been waived and that there was a risk that the issue could not be raised on appeal. CSOF ¶ 154

Nonetheless, Weinberg Wheeler and Lewis King take the position that knowledge of the waiver can be imputed to Plaintiffs simply by virtue of their attorney-client relationship with Lewis King and Weinberg Wheeler. *See* Weinberg Wheeler Memo at 21-22 (arguing that Lewis King's knowledge of Weinberg Wheeler's negligence should be imputed to Plaintiffs); Lewis King Memo at 18-19 (arguing that Weinberg Wheeler's knowledge of Lewis King's negligence should be imputed to Plaintiffs). In other words, they argue that Lewis King's knowledge of Weinberg Wheeler's negligence can be imputed to Plaintiffs because Lewis King was co-counsel for Plaintiffs and vice versa (*i.e.*, Weinberg Wheeler's knowledge of Lewis King's negligence must be imputed to Plaintiffs because Weinberg Wheeler was co-counsel for Plaintiffs), even though both Lewis King and Weinberg Wheeler clearly had a vested interest in Plaintiffs ***not*** becoming aware of that negligence. This Court should not countenance such a result.

An attorney's knowledge is imputed to her client when determining the client's rights and liabilities with respect to ***third parties***; an attorney's knowledge is ***not*** imputed to her client when assessing the client's rights and liabilities with respect to that ***same*** attorney. *See, e.g., Stueve*

- 35 -

*Bros. Farms, LLC v. Berger Kahn*, 222 Cal. App. 4th 303, 316, 166 Cal. Rptr. 3d 116, 126

(2013) (rejecting an argument similar to what Defendants assert here: "[I]n none of the cases

Berger Kahn cites was the attorney's knowledge that he had wronged his client imputed to his

law firm and imputed to the client. Rather, in those cases, the attorney's knowledge was imputed

to the client where the actions of an unaffiliated third party gave rise to a cause of action on

behalf of the client."); *JPMorgan Chase Bank, Nat. Ass'n. v. Fifth Third Bank*, *N.A.*, 222 F.

App'x 444, 449-50 (6th Cir. 2007) (Tennessee law) (client deemed to have actual knowledge of

bank's deed of trust, and thus bank had priority interest in property, where client's attorney had

knowledge of said deed of trust); *Bellar v. Baptist Hosp., Inc*., 559 S.W.2d 788, 789 (Tenn.

1978) (for purposes of statute of limitations in worker's compensation action, client had

knowledge of medical doctor's diagnosis when doctor relayed diagnosis to client's attorney);

*Mehler v. Larkin*, No. CA 1287, 1989 WL 128493, *2 (Tenn. Ct. App. Oct. 25, 1989) (client

charged with attorney's knowledge for purposes of statute of limitations for client's action

against third party); *see also* Restatement (Third) Of Agency § 5.03 cmt. b (2006).

Knowledge is *not* imputed from an attorney to a client when determining the rights and

liabilities *between the attorney and client*:

> [N]otice is not imputed for purposes of determining rights and
> liabilities as between principal and agent. As a consequence,
> imputation does not furnish a basis on which an agent may defend
> against a claim by the principal.

*See* Restatement (Third) Of Agency § 5.03 cmt. b (2006). Therefore, the knowledge of a

negligent attorney cannot be imputed to her former client to preclude the client's malpractice suit

against the attorney. *See, e.g., Stueve Bros. Farms, LLC*, 222 Cal. App. 4th at 316, 166 Cal.

Rptr. 3d at 126 (noting that otherwise, "in every case where the client had no actual knowledge

of the attorney's misdeeds, the own attorney's knowledge would be imputed . . . to the client,

- 36 -

such that in all events it would be said that the client 'should have known' what his or her malfeasant attorney knew.").

Tennessee courts have applied the imputation principle in legal malpractice cases, but they have done so to impute the knowledge of a ***subsequent*** attorney, rather than the knowledge of the negligent attorney, to the client. *See e.g.*, *Lane-Detman, L.L.C. v. Miller & Martin*, 82 S.W.3d 284, 296 (Tenn. Ct. App. 2002) (charging the client with knowledge held by the client's subsequent attorney relating to a former attorney's malpractice); *Lufkin v. Conner*, 338 S.W.3d 499, 504-05 (Tenn. Ct. App. 2010) (same); *Batchelor v. Heiskell, Donelson, Bearman, Adams, Williams & Kirsch*, 828 S.W.2d 388, 394, 396 (Tenn. Ct. App. 1991) (same).

In *Wilkins*, relied on by Weinberg Wheeler, the alleged malpractice was the attorney's failure to file the client's underlying case within the statute of limitations. *See* 995 S.W.2d at 576. The attorney raised the statute of limitations as his defense in the malpractice action. *See id.* at 577–78. The court held that the client had knowledge of the malpractice when opposing counsel in the underlying case filed its answer asserting its statute of limitations defense. *Id.* at 583. When that answer was filed, however, the client had already obtained a ***different*** attorney, and it was ***this new*** non-negligent attorney's knowledge that was imputed to the client. *Id.* at 583–84 ("[I]t must be remembered that when . . . [the] answer was filed . . . ***Irwin Venick and not Jon Seaborg, was Wilkins' attorney***.") (emphasis added).

*Petkoff*, cited by both Lewis King and Weinberg Wheeler, actually explains why imputing the negligent attorney's knowledge to the client to endow the negligent attorney with the benefit of the statute of limitations is unwise from a policy perspective. In that case, the client had employed the defendant law firm to represent him as plaintiff in a lawsuit. *See* 919 S.W.2d at 595. The firm filed a complaint on the client's behalf, but it failed to name "Theos" as

- 37 -

a defendant in the lawsuit, and the statute of limitations subsequently expired. *See id.* at 596.

Thereafter, attorney Muldavin "became associated with the law firm and assumed representation

of plaintiff." *Id.* Muldavin then realized that Theos should have been named in the complaint,

but failed to raise the issue with the client. *See id.* Several years later, Muldavin ceased to be

associated with the law firm, and "a consent order was entered substituting Muldavin as counsel

of record for plaintiff[] in place of the law firm." *See id.*

The court explained:

> The question remains as to at what point in this saga of Muldavin's
> representation of plaintiff could it be said with legal certainty that
> the knowledge of Muldavin was imputed to plaintiff. There are
> several dates along the way about which a strong argument could
> be made that the imputation was complete. The first would be in
> early 1990 after he had reviewed the file and reached the
> conclusion that the firm should have named Theos as a party.
> Without reaching any legal conclusions as to this point, it could be
> said that because he was representing plaintiff as an associate of
> the law firm until April 20, 1992, there were dual loyalties that
> would confuse the issue. We choose not to step into this quagmire.
>
> However, on April 20, 1992, a consent order was entered removing
> the firm . . . as counsel of record and substituting in their place . . .
> Muldavin. ***At this point, Muldavin had but a single obligation in
> this case, and that was totally to plaintiff.*** Accordingly, we are of
> the opinion that at this point in time, his knowledge was
> completely and totally imputed to plaintiff . . . The one year
> statute of limitations on plaintiff's malpractice claim began to run
> on that date.

*Id.* at 598 (emphasis added).

Thus, although it declined to "step into th[e] quagmire" by affirmatively recognizing

Muldavin's competing loyalties, the court held that Muldavin's knowledge was imputed to the

client when he ceased to be associated with the negligent law firm, ***even though he had acquired

the relevant knowledge years before that point***. *See id.* It was at that point, when his affiliation

- 38 -

with the defendant law firm was no more, that he "had but a single obligation in this case, and that was totally to plaintiff." *Id.*

Lewis King and Weinberg Wheeler argue that Lewis King's knowledge of Weinberg Wheeler's negligence must be imputed to Plaintiffs, and Weinberg Wheeler's knowledge of Lewis King's negligence must be imputed to Plaintiffs, even though it cannot plausibly be said that they "had but a single obligation . . . totally to [P]laintiff[s.]" Even *Petkoff* aside, both the Restatement and the above Tennessee case law make clear that imputation is simply not proper under those circumstances.

### 3. Equitable estoppel tolls the statute of limitations until the Court of Appeals' opinion.

Even assuming *arguendo* that Plaintiffs had knowledge of an injury prior to the Court of Appeals' decision and that the injury was caused by Defendants' negligence, equitable estoppel tolls the statute of limitations until that decision. "In equitable estoppel cases, the plaintiff has either actual or constructive knowledge of an injury, but the defendant's subsequent conduct prevents the plaintiff from filing suit in time." *Ne. Knox Util. Dist. v. Stanfort Const. Co.*, 206 S.W.3d 454, 461 n. 2 (Tenn. Ct. App. 2006). To prove equitable estoppel for tolling purposes, the plaintiff must show that: "(1) the defendant knew or should have known that its conduct would induce the plaintiff to delay filing suit, (2) the plaintiff's reliance on this conduct was reasonable, and (3) the plaintiff's delay was not unreasonable or due to lack of diligence." *Id.* at 461.

Proof of equitable estoppel may be satisfied by proving "silence of one under a duty to speak and his omission to act[.]" *Lusk v. Consol. Aluminum Corp.*, 655 S.W.2d 917, 920 (Tenn. 1983) (affirming trial court's application of equitable estoppel to statute of limitations defense where "good conscience require[d] that [defendant] speak out at the time and make that fact

- 39 -

known to the plaintiff in no uncertain terms"). As Plaintiffs' attorneys in the Underlying Lawsuit, Defendants had a duty to disclose facts material to Plaintiffs' representation to Plaintiffs. *See* Restatement (Third) of the Law Governing Lawyers, § 20, cmt. c (2000) ("A lawyer must keep a client reasonably informed about the status of a matter entrusted to the lawyer, including the progress, prospects, problems . . . . The duty includes both informing the client of important developments in a timely fashion, as well as providing a summary of information to the client at reasonable intervals so the client may be apprised of progress in the matter."). Defendants had a duty to advise Plaintiffs of their own malpractice. *Id*. ("If the lawyer's conduct in the matter gives the client a substantial malpractice claim against the lawyer, the lawyer must disclosed that to the client."); *Beal Bank, SSB v. Arter & Hadden, LLP*, 167 P.3d 666, 673 (Cal. 2007) ("[A]ttorneys have a fiduciary obligation to disclose material facts to their clients, an obligation that includes disclosure of acts of malpractice.").

This duty required Defendants to inform Plaintiffs of the consequences of Metro's waiver defense and Defendants' own potential malpractice when Metro raised waiver. In fact, Sullivan explained that he "had a duty to advise [his clients] to go see their counsel and look over what happened." CSOF ¶ 155. Instead, Defendants never discussed waiver with Plaintiffs until after the Court of Appeals' opinion came down. CSOF ¶¶ 109-111. As explained above, when Casey diligently inquired as to the status of the matter after receiving the appellate briefs from Mowles, Sullivan reassured her as to the progress of the appeal, neglecting to mention the issue of waiver and the significance of the waiver argument for purposes of his own firm's malpractice. CSOF ¶¶ 138-140. Even if Casey had reviewed the appellate briefing, Lewis King argued that no waiver had occurred—it would have been reasonable for Casey to rely on her own attorneys' assessment of that issue in the absence of any other advice from counsel.

- 40 -

In fact, Sullivan's conduct following the Court of Appeals' decision belies any contention that an injury occurred prior to that point, and Defendants should be estopped from asserting an argument to the contrary. Sullivan, an experienced attorney, was apparently well aware of his duty to advise his clients of potential malpractice and did so at the time the cause of action accrued after the Court of Appeals issued its ruling. Casey and Spruance both testified that Sullivan traveled to Phoenix within days of the Court of Appeals' decision to advise them that malpractice had occurred. CSOF ¶¶ 109-111, 152-3. Sullivan even admitted in his deposition that he advised them to have their regular Phoenix counsel look into the matter. CSOF ¶¶ 155, 219. It would be inequitable to allow Defendants to take the position that Plaintiffs suffered injury before the Court of Appeals' decision while they were silent on the waiver issue prior to that point.

Defendants' contention that there are no genuine issues of material fact on the issues of (1) whether Plaintiffs' suffered an injury before March 22, 2012 and (2) whether Plaintiffs' knew or should have known that Defendants' negligence caused the damage defies logic. If Defendants want to raise these arguments at trial and ask a jury to decide the fact questions, they are free to do so. Summary judgment, however, is inappropriate for numerous reasons. Plaintiffs respectfully requests that the Court deny summary judgment on statute of limitations.

## B. Weinberg Wheeler's committed malpractice.

To briefly summarize Plaintiffs' contention regarding Weinberg Wheeler,[14] the trial court's exclusion of Held's diminution in value opinions were not preserved in the motion for

---

[14] Plaintiffs also allege negligence on the part of Lewis King and Levine Orr in connection with the motion for new trial but this section addresses why Weinberg Wheeler's conduct fell below the standard of care because Weinberg Wheeler is the only firm attempting to obtain summary judgment on this issue. A subpart of this section also addresses Weinberg Wheeler's causation argument, which Lewis King joined.

new trial, along with several other related issues. This error of failing to preserve the critical issue for appeal in the case resulted from, among other things, a complete lack of attention, diligence and supervision by Weinberg Wheeler (Sullivan and Witzigreuter). The motion for new trial should have been the product of a careful and thoughtful effort by the defense team, commencing early in the engagement. Instead, it became a rush job where the lawyers did not start work until December 17th, 2010 and scrambled to put together a deficient brief that was almost entirely prepared by a first-year lawyer in the days leading up to the due date. Through this process, Weinberg Wheeler failed to research the statute forming the basis of Held's exclusion, failed to find the recent on-point and controlling case (*City of Pulaski*) that easily could have been found through Keyciting or Shepardizing the statute, and failed to understand how significant of an impact Held's exclusion was in the trial court given that it resulted in a slew of other related evidence being excluded. Of course, Weinberg Wheeler now argues that Held was irrelevant and such research (even though it never was undertaken) was not necessary.

Other than the testimony of Weinberg Wheeler's witnesses, there is ***no*** evidence that Weinberg Wheeler decided ***at the time of writing the motion for new trial*** that Held was a non-issue. On the contrary, Sullivan, the lead attorney for Weinberg Wheeler, wrote in an email that Held's exclusion was a significant issue, citing the statute upon which Held was excluded. CSOF ¶ 75. In fact, at the time of his deposition in this case, Sullivan could not explain Weinberg Wheeler's "theory" for why it excluded Held from the motion for new trial, explaining that he relied on his "team." CSOF ¶ 207. Further, there is no documentation reflecting this "decision"—no internal emails, time entries, memoranda, notes to file, research notes, etc.

The Lewis King attorneys uniformly testified that the first time they had ever heard that Weinberg Wheeler "decided" to intentionally omit Held was at their depositions in this case in

- 42 -

June 2014. Notably, although Weinberg Wheeler did not draft the appellate briefs, Sullivan was involved in the appellate process by working with Mowles to attempt a settlement with Metro and advising Plaintiffs as to the status of the case. CSOF ¶ 206. Sullivan even attended oral argument in the Court of Appeals. CSOF ¶ 206. At no point did Sullivan tell Mowles that arguing the issue of Held's exclusion was pointless because Weinberg Wheeler intentionally omitted it from the motion for new trial. CSOF ¶¶ 201-04. In short, viewing all of the evidence, Plaintiffs believe a jury will conclude that Weinberg Wheeler did not, in fact, make a "decision" to intentionally omit the exclusion of Held's valuation opinions from the motion for new trial but rather negligently missed the significance of the issue by, among other things, delegating to a first-year attorney the preparation of the motion and waiting until New Years' weekend to perform the bulk of the work.

The unstated premise of Weinberg Wheeler's argument from page 23 through nearly the bottom of page 43 is that this Court should decide on summary judgment all factual issues related to the affirmative defense of the professional judgment rule. An attorney may only take advantage of the professional judgment rule, however, if that attorney can prove he met the standard of professional care and the alleged negligence was an exercise of honest professional judgment. *See Woodruff v. Tomlin*, 616 F.2d 924, 930 (6th Cir. 1980). Weinberg Wheeler cannot meet that standard on summary judgment for many reasons.

First, Weinberg Wheeler's causation argument is contained within the section of their memorandum arguing that "Weinberg Wheeler did not commit malpractice." Causation is a wholly separate element of a negligence claim and is a different issue than whether Weinberg Wheeler breached the standard of care. Second, Lewis King's and Plaintiffs' standard of care experts both describe in detail why Weinberg Wheeler's conduct fell below the standard of care.

Third, there is no evidence that Weinberg Wheeler intentionally "decided" to omit the Held issue from the motion for new trial rather than negligently failed to include that issue. Fourth, even if Weinberg Wheeler "decided" not to include the Held issue in the motion for new trial, Weinberg Wheeler fell below the standard of care in failing to advise Plaintiffs of such a decision or otherwise obtain input or approval because of the ramifications it would have on appeal. Fifth, after the Court of Appeals held that waiver had occurred, Weinberg Wheeler's senior attorney on the matter, Sullivan, flew to Phoenix to advise Plaintiffs' representatives that negligence had occurred, recommending that Plaintiffs file a malpractice lawsuit. In short, there is no basis to grant summary judgment on any of the issues raised by Weinberg Wheeler.

1. **Causation is an issue for the jury and cannot be resolved on summary judgment.**

Weinberg Wheeler's and Lewis King's[15] causation argument misunderstands the nature of Plaintiffs' causation burden and fails to consider the case within a case will be tried to establish the causation element. "In order to make out a prima facie legal malpractice claim, the plaintiff must show (1) that the accused attorney owed a duty to the plaintiff, (2) that the attorney breached that duty, (3) that the plaintiff suffered damages, (4) that the breach was the cause in fact of the plaintiff's damages, and (5) that the attorney's negligence was the proximate, or legal, cause of the plaintiff's damages." *Gibson v. Trant*, 58 S.W.3d 103, 108 (Tenn. 2001) (citations omitted). "Proximate cause has been explained as 'the nexus between the negligence and the injury'." *Jessup v. Tague*, No. E2002-02058-COA-R3-CV, 2004 WL 2709203, *2 (Tenn. App. Nov. 29, 2004) (citation omitted). Causation in legal malpractice actions in which the alleged negligence occurred in connection with litigation requires that the plaintiff prove a case within a

---

[15] The argument related to causation is set forth in Weinberg Wheeler's memorandum but Lewis King adopts such arguments by reference.

case. *See, e.g.*, *Gay & Taylor, Inc. v. Am. Cas. Co. of Reading, Pa.*, 381 S.W.2d 304, 306 (Tenn. Ct. App. 1963) ("The burden of proving that damages resulted from the negligence of an attorney, or from his failure to follow instructions, in connection with the prosecution or defense of a suit rests upon the client and usually requires the client to demonstrate that, but for the negligence complained of, the client would have been successful in the prosecution or defense of the action in question."); *Bruce v. Olive*, No. 03A01-9509-CV-00310, 1996 WL 93580, at *3 (Tenn. Ct. App. Mar. 4, 1996) ("In effect, the plaintiffs bringing the malpractice action must prove a case within a case."). For alleged negligence in connection with an appeal, "the plaintiffs must demonstrate that the appeal of the underlying litigation would have been successful, and that upon trial after remand they would have [prevailed]." *Bruce*, 1996 WL 93580 at *3 (citation omitted).

Plaintiffs will re-try the Underlying Lawsuit with the evidence that should have been admitted but for Defendants' negligence. Because of the nature of proving causation in a legal malpractice case, the causation element is necessarily an issue of fact for a jury to determine. *See e.g.*, *Jessup*, 2004 WL 2709203 at *2 ("The causation issue is one for the jury to determine . . .."); *Woodruff*, 616 F.2d at 936 ("[C]ausation is a jury question.") (citing *Loftis v. Finch*, 491 S.W.2d 370, 373 (Tenn. App. 1972). Further, as shown below, there are many issues of fact as to the specific points Weinberg Wheeler raises.

As evidenced below by the testimony of Lewis King's witnesses, the causation arguments that Lewis King incorporates by reference from Weinberg Wheeler's response are inconsistent with the testimony from Lewis King's own witnesses. For example, Lewis King believed that Held's valuation opinions were excluded because he was not a licensed appraiser under the statute. CSOF ¶¶ 74, 98, 157-58, 160-62. Similarly, Lewis King's appellate attorneys

- 45 -

testified that *City of Pulaski* was "controlling" and even asked the Court of Appeals to remand the case back to the trial court for consideration of that case alone before even filing the opening brief on appeal. CSOF ¶¶ 105, 160. That the Lewis King witnesses testified wholly inconsistently with the causation arguments that Weinberg Wheeler presents on its own creates a genuine issue of material fact as to Weinberg Wheeler's arguments.[16]

> ### a. The trial court excluded Held's valuation opinion because he was not a licensed appraiser under the statute.

Weinberg Wheeler's contention that Held was **not** excluded due to his failure to have an appraiser's license directly contrasts with the testimony of every other attorney involved in the matter and the documents produced in the case. With the sole exception of Weinberg Wheeler, everyone involved in the defense of the Underlying Lawsuit universally agreed that the trial court excluded Held for failure to have an appraiser's license under the Tennessee statute. This is an obvious and material factual dispute that makes resolving this issue on summary judgment inappropriate.

The measure of damages for injury to real estate is the lesser of the cost of repair or diminution in market value. *See Conatser*, 2001 WL 873457 at *12 ("[T]he plaintiffs do not have the burden of offering alternative measures of damages. The burden is on the defendant to show that the cost of repairs is unreasonable when compared to the diminution in value.") (internal quotations and citation omitted). Orr planned to use Held to prove that the diminution of value was less than the cost of repair. *Metro Gov't*, 2012 Tenn. App. LEXIS 189 at *9.

Before trial, however, Metro filed a motion *in limine* to exclude Held's diminution in value opinions, primarily arguing that because Held "does not hold the requisite licensed from

---

[16] Given that the testimony of the Lewis King witnesses and the Weinberg Wheeler witnesses was wholly inconsistent as to the points raised in Weinberg Wheeler's causation arguments, it is somewhat bizarre that Lewis King joined these arguments.

the State of Tennessee, *Wheeler*, and Tᴇɴɴ. Cᴏᴅᴇ. Aɴɴ. § 62-39-101, *et. seq*. mandate that the Court bar any expert testimony from Mr. Held concerning his opinion of the Plant's value." CSOF ¶ 156.

The trial court granted the plaintiffs' motion *in limine*, excluding Held because he was not a licensed real estate appraiser under the Tennessee appraiser statute, T.C.A. § 62-39-102. CSOF ¶¶ 38-45. The licensure issue was critical at oral argument as argued by Metro's counsel and also as recognized by the trial court. CSOF ¶¶ 38-45. Even after the ruling, Orr explained Held's exclusion to Plaintiffs, writing that Held's lack of licensure under Tenn. Code Ann. § 62-39-103 was the reason the court excluded Held. CSOF ¶ 45.

Orr testified during his deposition in this case that Held's exclusion

> was based on a statute [Tenn. Code Ann. § 62-39-103] that basically, because Mr. Held was not a licensed real estate agent, I believe the word is, in Tennessee there was a provision and a statute that, at least in Judge Binkley's interpretation, rendered him unable to testify or express an opinion.

CSOF ¶ 44.

During trial, Stevens provided Plaintiffs an appellate analysis that noted Held was excluded because he was "not a licensed appraiser in the state of Tennessee . . . ." CSOF ¶ 157. Notably, in response to this appellate analysis, Mowles, apparently having read the analysis and having known of Held's exclusion on the basis of the statute, writes to Stevens: "The appellate report was excellent – we need to be sure that these issues are included in a motion for new trial since we will not be able to raise them in a jury trial appeal unless we have gone the new trial motion route." CSOF ¶ 158. In late November 2010, Sullivan emphasized in an email that the "threshold question" as to Held was "whether he is allowed, under Tennessee law to testify (absent his appraiser's license) which appears to be dictated by statute." CSOF ¶ 159.

- 47 -

Lewis King's appellate filings support the fact that Held was a central issue on appeal and that Held was excluded due to his lack of licensure. On March 31, 2011, Lewis King filed its statement of issues with the Court of Appeals, identifying the central issue that was not in the new trial motion and brief: "The trial court erred in its exclusion of Defendants' expert witness on the basis that he was not a licensed appraiser in the State of Tennessee." CSOF ¶ 98. After finding *City of Pulaski*, Lewis King even asked the Court of Appeals to remand the case back to the trial court to allow the trial court to consider the new authority, writing that Held was excluded because he was "giving an appraisal when he is not a licensed appraiser under" T.C.A. §62-39-103. CSOF ¶ 160. Plaintiffs' opening brief that Lewis King filed in the Court of Appeals specifically raised the issue of Held's exclusion as a point of harmful error: "The order prohibiting Mr. Held from testifying was based solely on an issue of law—the trial court's understanding of the requirements of §62-39-103." CSOF ¶ 161

Significantly, Levine Orr's standard of care expert, Plaintiffs' standard of care expert, and Lewis King's standard of care expert will testify that Held was excluded from testifying in the Underlying Lawsuit due to the Tennessee appraisal licensing statute. CSOF ¶ 162. Further, Levine Orr's Concise Statement of Undisputed Materials Facts in support of its motion for summary judgment even noted that Held was excluded due to the statute. *See* Levine Orr's Concise Statement of Undisputed Material Facts, ¶ 7.

Weinberg Wheeler's argument that the trial court excluded Held not because of the statute but due to the fact that he was not an appraiser[17] and did not conduct a before and after

---

[17] Whether Held was an appraiser is inseparable from the statutory basis for his exclusion. He was not a certified Tennessee appraiser consistent with the statute and, therefore, he was not permitted to testify. Weinberg Wheeler's cited basis for Held's exclusion (that he was not an appraiser) is necessarily wrapped up in a determination that Held failed to comply with the statute.

valuation is unsupported by the case law. Tennessee law allows diminution in value opinions using non-standard valuation methods. *See State ex rel. Department of Transp., Bureau of Highways v. Brevard*, 545 S.W.2d 431, 436 (Tenn. Ct. App. 1976) ("As to whether [a property's] value is increased or diminished is a matter for the jury to decide and, generally speaking, an expert witness is not disqualified to testify merely because he may have used some criteria in arriving at his opinion which is not altogether the standard among appraisers."); *City of Brentwood v. Cawthon*, No. M200902330COAR3CV, 2010 WL 1931095, at *7 (Tenn. Ct. App. May 13, 2010) (holding that the trial court did not abuse its discretion in admitting expert testimony that calculated diminution in value using a percentage loss rather than a before and after valuation: "While Mr. Parrish's methodology of calculating incidental utilized a percentage of loss to the property's value prior to the taking rather than a determination of actual value after the taking (and subtraction of that figure from the pre-taking value) may not be the easiest or most preferred method for calculating incidental damages, the method is based on more than mere speculation inasmuch as it incorporates and gives credence to the elements properly considered in determining whether incidental damages have been incurred . . . .").

Finally, even if the trial court had other bases for excluding Held, there was no downside to including a discussion of the statute in the motion for new trial to ensure that the issue was preserved for appeal. Mowles testified that motions for new trial are "very rarely" granted and, as a result, the real thrust of a motion for new trial is to preserve issues for appeal. CSOF ¶ 163.

  **b.**   *City of Pulaski* **is on-point case law, and the trial court abused its discretion in excluding Held.**

If Held's licensure issue had been researched in connection with the motion for new trial, the research would have revealed a case that was squarely on point, which the Court of Appeals issued just days before the trial started: *City of Pulaski v. Morris*, No. M2010-00047-COA-R3-

CV, 2010 Tenn. App. LEXIS 591 (Tenn. Ct. App. Sept. 23, 2010). This case held that the particular appraisal statute at issue did not preclude an expert without an appraiser's license from offering a valuation opinion as to real property. As explained below, however, no one even researched the statute in connection with the motion for new trial or learned of *City of Pulaski* until long after the trial court denied the motion for new trial.

Defendants did not even research the statute until mid-April 2011 when Mowles asked Olivas to do so. CSOF ¶¶ 52, 99-100, 209. Shortly thereafter, Olivas emailed Mowles explaining that he had found *City of Pulaski*, at which point he testified there was a "surprise surprise" moment when they realized the trial court was "wrong" in excluding Held. CSOF ¶ 101.

Significantly, none of the Weinberg Wheeler attorneys were even aware of the case until summer 2011. The first time Sullivan learned of it was when he was copied on an email that Mowles sent in June 2011. CSOF ¶ 164. Witzigreuter first reviewed *City of Pulaski* in June 2011 in response to a phone call he received from Olivas. CSOF ¶ 165. Wood did not even read the case until after the Court of Appeals' opinion in March 2012. CSOF ¶ 166.

Mowles testified that *City of Pulaski* was controlling and she was surprised that it was not in the motion for new trial. CSOF ¶ 105. Indeed, based on *City of Pulaski*, Mowles even filed a motion with the Court of Appeals on June 7, 2011 to stay further proceedings and to remand the case to the trial court in light of that case. CSOF ¶ 106. Mowles asked the Court of Appeals to remand the case to the trial court, arguing that "[i]f Judge Binkley had had the benefit of the decision in *City of Pulaski* when he was deciding Metro's motion to exclude Mr. Held's testimony, it is BFI's sincere belief that his ruling would have been to allow Mr. Held to testify." CSOF ¶ 107. Mowles further wrote:

- 50 -

The problem for the trial court was that Mr. Held was not a licensed appraiser under the Tennessee Act. However, under the *City of Pulaski* decision, the trial court's concern was not well-founded. Rather, Judge Binkley could have allowed Mr. Held to testify since his opinions would have assisted the jury and his credentials were impressive. The trial court's gatekeeper functions were satisfied and, but for the lack of a license, BFI's expert should have been allowed to testify.

CSOF ¶ 167. The motion was denied. *Metro Gov't*, 2012 Tenn. App. LEXIS 189, *5.

Mowles then argued on appeal that the trial court abused its discretion in excluding Held.

CSOF ¶ 168.

But the lack of an appraiser's license should not have precluded him from testifying in this case. The *City of Pulaski* [case] makes clear that "the law" did not require him to be licensed under the Tennessee appraiser statute. Thus, the trial court's erroneous interpretation of the statute resulted in substantial harm to the Defendants' [Plaintiffs in the instant suit] rights, specifically the exclusion of their imminently qualified expert witness from testifying as to his opinions regarding the valuation of the property at issue in this case. It was an error of law that was harmful error in its own right, and it is further harmful error because of the other exclusionary rulings that were premised on the exclusion of Mr. Held's testimony. . . .

CSOF ¶ 169. Such an argument is correct because an error of the law constitutes an abuse of

discretion. *See Johnson v. Nissan N. Am., Inc.*, 146 S.W.3d 600, 604 (Tenn. Ct. App. 2004) ("A

trial court 'abuses its discretion' when it makes an error of law."). The Court of Appeals did not

even reach this issue due to its failure to be preserved in the motion for new trial. Even if

Weinberg Wheeler contends that it was not an abuse of discretion to exclude Held, not only do

Plaintiffs disagree but the other Defendants in this case disagree, creating an issue of fact ripe for

the trier of fact to consider.[18]

---

[18] Weinberg Wheeler speculates that it is doubtful that Plaintiffs can prove that Weinberg Wheeler would have been able to find *City of Pulaski* in December 2010 had they undertaken the research. The Court of Appeals issued the case before the trial. Given that Weinberg Wheeler did not begin work on the motion until late December, there is little doubt that Weinberg

- 51 -

The Court of Appeals held that the issue of Held's valuation testimony was waived due to the failure to include it in the motion for new trial. The Court further held that waiver occurred with respect to the exclusion of evidence related to the facility's pre-fire condition and the exclusion of Gershman's demolition cost testimony because the motion for new trial failed to challenge the exclusion of evidence regarding the facility's current condition and demolition costs.

As context, subsequent to Metro's supplemental motion to strike Held, on August 26, 2010, Metro filed a motion *in limine* to exclude, among other things, any references at trial to: (1) Metro's alleged pre-fire plan to discontinue waste-to-energy operations at the facility; or (2) the facility's negligible or negative value at the time of the fire. CSOF ¶ 171.

After excluding Held, the trial court granted the motion in limine. Lewis King's appellate brief summarized the closely-linked rulings:

> From this ruling [the Held exclusion], the court then extrapolated that evidence of future plans for the building at issue was irrelevant under Rule 401 of the Tennessee Rules of Evidence since there would be no evidence about the value of the property post-fire as Mr. Held had been excluded, and, further, that the risk of unfair prejudice under Rule 403 outweighed its probative value. . . . This dramatically curtailed Defendant's case and was the first in a cascade of additional rulings that resulted in the jury hearing a skewed truncated version of what the case was really about. . . .
>
> In a closely related ruling, the Court held that evidence of Metro's pre-fire plan to close the Plant was irrelevant because the measure of damages in this case was confined to the cost of repair. . . . That

---

Wheeler would have been able to find a case that was several months old at that point. Indeed, the Tennessee Bar Association ("TBA") was aware of the case and had even posted it on its website on September 24, 2010. CSOF ¶ 170. The "TBA Today" newsletter is e-mailed daily to all TBA members. Even if Weinberg Wheeler did not receive the TBA e-mail, Levine Orr and Lewis King would have received it.

is, without evidence of the diminution in value, which Defendants intended to introduce through the now excluded testimony of Mr. Held, Plaintiffs need only argue the cost to repair as the measure of damages.

CSOF ¶ 172. Thus, the exclusion of Held's testimony created a domino effect that led to the exclusion of other evidence critical to Plaintiffs' case. CSOF ¶ 173. Judge Binkley also precluded any evidence about the facility's future plans, its obsolescence or its negative value because such testimony was irrelevant due to his preclusion of Held from testifying about the facility's value, and even if relevant, held that "the probative value of the evidence, if any, is outweighed by its prejudicial effect." *Metro. Gov't*, 2012 Tenn. App. LEXIS 189, at *4. As a result, Plaintiffs had no evidence with which to calculate diminution in value damages and, therefore, the trial court only provided a jury instruction as to cost of repair damages, not diminution in value damages. *Id.* In short, Held's exclusion resulted in the jury never hearing that Nashville Metro planned, in the near future, to close the facility and tear it down. *See id.* at *2-5; CSOF ¶ 174.

Weinberg Wheeler's last argument in the motion for summary judgment contends that it did not cause Plaintiffs any damage by failing to raise the issues of demolition costs and pre-fire condition of the facility (which are explained above) in the motion for new trial because "there was no evidence introduced at trial to preserve" these issues, and the trial court rejected an offer of proof on the evidence supporting these issues. This position is as incorrect now as it was when Weinberg Wheeler failed to raise demolition costs and pre-fire condition of the facility in the motion for new trial.

When evidence is excluded, an offer of proof is only necessary if "the substance of the evidence and specific evidentiary basis supporting admission" is not otherwise apparent from the context. *See* Tenn. R. Evid. 103(a)(2) ("Error may not be predicated upon a ruling which admits

- 53 -

or excludes evidence unless a substantial right of the party is affected, and . . . . the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context."). In other words, an offer of proof was not necessary provided the trial court record sufficiently reflected the substance of the evidence and the evidentiary basis for it. *See, e.g., Singh v. Larry Fowler Trucking, Inc.*, 390 S.W.3d 280, 286 (Tenn. Ct. App. 2012), appeal denied (Dec. 11, 2012) ("Although we concede that Mr. Singh did not make a separate offer of proof, because the appellate record contains Dr. Jaffin's full deposition, the motion in limine, and the trial court's order on the motion, there is sufficient evidence in the record from which to determine the trial court's reasoning and whether it was erroneous. The purpose of Rule 103(a)(2) is to help this Court determine whether the trial court's exclusion was reversible error. Here, the substance of the evidence and the specific evidentiary basis supporting admission or exclusion are apparent from the context. Accordingly, Mr. Singh's failure to make a separate offer of proof is not fatal to his appeal.").

Had Weinberg Wheeler reviewed the trial court record, it would have found ample evidence that provided context, negating the need for an offer of proof. For example, Lewis King's opening brief on appeal identified the evidence, noting that "the excluded deposition testimony establishes that Defendants could prove to the jury that Metro's own plans had doomed the Plant and that, during the years before the fire, Metro had obtained financing for, and was in fact building, a new facility to create energy for the City of Nashville." CSOF ¶ 175. The Opening Brief details the facts in the record supporting this issue. CSOF ¶ 176. The same is true with evidence regarding Mr. Gershman whose testimony was excluded as a result of separate motion in limine briefing. CSOF ¶ 177. Finally, the trial court did allow an offer of

9675762

proof as to Held. Given that the exclusion of Held led to the rest of the other evidence being excluded, Held's offer of proof was sufficient for purposes of Rule 103(a)(2).

Indeed, during the oral argument on the motion for new trial, the trial court even noted that an offer of proof was not necessary because the issues were otherwise preserved for appeal due to the motions in limine (provided such issues had been appropriately raised in a motion for new trial). CSOF ¶ 178. Weinberg Wheeler's attempts on summary judgment to resolve issues of fact using post-hoc justifications that are as legally incorrect now as they were in January 2011 fail.

> ### 2. Lewis King's and Plaintiffs' standard of care experts will testify that Weinberg Wheeler's conduct fell below the standard of care.

Lewis King's standard of care expert, Roger W. Dickson, opines in his expert report that "Weinberg Wheeler breached the standard of care by failing to diligently prepare the motion for new trial." CSOF ¶ 179. He supports this conclusion in several respects. First, "Weinberg Wheeler failed to diligently act considering the jurisdictional nature of the filing deadline for the motion for new trial." CSOF ¶ 180. Dickson explains that Weinberg Wheeler drafted the motion for new trial at the last minute, failing to circulate a complete draft of the motion for new trial until after 10:00 p.m. on the day before it was due:

> As evidenced by the time records and emails I have reviewed, Weinberg Wheeler did not begin substantive work on the supporting brief until around December 17, 2010, two weeks after the entry of judgment. Even then, it appears that a minimal amount of effort was expended until December 28, 2010. . . . Weinberg Wheeler's lack of diligence created a truncated, rushed process . . . It does not appear that Weinberg Wheeler shared a complete draft with Lewis King and Levine Orr until after 10:00 p.m. on January 2, 2011.

CSOF ¶ 181. Mr. Dickson further opined: "Weinberg Wheeler breached the standard of care by effectively placing a large portion of the responsibility for preparation of the motion for new trial

- 55 -

in the hands of Josh Wood, an associate attorney with less than two months of practice experience."  CSOF ¶ 182.

Plaintiffs' standard of care expert, David Randolph Smith, also will testify that Weinberg Wheeler breached the standard of care in several ways.  Smith set forth significant detail as to the way in which the briefing related to the motion for new trial was prepared.  Smith's report explains: (1) Levine Orr, Lewis King and Weinberg Wheeler were aware of the Held issue's significance from an appellate perspective long before the motion for new trial was due; (2) much of the substantive work on the memorandum in support of the motion for new trial occurred over a holiday weekend within days of the deadline; (3) Wood, an attorney with less than two months of practice, was the primary attorney preparing the motion; (4) Sullivan, the lead attorney for Weinberg Wheeler, did not even review the motion for new trial and supporting memorandum until the morning that it was due; (5) Weinberg Wheeler did not circulate a first draft, which was prepared entirely by Wood as Witzigreuter noted when sending the draft, to Lewis King and Levine Orr until late on the afternoon of December 30, 2010, just days before it was due on January 3, 2011; (6) a draft with Witzigreuter's input was not circulated until after 10:00 p.m. on the night before the motion was due; and (7) none of the attorneys who attended trial participated in developing the issues for the motion or reviewed the motion before it was filed even though they were copied on the emails of the drafts.  CSOF ¶ 183.

Based on these and other facts, Smith opines that:

- "All defendants fell below the standard of care by failing to include the Held issue in the motion for new trial, resulting in a total waiver on this issue on appeal (and a loss of the ability to raise the exclusion of the other evidence on appeal due to the domino effect of that ruling)[;]"  CSOF ¶ 184.

- 56 -

- "It fell below the standard of care for a lawyer of Wood's inexperience to be tasked with outlining and eventually drafting the motion for new trial with minimal to no supervision. . . . The assignment of this critically important matter to Wood so late in the process was negligent supervision and a breach of the standard of care[;]" CSOF ¶ 185.

- "The brief was hurriedly done and completely failed to address or understand the defendant's burden of proof. . . . Much of the work in connection with the motion for new trial occurred between December 30, 2010 and January 3, 2011, including late into the evening on January 2, 2011[;]" CSOF ¶ 186.

- "It fell below the standard of care not to recognize the centrality of Held to the appeal and the clear connection between Held's exclusion and loss of other evidence cannot be reconciled with the testimony of Weinberg Wheeler that they consciously waived the issue[;]" CSOF ¶ 187.

- "The standard of care for the attorneys representing Allied/BFI in connection with the motion for new trial required a careful review of the trial court's evidentiary rulings for the purposes of identifying issues to be included in a motion for new trial and to conduct or cause to be conducted legal research on the issues related to the trial court's exclusion of expert Held's testimony and the Tennessee appraiser law that formed the basis of the exclusionary ruling[;]" CSOF ¶ 188.

- "It fell below the standard of care for the *City of Pulaski v. Morris* not to have been found in connection with the preparation of the motion for new trial and included therein[;]" CSOF ¶ 189.

- "Under the standard of care, the attorneys involved in the underlying trial and the motion for new trial (Orr, Sullivan, Wood, Witzigreuter, Stevens, Mowles and Olivas) needed to

research or cause to be researched all of the potential issues identified at trial before making decisions on which issues should be raised in the motion for new trial[;]" CSOF ¶ 190.

- "[T]he Weinberg Wheeler attorneys did not exercise 'judgment' because they admittedly never researched the Tennessee appraisal statute and did not evaluate the issue with the benefit of independent research. . . . Even if the Weinberg Wheeler attorneys thought that a motion for new trial was unlikely to succeed, it is critical to include in the motion important issues such as the Held exclusion to ensure they are preserved for the appeal. The appellate lawyers could always choose not to include an issue in the appeal, but failing to raise an issue at the motion for new trial stage takes it off the table entirely. If it is accurate that Weinberg Wheeler intentionally did not raise Held's exclusion, their failure to do so violated the standard of care--no reasonable lawyer would completely foreclose raising the issue on appeal[;]" CSOF ¶ 191.

- "[N]ot raising the Held exclusion was an issue of such significant importance that the standard of care required the Weinberg Wheeler attorneys to advise and consult with the client regarding the conscious decision not to raise the Held issue in the motion for new trial before filing the motion. The standard of care required the attorneys to consult with [the] client and obtain consent from the client before waiving an issue as central as Held's exclusion assuming *arguendo* Weinberg Wheeler, in fact, intended to waive this issue[;]" CSOF ¶ 192.

- "Even if Weinberg Wheeler decided that the Held exclusion was not an issue, it was nevertheless below the standard of care to not raise the issue[,]" given that all other attorneys involved in the matter thought the Held issue was significant. CSOF ¶ 193.

- 58 -

- "With respect to Sullivan specifically, he testified that he had 20 active, busy cases during the time that Weinberg Wheeler handled the motion for new trial. . . . The standard of care requires that attorneys only accept those cases that they have time to handle and manage . . . ." CSOF ¶ 194.

- "When it became apparent upon receipt of Metro's response brief, wherein waiver of the Held issue was raised, Lewis King and Weinberg Wheeler were required under the standard of care to advise BFI/Allied that waiver could mean malpractice had occurred if the Court of Appeals agreed with Metro. The concept of waiver is complex as evidence by the competing arguments in the briefing. The standard by which issues need to be stated in motions for new trial in order to preserve them for appeal and the nuanced concept of waiver are legal topics that only experienced attorneys comprehend. It did not meet the standard of care to simply send [] BFI/Allied the briefing (as Mowles eventually did), expecting the client to read and comprehend the significance of the waiver argument and that it could be evidence of malpractice." CSOF ¶ 195.

There is no shortage of expert testimony that will describe with granularity how and why Weinberg Wheeler's conduct fell below the standard of care, rendering any finding to the contrary on summary judgment inappropriate.

### 3. There is no evidence in the record that Weinberg Wheeler intentionally decided, rather than negligently omitted, the issue of Held's exclusion from the motion for new trial.

There is ample evidence that attorneys from each of the defendant-firms thought the Held issue was a significant issue for appeal. Other than the self-serving testimony of Weinberg Wheeler's witnesses, there is no evidentiary support for the notion that Weinberg Wheeler

- 59 -

exercised "judgment" in not raising the Held issue. Rather, the evidence reflects that it was negligently omitted.

Well in advance of the motion for new trial, all Defendant firms knew the Held issue was going to be a central issue for appeal and needed to be preserved in the motion for new trial. On September 30, 2010, Stevens wrote to Plaintiffs and their insurance carrier, copying Orr, that Orr "has done what he can to preserve the issue for appeal," referring to Held's exclusion under the Tennessee statute. CSOF ¶ 74. On November 22, 2010, Sullivan provided his analysis on the importance of the Held issue, explaining that he had reviewed Held's deposition, attachments and CV and believed that "[t]he bigger issue, in my view, about Held, is the threshold question of whether he is allowed, under Tennessee law to testify (absent his appraiser's license) which appears to be dictated by statute. If we can't get over this hurdle, his valuation testimony is inadmissible." CSOF ¶ 75.

Weinberg Wheeler's attorneys contend that it was on a December 17, 2010 call that they advised the Lewis King attorneys of their "decision" not to raise the issue of the trial court's exclusion of Held's diminution of value opinions in the motion for new trial. CSOF ¶ 79. As an initial matter, Weinberg Wheelers' attorneys' testimony about who was even on the call is not supported by the billing records. Lewis King's time records reflect that only Mowles was on the December 17 call. CSOF ¶ 196. In contrast, Wood testified that Olivas and Stevens were on the call for Lewis King. CSOF ¶ 197. Both Olivas and Stevens testified that they would have recorded their time for an hour-long call had they been on it. CSOF ¶ 198. As a result, only Mowles was on the call for Lewis King despite Weinberg Wheeler's testimony to the contrary, which was based only on recollection rather than billing records or notes.

- 60 -

More important, the Lewis King attorneys deny that any such decision was discussed on that call or at any other point. CSOF ¶ 199. Stevens testified that "I truly expected that [Held's exclusion] was going to be an issue on appeal," noting that the first time she heard of Weinberg Wheeler's purported intentional decision not to raise the Held issue was on the day of her deposition in June 2014. CSOF ¶ 200. Mowles, who was on the call, was "astonished" at Weinberg Wheeler's testimony:

> Q: Did you have any understanding -- and you heard Mr. Olivas testify on this topic – that Weinberg Wheeler's position, apparently, is that there was a conscious decision made by Weinberg Wheeler and at least concurred with by Lewis King, not to even raise the exclusion of Mr. Held in the motion for new trial because it was essentially a complete loser?
>
> A: Did I hear that from what Mr. Olivas said?
>
> Q: Did you have any understanding before today that that is --
>
> A: No.
>
> Q: -- Weinberg Wheeler's position?
>
> A: No. That -- that astonished me.

CSOF ¶ 201.

Mowles also explained several times in her deposition how central Held was to the appeal and that the first time she had heard that theory that Weinberg Wheeler intentionally did not raise that Held issue was at the time of her deposition in this legal negligence case:

> Q: And you argued that Mr. Held's exclusion -- my words, not anyone else's, had kind of had a domino effect. Because Mr. Held couldn't testify, the Court gave a jury instruction, only on the cost of repair, correct?
>
> A: Yes.
>
> Q: And because of Mr. Held's exclusion, the trial court disallowed any evidence, including from plaintiffs' own witnesses, that the Nashville Metro facility was going to be closed, stop

receiving waste, or be demolished within a few months after the fire occurred?

A:      That's right.

Q:      And your firm argued that this exclusion, these things that happened based on Mr. Held's exclusion, collectively amounted to harmful error in the case that warranted a new trial.

A:      Correct.

Q:      Did it ever occur to you, say at the time that those arguments were being made to the Court of Appeals in the briefs, that there had been a conscious decision by anybody to waive Mr. Held's exclusion, and consequently, everything that flowed from it?

A:      No.

Q:      I take it none of the Weinberg Wheeler lawyers, Mr. Witzigreuter, Mr. Sullivan or Mr. Wood, ever communicated to you when you were making these arguments to the Court of Appeals, don't waste your time on Held, because we intentionally omitted him from the motion for new trial?

A:      No.  They never said that.

Q:      When was the first time that you ever heard that Weinberg Wheeler's position is that they intentionally did not raise Mr. Held's exclusion in the motion for new trial?

A:      Here.

Q:      Today?

A:      Yeah.

Q:      And you said something about -- your word was stronger than surprised.  I don't remember what it was.  What was your reaction when you heard that?

A:      I don't remember, but flabbergasted would be close.  I mean, I'm -- I just can't comprehend that, because of the ramification of it.

Q:      What do you mean by the ramification of it?

- 62 -

A:    Well, just the domino effect.  I mean, from it flowed a great number of things.

CSOF ¶ 202.

Q.    If, in fact, the Weinberg Wheeler lawyers had made a conscious decision to waive an issue as important as Mr. Held's exclusion turned out to be, is that something that you would have liked them to make you aware of before they did it?

A.    If they wanted me to have -- handle an appeal that had any chance of -- of doing anything, it would have been nice to know they were thinking of that.

CSOF ¶ 203.  Mowles further testified that she would never have agreed to not raise the Held issue in the motion for new trial.  CSOF ¶ 204.

Significantly, Sullivan participated in the appellate process.  CSOF ¶ 205.  Sullivan even attended the appellate oral argument and conferred with Mowles, Metro's counsel, Owens and others involved in the case throughout the life of the appeal.  CSOF ¶ 206.  Based on Mowles' testimony as set forth above, at no point did Sullivan ever communicate to Mowles that Lewis King should not be arguing the issue of Held's exclusion on appeal because Weinberg Wheeler intentionally excluded that issue.  Indeed, Sullivan, the lead partner for the case, could not articulate the reasoning for why Held was excluded from the motion for new trial, testifying that he deferred to his "team's" decision.  CSOF ¶ 207.  Moreover, there is no document reflecting that the clients were advised that Weinberg Wheeler intentionally decided to not raise the issue of Held's exclusion.

If a firm decided not to raise a major issue on appeal, the firm would advise the client, advise co-counsel, talk to trial counsel or even document it internally in time entries or a file memorandum.  None of the foregoing occurred with respect to Weinberg Wheeler's "decision" to forgo raising the Held issue.  A jury could easily decide that Weinberg Wheeler negligently

omitted the Held issue, creating a post-hoc justification for the failure of Held to be raised in the motion for new trial. As such, summary judgment in Weinberg Wheeler's favor is inappropriate.

> **4.** **Weinberg Wheeler cannot take advantage of the professional judgment defense where it failed to conduct any legal research on an issue before "deciding" not to include that issue in the motion for new trial.**

Assuming *arguendo* that Weinberg Wheeler intentionally "decided" rather than negligently omitted Held's exclusion, which is an issue of considerable disagreement, Weinberg Wheeler's failure to conduct *any* legal research on the topic precludes any finding on summary judgment that Weinberg Wheeler can benefit here from the professional judgment defense. *See, e.g., Sun Valley Potatoes, Inc. v. Rosholt, Robertson & Tucker*, 981 P.2d 236, 240 (Idaho 1999) (noting that the attorney judgment rule is conditioned on the "attorney acting in good faith and upon an informed judgment after undertaking reasonable research of the relevant legal principles and facts of the given case," that "an attorney who fails to exercise reasonable skill and diligence when investigating the merits of his opponent's position on an issue is not immune from liability" and that "[a]n attorney who is unfamiliar with or disregards controlling points of law when presenting his client's case is also not immune from liability.") (citing *Woodruff*, 616 F.2d at 933-35).

An attorney's professional judgment must be reasonable *at the time* it was purportedly exercised. *Woodruff*, 616 F.2d at 930 (no liability for acts and omissions "*based* on an honest exercise of professional judgment") (emphasis added). Failing to research an appealable, material issue constitutes negligence. "For loss of clients resulting from a want of proper knowledge of matters of law . . . an attorney is liable . . . for the consequences of his ignorance or nonobservance of the rules of the courts in which he practices, or for his ignorance of the statutes and published decisions of his own state." *In re Woods*, 13 S.W.2d 800, 803 (Tenn. 1929)

(internal quotations and citations omitted); *see also Muse v. St. Paul Fire & Marine Ins. Co.*, 328 So. 2d 698, 702, 704 (La. Ct. App. 1976) (finding that a reasonable standard of professional conduct required researching "the statutes on which [the client's opponent's] claim and lien were based and recognition of any doubt or invalidity as to [opponent's] claim which might appear from a careful perusal thereof[]" because "[t]he attorney . . . owes his client the duty of diligent investigation and research of the basis of any claim against his client and the utilization of all that such investigation and research should disclose.").  Smith also opined in his report that the Weinberg Wheeler attorneys fell below the standard of care in not raising the issue of Held's exclusion in the motion for new trial.  CSOF ¶ 184.  Mowles even testified that it is standard legal practice to conduct research on issues that arose during an original case to ensure that the client is afforded a properly prepared, thorough and competent motion for new trial. CSOF ¶ 208.

Weinberg Wheeler admits that none of its lawyers ever even researched the appraiser issue.  Witzigreuter testified that he did not conduct any research specific to Held, and Wood similarly testified that he "relied on Scott [Witzigreuter] and [Lewis King] . . . about that statute."  CSOF ¶ 209.  As a result, Weinberg Wheeler could not have exercised reasoned professional judgment without evaluating Tennessee law or considering the issues.

Further, because Weinberg Wheeler did not research the appraisal statute, no attorney at Weinberg Wheeler had even read the *City of Pulaski* case until six months after the motion for new trial was filed when Lewis King brought it to Weinberg Wheeler's attention.  CSOF ¶¶ 164-66.  Witzigreuter's time records reflect that he received a call on June 9, 2011 from appellate counsel regarding *City of Pulaski*, at which point he noted the following in his time entry: "research Tennessee law and review of City of Pulaski case regarding appraiser's ability to

testify." CSOF ¶ 210. Despite having read *City of Pulaski* and conferred with Lewis King about its use, Witzigreuter **never** during the appeal told Lewis King that the Held statutory issue was a non-issue because he "decided" not to raise that issue in the motion for new trial. CSOF ¶¶ 199-202.

Weinberg Wheeler argues (with the benefit of hindsight and with serious motivation to avoid its holding) that it interprets *City of Pulaski* differently than Lewis King, and that, even had it been educated about *City of Pulaski* before the motion for new trial was due, it still would not have included the Held issue in its motion. CSOF ¶ 211. But it is impossible to arrive at a legal conclusion without researching the principal issue. *At the time* Weinberg Wheeler allegedly made its "decision" to omit the Held testimony issue, such "decision," if it even occurred, was not based on **any** research of that issue. CSOF ¶¶ 164-166, 191. Weinberg Wheeler's failure to research the issue to allow the attorneys and client to make an informed decision is the "ignorance" to which *Woods* refers, precluding any finding on summary judgment that Weinberg Wheeler met the standard of care.

### 5. Weinberg Wheeler never advised Plaintiffs of either the "decision" not to include the Held issue in the motion for new trial or of the potential for waiver given the arguments in the appellate briefing.

Weinberg Wheeler was required to tell Plaintiffs that it was considering intentionally waiving an issue for appeal and obtain client consent if, in fact, that is what occurred. Mowles was adamant that she would "not take away an issue from a client without discussing with them first." CSOF ¶ 212. She even testified that failure to confer with a client regarding such an important decision seemed to violate the Tennessee Rules of Professional Conduct. CSOF ¶ 213. Rules of Conduct aside, the standard of care requires attorneys to apprise their clients of significant facts and issues and to let them make important decisions. CSOF ¶ 214, *citing* Exhibit 5, Smith Report at 51. At no point did Weinberg Wheeler ever advise Plaintiffs (or Lewis King

- 66 -

based on the testimony of Lewis King's attorneys) that it was considering omitting the Held

issue from the motion for new trial and explain the ramifications of doing so.

### 6.     Weinberg Wheeler admitted that negligence had occurred and advised Plaintiffs to sue.

Weinberg Wheeler cannot credibly argue that it met the standard of care, as a matter of

law, when Sullivan admitted to two of Plaintiffs' representatives that negligence had occurred

and advised them to sue all firms involved in representing Plaintiffs.  Shortly after the Court of

Appeals' ruling, Sullivan flew to Arizona to meet personally with Spruance and Casey.  At this

meeting, Sullivan told Casey: "He wanted to apologize to myself and Dave [Spruance] for the

errors that were made in the brief – in the briefing.  He then suggested that we file malpractice

actions against everyone."  CSOF ¶ 215.  Indeed, only as a result of that conversation with

Sullivan did Spruance even understand that a holding of waiver by the Court of Appeals meant

that negligence had occurred and that Plaintiffs should pursue a legal negligence action against

the Defendants named here:

> Q.     And you did discuss the case with Mr. Sullivan, correct?
>
> A.     Yes.
>
> Q.     Okay.  What were his recommendations at this point?
>
> A.     I can't recall specifically the statements he made, but it would have been to the effect of they screwed up, or they messed up, something up, and this is something, and he looked me right in the eye and he said, this is something you really need to look at and pay attention to, but he didn't say Weinberg, Wheeler messed up, he didn't say Lewis, King messed up, he didn't say Robert Orr messed up. He said they messed up, and I took it -- and he did it in the context of somebody working on the file messed up, and that the import of this ruling from the Court of Appeals was that somebody on the legal team waived the issue of Jonathan Held and that was the reason why the Court denied or upheld the Trial Court's decision.

Q.      When that discussion was had did you -- what did you do in reaction?

A.      I asked him what our options were.  I still have great respect for Terry Sullivan.  I was impressed with the fact that he actually went out to Phoenix and sat down and told us that a mistake was made, and so I was happy to ask him what options we had.

Q.      Well, the statement that you made, was he referring -- when he said somebody messed up, was he referring to the lawyers or was he referring to the Court of Appeals?

A.      No, it wasn't the Court of Appeals.  The ruling itself is self-explanatory, and you take the Court of Appeals as it is, and they decided, rightly, I guess, that somebody failed on the legal team to preserve the Jonathan Held exclusion, and, therefore, it was waived, and the fact that that was not brought up somewhere in the process, and I don't profess to know when that should have been brought up or how it should have been preserved, but somebody on the legal team failed to preserve that issue, and, therefore, the Court wasn't even going to get to the merits of the case because a procedural point had been missed.

CSOF ¶ 216.

Q.      Okay.  What discussions did you have, if any, with Mr. Sullivan concerning your opinion that a malpractice action should be initiated?

A.      I would have to say I relied almost exclusively on what he told us, meaning that he said, you know, they screwed up, a mistake was made, and you need to look at this. Before that, if I -- even reading the ruling, while I know the Court ruled against us, I didn't understand the import of why that had happened until he said, David, you need to look at this, they screwed up, and I certainly applaud him for doing that, I thought that was not only from a gentleman, but from a true professional who understood that a mistake had been made, and advising his client that is what took place, but I can't say that I understood the import from the ruling. I know it was against us, obviously, but not how that happened or why it happened and what the import was of that until Terry said, David, look at this, this is -- this was not right, this was wrong.

- 68 -

CSOF ¶ 217.  Sullivan's time records confirm that he traveled nearly 13 hours to and from Phoenix after the Court of Appeals ruling simply to meet with Casey and Spruance.  CSOF ¶ 218.  Although Sullivan denies telling Casey and Spruance that malpractice occurred and that Weinberg Wheeler would need to be named as a defendant, Sullivan admits that he advised Casey and Spruance to have its Phoenix counsel evaluate the case for errors.  CSOF ¶ 219.

Plaintiffs are confident that a jury, after hearing all of the evidence, will find that Plaintiffs' seven attorneys from three different law firms, which cost Plaintiffs several hundred thousand dollars throughout the life of the case, fell below the standard of care, damaging Plaintiffs' defense at nearly every critical juncture of the Underlying Lawsuit.  As a result, given the ample evidence in the record, there is no basis to grant summary judgment on any of the issues raised by Weinberg Wheeler, Lewis King and Levine Orr.

### C.     Defendants' damages argument fails.

Weinberg Wheeler, Levine Orr and Lewis King set forth the same argument regarding the damages in the Underlying Lawsuit.  As background, although a $7.2 million judgment was entered against Plaintiffs, the case was settled after the appellate court ruling for $8 million.  Plaintiffs maintained insurance with a deductible of $2.5 million, plus litigation costs.  Thus, the total Plaintiffs directly paid in connection with the Underlying Lawsuit was approximately $3.6 million.  CSOF ¶ 220.  Defendants contend that, due to the stipulated damages in the Underlying Lawsuit, a re-trial cannot result in any less damages to Plaintiffs because Plaintiffs had to pay the $2.5 million deductible regardless of the outcome.  This argument is factually and legally flawed.

### 1.     The damages argument incorrectly assumes that a re-trial would focus only on damages, not liability.

The damages argument incorrectly assumes that Plaintiffs would not prevail on liability through a re-trial and that any re-trial would focus on damages alone.  The motion for new trial

and the appellate briefing sought the remedy of a new trial in its entirely, not simply a re-trial of the damages. As to each of the issues raised in the appellate briefing, Lewis King requested a new trial. CSOF ¶221. Indeed, Mowles represented to Owens (one of the insurance adjustors) that the only remedy sought through the appeal was a new trial. CSOF ¶ 222.

Further, the adverse inference instruction, resulting from an inexplicable error by Levine Orr that Orr admitted on the record, specifically instructed the jury to infer that missing evidence would have favored Metro. *See infra*, § II.D.3. Such an instruction surely impacted a liability finding since it related to Plaintiffs' policies and procedures for reducing the risk of the fire in the first instance, necessitating a complete re-trial upon remand.

In addition, as explained above, Held's exclusion led to a cascade of other liability and damages evidence being excluded. Lewis King's appellate brief summarized the impact of the trial court's pre-trial rulings, all of which arose from Held's exclusion:

> It has been said that what you see depends on where you stand and that who you listen to determines what you hear. In this case, the jury stood in the vacuum created by the trial court's rulings and heard only what the Plaintiffs told them: that the Plant was operating; that it was severely damaged by fire; and that Defendants were responsible for the blaze. That was it. Jurors heard nothing about the Plant's pre-fire dilapidated condition or Metro's future plans for the Plant's impending demolition. They heard nothing about the Plant's negligible value or about the diminution in value component of damages under TPI 14.45.
>
> . . .
>
> The rulings of the trial court had so truncated the evidence that could be presented by the Defendants that the ability to give the jury their defense was severely compromised. Defendants submit that the trial court abused its discretion, misinterpreted the statute, and rendering rulings that were inconsistent with the facts or relevant precedent and that so adversely affected the outcome of the trial that Tenn. R. App. Proc. 36(b) mandates that a new trial should be awarded by this Court.

CSOF ¶ 223.  Indeed, a Lewis King attorney testified during his deposition that he believed the imposition of the adverse inference instruction and the exclusion of Held and all of the rest of the evidence that followed from Held's exclusion impacted not just the damages that the jury imposed but the jury's liability finding as well.  CSOF ¶ 224.  Thus, to re-try the Underlying Lawsuit absent the alleged negligence, a re-trial of both damages and liability is necessary.

### 2.    Stipulated damages would not be in play upon re-trial.

The damages argument incorrectly assumes that the stipulated damages would bind a re-trial.  There were two categories of stipulated damages: (1) business interruption damages; and (2) crane replacement damages.  First, both types of damages were stipulated to with the caveat that Plaintiffs reserved the right to contest liability for those damages; the stipulations were simply an agreement that if the jury found Plaintiffs liable, that was the amount to impose for those two types of damages.  CSOF ¶ 225.

Second, Orr plainly testified that he only stipulated to those damages as a result of the trial court's pre-trial rulings that were related to Held's exclusion:

> Q.    And I think it was said that you stipulated to, like, the cost of the crane repair and the cost of the building repair and the cost of the business interruption, given the Trial Court's rulings.
>
> A.    To my recollection, we did not have experts to dispute those figures.  And given the Judge's ruling, there was -- there was no alternative but to stipulate.
>
> Q.    No, I understand.  I mean, you've got to deal with the hand that you're dealt at that point. But in other words, you didn't stipulate to, like, the replacement value of the cranes because they were going to be replaced; you just, under the Court's rulings, didn't have evidence that it was different than what the plaintiffs' were claiming?
>
> A.    That's correct.  And I presume, without knowing, that if I could have found an expert, the difference between what the plaintiffs proved and what I could have proved by dispute would have been insignificant anyway. Whatever the cranes are and

- 71 -

> whatever the machinery was, it was -- if it was going to be
> repaired, it was going to be repaired. And the cost between what
> my expert would say and what the plaintiffs' expert said was
> probably not very much.

CSOF ¶ 226. Thus, the stipulated damages flowed from Held's exclusion. Upon re-trial of the case within a case, Plaintiffs are not bound to decisions made as a result of the negligent conduct. On the contrary, Plaintiffs will re-try the case as it should have been defended with all evidence that would have otherwise been admitted but for Defendants' negligent acts.

Third, the stipulated damages' argument fails to consider the fault allocation that would occur. For example, Tennessee is a modified comparative fault state with a 49% rule. *McIntyre v. Balentine*, 833 S.W.2d 52, 57 (Tenn. 1992), *abrogated, in part, by statute as explained in Marler v. Scoggins*, 105 S.W.3d 596 (Tenn. App. 2002). This means that the plaintiff can only recover damages if the plaintiff's negligence is less than the defendant's negligence. Because it is entirely possible that Metro's negligence exceeded Plaintiffs' comparative negligence (to the extent any liability is assessed against Plaintiffs), the stipulated damages would be irrelevant in that event that Plaintiffs' negligence was less than the negligence allocated to Metro. Similarly, Plaintiffs are allocated only the percentage of damages for which they are responsible. It is unlikely that a scenario could play out where Plaintiffs' damages do not exceed the deductible.

Finally, as explained below, the collateral source rule bars admission of Plaintiffs' insurance policy. Even if stipulated damages are imposed upon Plaintiffs through the re-trial, the collateral source rule permits the recovery of $8 million rather than simply the deductible amount.

### 3. The collateral source rule bars admission of Plaintiffs' insurance policy.

Defendants caused $8 million in damages in the Underlying Lawsuit. The fact that an insurance policy Plaintiffs purchased provided some coverage for payment of the final damages

incurred in the Underlying Lawsuit is irrelevant for assessing how much damage Defendants caused and now are subject to paying.

> ### a. The Tennessee Legislature's statutory abrogation of the common law rule only in claims involving health care liability shows an intent to allow the common law to apply the collateral source rule in other contexts.

Tennessee courts apply the collateral source rule except as abrogated by statute. *See, e.g., Heil Co. v. Evanston Ins. Co.*, No. 1:08-CV-244, 2010 WL 3064037 (E.D. Tenn. 2010); *Fye v. Kennedy*, 991 S.W.2d 754 (Tenn. App. 1998). "Normally, of course, in an action for damages in tort, the fact that the plaintiff has received payments from a collateral source, other than the defendant, is not admissible in evidence and does not reduce or mitigate the defendant's liability." *Fye*, 991 S.W.2d at 763; *see Heil Co.*, 2010 WL 3064037, at *1 (evidence of payments by insurance policies or someone other than the tortfeasor are generally inadmissible).

The Tennessee Court of Appeals has expressly adopted RESTATEMENT (SECOND) OF TORTS § 920A (1977) (Effect of Payments Made to Injured Party). *Fye*, 991 S.W.2d at 763. Section 920A(2) provides that "[p]ayments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable." The comment further explains:

> *b. Benefits from collateral sources.* Payments made or benefits conferred by other sources are known as collateral source benefits. They do not have the effect of reducing the recovery against the defendant. The injured party's net loss may have been reduced correspondingly, and to the extent that the defendant is required to pay the total amount there may be a double compensation for a part of the plaintiff's injury. ***But it is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor*** . . . . If the benefit was a gift to the plaintiff from a third party or established for him by law, he should not be deprived of the advantage that it confers. The law does not differentiate between the nature of the benefits, so long as they did not come from the defendant or a person acting for him. ***One way of stating this conclusion is to say that it is the***

> *tortfeasor's responsibility to compensate for all harm that he causes, not confined to the net loss that the injured party receives* . . . .

*Fye*, 991 S.W.2d at 763-64 (quoting § 920A, comment b) (emphasis added).

The Tennessee legislature has partially abrogated the collateral source rule, but only in certain health care liability actions. T.C.A. § 29-26-119. The Tennessee Court of Appeals has held that this statute "is in derogation of the common law" and must "be strictly construed." *See Steele v. Ft. Sanders Anesthesia Group, P.C.*, 897 S.W.2d 270, 282 (Tenn. App. 1994) (citations omitted); *cf. Lee v. Royal Indem. Co.*, 108 F.3d 651, 657 n. 5 (6th Cir. 1997). It also has ruled that "[t]he common law may not be altered any further by statute than the statute expressly declares and necessity requires." *Steele*, 897 S.W.2d at 282 (citations omitted).

Because the statute does not even purport to affect the collateral source rule outside of health care liability claims, the common law rule continues to apply to non-health care claims. Had the Tennessee legislature intended to limit the collateral source rule in legal malpractice cases as it has in health care liability actions, it easily could have done so. It not doing so indicates legislative intent for the collateral source rule to continue to apply to other types of tort actions, including legal malpractice actions.

Indeed, courts in other jurisdictions hold that partial statutory abrogation of the collateral source rule demonstrates that the rule remains in force in other, non-abrogated contexts. *See Horn v. Moberg*, 844 P.2d 452, 458 (Wash. App. 1993); *Bloome v. Wiseman, Shaikewitz, McGivern, Wahl, Flavin & Hesi*, 664 N.E.2d 1125, 1133 (Ill. App. 1996).

In *Horn*, the court of appeals upheld the trial court's application of the collateral source rule because the fire insurance payment was from a collateral source and "the state of Washington excludes benefits received by an injured party from a source which is independent of the tortfeasor," except possibly collateral source payments related to medical malpractice

- 74 -

cases as expressed in a particular state statute. 844 P.2d at 458. The court did not distinguish a legal malpractice claim from other kinds of cases when analyzing whether the payments were from a collateral source and covered by the collateral source rule. *See id.*

The court in *Bloome* found that the state statute barring application of the collateral source rule in certain circumstances only explicitly applies to a subset of medical malpractice cases and thus does not apply to legal malpractice claims. 664 N.E.2d 1125, 1133. It reasoned that "statutory language should be given its plain and ordinary meaning." *Id.* (citations omitted). Had the legislature intended to extend the statute's protections, "[t]he legislature could have simply stated that this section was also applicable to legal malpractice cases." *Id.* Likewise, the Tennessee legislature easily could have done the same had it intended to abolish the collateral source rule in legal malpractice actions.

Finally, as *Steele* notes, the statute by its terms does not apply to insurance benefits the plaintiff purchased in whole or in part. 897 S.W.2d at 282. Plaintiffs paid for the entire insurance policy. Thus, even when narrowing the collateral source rule, the Tennessee legislature left it intact as to benefits from policies the plaintiff bought. In short, Plaintiffs "should not be deprived of the advantage" the policies confer. *See Fye*, 991 S.W.2d at 763-64 (quoting RESTATEMENT (SECOND) § 920A, comment b).

> ### b. Courts in other jurisdictions that apply the collateral source rule do not distinguish legal malpractice actions from other claims.

Courts in California, Illinois, Kansas, Louisiana, New York, Vermont and Washington have applied the collateral source rule in legal malpractice cases. *See Norton v. Superior Court*, 30 Cal. Rptr. 2nd 217, 219-222 (Cal. App. 1994); *Arena Football League, Inc. v. Roemer*, 9 F. Supp. 2d 889, 899-900 (N.D. Ill. 1998); *Guidry v. Coregis Ins. Co.*, 896 So. 2d 164, 183 (La. App. 2004); *Ocean Ships, Inc. v. Stiles*, 315 F.3d 111, 115-16, 118-19 (2d Cir. 2002) (applying

New York law); *Horn*, 844 P.2d at 458; *Bloome*, 664 N.E.2d at 1133-34; *Johnson v. Baker*, 719 P.2d 752, 756 (Kan. App. 1986); *Houghton v. Leinwohl*, 376 A.2d 733, 737 (Vt. 1977).

*Ocean Ships* and *Roemer* closely resemble the facts in this case. In *Ocean Ships*, the underlying litigation involved a lawsuit an injured employee filed against an employer. 315 F.3d at 111. The employer engaged counsel to help with post-trial motions and to be solely responsible for appeal, but counsel never perfected the appeal. *Id.* The employer paid the policy deductible in the underlying litigation, but its insurer paid the rest of the judgment. The court applied the collateral source rule, holding that a recovery of the entire underlying judgment was justified. *Id.* at 119.[19]

In *Roemer*, a workers' compensation insurer sued the Arena Football League (the "AFL") for misstatements in insurance applications. The AFL made the statements based on attorney Roemer's advice. The AFL settled the lawsuit and was then reimbursed for the settlement amount by the individual arena league teams. In a subsequent legal malpractice action, Roemer argued that the AFL had suffered no damages because of the team reimbursement. The court, however, applied the collateral source rule, holding the payments were irrelevant and that the AFL had been harmed. 9 F. Supp. 2d at 899-900.

*Norton* also applied the collateral source rule to a legal malpractice action. 30 Cal. Rptr. 2d at 219-22. The court held that the collateral source evidence would not be admissible in the underlying litigation and, because the defendants in the legal malpractice claim stood in the shoes of the tortfeasor in the underlying case, the insurance payments could not be

---

[19] The discussion of the collateral source rule occurs first in the subject matter jurisdiction section. The negligent attorneys argued that because Ocean Ships' insurance deductible in the underlying litigation was only $5,000, Ocean Ships could not satisfy the amount in controversy requirement under 28 U.S.C. § 1332(a). Due to the collateral source rule, the court held that Ocean Ships' damages were not limited to the deductible and the amount in controversy was satisfied. 315 F.3d at 115-16.

- 76 -

used in the legal malpractice claim to reduce recovery.[20] *Id.* The court in *Guidry* applied similar logic, holding that the collateral source (*i.e.*, the workers' compensation carrier) of funds for medical and funeral expenses would not have been admissible in the underlying litigation against the employer and thus should not benefit the defendants in the legal malpractice case. 896 So. 2d at 183. The court further noted that neither the wrongdoers in the underlying litigation nor the attorneys in the legal malpractice case were being required to pay twice for the same element of damage; the defendants were simply being forced to pay for all of the damage they caused. *Id.*

The courts in *Johnson* and *Houghton* similarly did not equivocate over whether the collateral source rule applies to legal malpractice claims and merely applied it because the payments fit the common law definition of a collateral source in their respective jurisdictions. *Johnson*, 719 P.2d at 756; *Houghton*, 376 A.2d at 737.

Because Tennessee has only statutorily abrogated the common law in cases of health care liability, the collateral source rule continues to apply in all other cases. Further, such a finding is consistent with the law of other jurisdictions. As a result, any damages argument involving the insurance deductible fails at summary judgment because the fact that a deductible was at play should not even be admitted at trial.

---

[20] The court in *Norton* explained the logic of such a holding: "The amount of damages remains the same even if the client received an insurance payment from its insurer covering some or all of the injury in the underlying action. This is because, under the collateral source rule, the insurance payment could not have been used to reduce the recovery from the tortfeasor in the underlying action. Since the insurance payment is not taken into account in determining the award of damages in the underlying action, the client in the above example would still have lost $1 million—the difference between the $3 million the competent attorney would have recovered and the $2 million the negligent attorney recovered." 30 Cal. Rptr. 2d at 221.

### D. Levine Orr cannot satisfy the professional judgment defense on summary judgment.

Levine Orr argues that its actions in: (1) selecting Held as Plaintiffs' damages expert notwithstanding his apparent noncompliance with T.C.A. § 62-39-103; (2) failing to request a continuance of the trial after the judge ruled adversely to Plaintiffs on several issues; and (3) failing to object to the language of the adverse jury instruction ordered by the judge are not malpractice because such actions fall within the professional judgment rule. *See* Levine Orr Memo at 5-8.[21]

The sole basis for Levine Orr's attempt to take advantage of this "professional judgment" rule is the report of Levine Orr's expert witness, who opines that Orr's shortcomings were exercises of proper professional judgment. *See* Levine Orr Memo at 7-8. In simply invoking the opinions of its own expert, Levine Orr has done nothing to show the ***absence*** of a triable issue of fact but rather has evidenced that there are numerous questions of material fact, precluding summary judgment. Plaintiffs have their own expert (David Smith) who squarely disagrees with the conclusions of Levine Orr's expert.

### 1. Orr's retention of Held is not protected by the professional judgment defense.

Regarding the selection of Held, Smith explains:

> A trial attorney must exercise reasonable care in the preparation of
> a case to include diligence and reasonable care in the selection of
> appropriate, legally competent and qualified experts. The attorney
> must also further exercise reasonable care in the presentation of
> expert testimony, which includes taking reasonable steps to ensure

---

[21] Plaintiffs note that they have alleged additional acts of negligence by Levine Orr for which Levine Orr is not seeking summary judgment. These acts include the failure to timely designate and produce a proper Rule 30.02(6) witness, failure to offer evidence that Metro had planned to discontinue operations at the facility, and failing to preserve issues for appeal. *See* First Amended Complaint, ¶¶ 18, 21, 42-43.

and protect admissibility and to make sure that there is no lack of necessary expert proof due to negligent mistakes by the attorney.

Orr's retention of Held to testify to the after-event diminution in value was below the standard of care because there was a question, before *City of Pulaski* . . . was decided, that Held's testimony would not be admissible.

CSOF ¶ 227.

Noting that the Tennessee Supreme Court had previously held that "persons seeking to give an expert opinion regarding the value of real property located in Tennessee must meet . . . the . . . requirements of Tenn. Code Ann. § 62-39-103(a),"[22] Smith explained:

> The problem with Held's qualification as an expert to testify to value should have, in the exercise of reasonable care, been identified much earlier by Orr when he was retaining appropriate experts given *Wheeler*.  The standard of care required familiarity with the applicable law governing the competency of experts (in this case the need for a licensed expert if the expert planned to offer an opinion "regarding the value of property in Tennessee," *see Wheeler*).  Had Orr acted in accordance with the standard of care, Allied/BFI would have had an expert who was qualified under the appraiser statutes.  "Orr admitted that he had overlooked this technicality."  September 15, 2010 Email from Piccirrilo to Casey (REPUBLIC00463). *It was not simply a technicality. It was a key legal hurdle for admissibility that Orr should have known and considered before selecting and retaining Held.*[]  The standard of care required Orr to have known about the requirements for expert testimony as to the value of real property at the time of expert retention/selection.

CSOF ¶ 228.

Despite his legal duty to consider the application of T.C.A. § 62-39-103 to his intended use of Held as an expert, Orr testified that he was ***not even aware*** of the statute. CSOF ¶ 229. Rather than having researched applicable requirements and then searched for an expert who would comply with those requirements, Orr testified that Held was suggested to him by "somebody at AIG." CSOF ¶ 230.  "Even if Held was recommended by [AIG], the standard of

---

[22] *Wheeler*, 2002 Tenn. App. LEXIS 727 at *9-10.

care required Orr to ensure that Held was qualified in Tennessee to provide the requisite expert testimony." CSOF ¶ 231. Orr's selection of Held cannot be an "honest exercise of professional judgment" when Orr did not even know of the statute and, therefore, did not exercise any professional judgment at all.

Orr also failed to consider subsequent events (*City of Pulaski*) casting doubt on the trial court's decision to exclude Held. Orr concluded that Judge Binkley's exclusion of Held was proper after merely "look[ing] at the statute, and . . . [then he] went and talked to the people at the – whatever it is, the licensing of the real estate people over in the State offices and so forth, and found out a little bit more about this statute." CSOF ¶ 232. Critically, he performed no research to verify that Judge Binkley's interpretation of the statute was accurate—he merely "trusted the Judge" that the ruling was correct. CSOF ¶ 233. He never read *City of Pulaski*. CSOF ¶ 234. Simply "trust[ing] the Judge" while performing no independent research of his own cannot constitute reasoned professional judgment sufficient to excuse Orr's negligence.

### 2. Orr's failure to seek a continuance is not protected by the professional judgment defense.

Regarding Orr's failure to seek a continuance, Smith explains that the standard of care required Orr to either seek leave of court to obtain a qualified expert appraiser or to move for a continuance "when the problem with Held's qualifications was openly identified at Held's deposition," after Metro filed both a supplemental motion to strike Held and a motion in limine. CSOF ¶ 235. After Judge Binkley's ruling excluding Held, Smith explains that the standard of care required Orr to both seek leave to obtain a qualified appraiser *and* move for a continuance. CSOF ¶ 236.

Although Levine Orr argues that a continuance would not have been granted, Smith squarely rejects that guess and explains that "Judge Binkley, or a reasonable judge in his

- 80 -

position, **almost certainly** would have granted either leave to obtain a new expert or would have granted a continuance if Orr had moved for leave or for a continuance at any point after the deposition, after the motion in limine was filed and even after the Court ruled on September 9th, 2010 on Plaintiffs' motion to strike expert Held." CSOF ¶ 237.

Even so, whether a continuance would have been granted bears on causation (as an element of malpractice) rather than whether Orr was acting within the discretion afforded to a professional in determining not to even **try** to obtain one.[23] Critically, in his deposition Orr **never disagreed** that a continuance would have been helpful to Plaintiffs' defense, or that there would have been any potential downside to seeking one—his only defense is that he guessed that Judge Binkley would not have granted one. CSOF ¶ 238. Even so, Metro's counsel in the Underlying Lawsuit has testified that if placed in the situation Orr was in, he would have sought a continuance to remedy the Held issue. CSOF ¶ 239. Where, as here, interlocutory rulings have damaged a client's case to such an extent as in the Underlying Lawsuit, it cannot be said as a matter of law that a lawyer engages in an honest exercise of his professional judgment when he declines to seek a continuance simply because he thought it might not be granted, and there is no potential downside in at least making the request. CSOF ¶ 240, *citing* Exhibit 5, Smith Declaration, ¶¶ 3-5.

---

[23] Levine Orr references comments made by the trial court in November of 2010 as establishing that the judge would not have granted a continuance to enable Orr to locate a proper expert to replace Held. Such comments by the trial judge were in the context of whether a continuance was in order to remedy the 30.02(6) rather than the Held issue. CSOF ¶ 241. Even so, an *ex post facto* statement by the trial judge that he would not have granted a continuance to remedy the Held issue does not at all affect the reasonableness of Orr's decision not to seek a continuance— an attorney's professional judgment must be reasonable **at the time it was purportedly exercised**. *Woodruff*, 616 F.2d at 930 (no liability for acts and omissions "based on an honest exercise of professional judgment").

### 3. Orr negligently drafted the adverse inference instruction and failed to object to the problematic language.

As an initial matter, Levine Orr did not move for summary judgment on Plaintiffs' claim that Orr's negligent conduct resulted in the imposition of the adverse inference instruction. Rather, Levine Orr argues that Orr's drafting of the instruction was not problematic as a matter of law. Smith opines that Orr was negligent in both "*preparing* the instruction and . . . fail[ing] to *object* to the language (even the language that Orr himself submitted) of the instruction at trial[.]" CSOF ¶ 242. Smith further explained the problem:

> The infirmity with this instruction as given was that while it said that the jury *may* infer that the non-produced evidence would have been unfavorable, it omitted the caveat that the jury was *not required* to infer that the testimony would have been unfavorable. *See Comments to Tennessee Pattern Jury Instruction (Civil)* 2.04 (T.P.I. Civil 2.04) ("[T]he jury may, *but is not required to,* infer that the testimony of the uncalled person would not support such party's case." (emphasis added) (citations omitted)). Instead, the instruction stated: "You are not, however, required to determine in what *respect it* [the non-produced evidence testimony] *would have been unfavorable* nor to give *this adverse inference* any particular weight in comparison with other facts and circumstances . . . the jury was *not told* that they did not have to infer anything at all.

> "In Tennessee, a party's failure to produce a document capable of shedding light on a material contested issue *can give rise to a permissive inference* that the missing document would have been unfavorable to the party possessing it." *Richardson v. Miller*, 44 S.W.3d 1, 27-28 (Tenn. Ct. App. 2000) (*citing* Tennessee Law of Evidence § 401.9 at 99) (emphasis added). Civil litigation attorneys, following the standard of care, must be familiar with the pattern jury instructions and the law regarding the difference between a permissive inference and a presumption in connection with jury instructions. For example, in *Gilley v. Eli Lilly & Co.*, the court held that it would instruct the jury *that it may infer, but is not required to infer*, that the Plaintiff did not take the digital photo of the certificate of completion at the time to which she has testified, based upon he failure to preserve the digital images and their accompanying metadata." No. 3:10-CV-251, 2013 U.S. Dist. LEXIS 56755, at *23 (E.D. Tenn. Apr. 2, 2013) (emphasis added).

- 82 -

> The instruction was, in fact, a *presumption* that the evidence not produced was unfavorable. The failure to object to the language of the instruction waived any chance for an appeal on this issue
>
> . . .
>
> Orr . . . **completely (and negligently) missed** the point that the instruction, as given, was an *incomplete* instruction that effectively created an irrefutable presumption.

CSOF ¶ 243.

Indeed, as Plaintiffs' expert has pointed out, Mowles and Olivas recognized the plain defectiveness of the instruction on appeal and characterized it as "overbroad and unrebuttable." CSOF ¶ 244. "The Court of Appeals, however, refused to consider this 'unrebuttable' issue because it had been waived at the trial by Orr's . . . failure to object to the language at trial . . . ." CSOF ¶ 245. Quite simply,

> [t]he standard of care *required* Orr . . . to object at trial to the instruction's language in order to preserve the appeal point. The standard of care required of reasonable trial lawyers in Tennessee is to know the difference between an inference and a presumption and to object to an instruction that fails to tell the jury that they are not required to infer anything at all.

CSOF ¶ 246.

At the very least, the dueling positions advanced by the parties' experts on the issue of Orr's negligence compels the conclusion that there remains a triable issues of fact preclusive of summary judgment to Levine Orr.

### III.    <u>CONCLUSION</u>

Defendants' motions fail for numerous factual and legal reasons. Plaintiffs respectfully urge the Court to deny the motions in their entirety.

- 83 -

Respectfully submitted this 17th day of November, 2014.

_s/ Douglas C. Northup_
Douglas C. Northup (admitted _pro hac vice_)
Carrie Pixler Ryerson (admitted _pro hac vice_)

Fennemore Craig, P.C.
2394 East Camelback Road, Suite 600
Phoenix, AZ 85016-3429
Telephone: (602) 916-5000
Email: dnorthup@fclaw.com
Email: cryerson@fclaw.com

- and -

Kenneth R. Jones, Jr. (Tenn. BPR #7278)
James W. White (Tenn. BPR #011886)
Jones Hawkins & Farmer, PLC
One Nashville Place, Suite 1820
150 Fourth Avenue North
Nashville, TN 37219
Telephone: (615) 726-0050
Email: kjones@joneshawkinsfarmer.com
Email: jwhite@joneshawkinsfarmer.com

_Attorneys for Plaintiffs_
_Allied Waste North America, Inc. and BFI Waste_
_Services, LLC_

- 84 -

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 17, 2014, the foregoing **Plaintiffs' Consolidated Memorandum in Response to Motions for Summary Judgment of Defendants Terrance Sullivan, Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC, Lewis, King, Krieg & Waldrop, P.C., Linda Mowles, Deborah Stevens, Levine, Orr & Geracioti, PLLC and Robert Orr, Jr.** was electronically transmitted to the Clerk's Office using the CM/ECF system for filing and service via transmittal of a Notice of Electronic Filing to the following CM/ECF registrants. All non-registered parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

Darrell G. Townsend
Howell & Fisher
Court Square Building
300 James Robertson Parkway
Nashville, TN 37201-1107
Email: dtownsend@howell-fisher.com
*Counsel for Lewis, King, Krieg & Waldrop and*
*Linda Hamilton Mowles and Deborah Stevens*

David B. Scott
T. William A. Caldwell
Ortale, Kelley, Herbert & Crawford
330 Commerce Street, Suite 110
P. O. Box 198985
Nashville, TN 37219-8985
Email: dscott@ortalekelley.com
Email: wcaldwell@ortalekelley.com
*Counsel for Weinberg, Wheeler, Hudgins, Gunn & Dial*
*and Terrance Sullivan*

Darryl G. Lowe
Gregory Brown
Lowe, Yeager & Brown
Riverview Tower, Suite 2102
900 S. Gay Street
Knoxville, TN 37902
Email: dgl@lyblaw.net
Email: gb@lyblaw.net
*Counsel for Levine, Orr & Geracioti, PLLC*
*and Robert Orr*

*s/ Douglas C. Northup*

9675762