# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

ALLIED WASTE NORTH AMERICA, INC., )
a Delaware corporation; and BFI WASTE )
SERVICES, LLC, a Delaware limited liability )
company, )
        )
     **Plaintiffs,** )
        )
  **v.** )    **No. 3:13-00254**
        )    **Judge Sharp**
LEWIS, KING, KRIEG & WALDROP, P.C., a )
Tennessee professional corporation; LINDA )
HAMILTON MOWLES, an individual; )
DEBORAH STEVENS, an individual; LEVINE, )
ORR & GERACIOTI, PLLC, a Tennessee )
limited liability company; ROBERT ORR, JR., )
an individual; WEINBERG, WHEELER, )
HUDGINS, GUNN & DIAL, LLC, a Georgia )
limited liability company; and TERRANCE )
SULLIVAN, an individual, )
        )
     **Defendants.** )

## MEMORANDUM

This a legal malpractice, breach of contract, and breach of fiduciary duty case that arose from

underlying state court litigation which led to a $7.2 million jury verdict against Plaintiffs Allied

Waste North America, Inc., and BFI Waste Services, LLC (collectively, "Allied/BFI"). Defendants

are three law firms (and some of their Members) (collectively "the law firms"), two of which were

hired to help remedy problems that the first allegedly created. This Memorandum addresses the five

pending motions (Docket Nos. 53, 73, 79, 80 & 85)[1] that were the subject of oral argument on

---

[1] Docket No. 83 is also listed as a pending Motion but will be terminated as a Motion because it is actually a Memorandum.

1

February 9, 2015.

# I. FACTUAL OVERVIEW

Leaving aside the literally hundreds of paragraphs and pages setting forth the parties' respective "concise" statements of facts and responses thereto, briefing on the pending motions nears 325 pages. To give some general context to the arguments addressed below, the Court begins by summarizing the factual allegations, which will later be expanded upon where necessary to discuss the  arguments raised in specific motions.

On May 23, 2002, fire destroyed the Nashville Thermal Transfer Facility, a waste-to-energy facility, owned by the Metropolitan Government of Nashville and Davidson County ("Metro"). Thereafter, in a case filed in the Davidson County Circuit Court styled Nashville and Davidson County, et al. v. BFI Waste Services, LLC, et al., Case Number 05C390T-5, Metro and its insurer sued multiple defendants, including Allied/BFI, for various causes of action related to the fire.

Allied/BFI retained Defendant Levine, Orr & Geracioti, PLLC ("Levine Orr"), and two of its Members, Defendants  Robert Orr, Jr. ("Orr") and Michael A. Geracioti ("Geracioti"), to defend the suit.  Plaintiffs allege that these Defendants failed to exercise reasonable care and breached their retainer contract by making numerous mistakes and missteps in the underlying litigation, but the following three are the most egregious.

First, even though Allied/BFI gave the Levine Orr Defendants the name of the individual who could testify about Allied/BFI's policies and procedures, those Defendants failed to timely designate and produce the witness in accordance with the requirements of Rule 30.02(6) of the Tennessee Rules of Civil Procedure.   Instead, the individual was disclosed just before trial.

The failure to make a timely designation led to a sanctions hearing on September 27, 2010,

during which Orr allegedly told the trial court that the discovery failure was his fault and that he had "screwed up," not Allied/BFI. As a consequence of the untimely disclosure, the trial court sanctioned Allied/BFI by giving an adverse inference instruction at trial which advised the jury that it could infer that Allied/BFI's policies and procedures and Rule 30.02(6) witness testimony were unfavorable to their defense.

Second, during discovery Allied/BFI learned that Metro had already intended to stop using the facility before the fire occurred. This made the facility's fair market value a key issue at trial. The Levine Orr Defendants retained an expert named Jonathan Held ("Held") to offer expert testimony on the facility's fair market value and to testify about the diminution in value of the facility due to its obsolescence (making the value of the property far lower than the cost of repairs that were never going to be made).

However, Metro moved to exclude Held's testimony under Tennessee Code Annotated (T.C.A.) § 62-39-103 on the ground that he was not a licensed appraiser and was thus prevented from offering an "appraisal report." Metro also argued that, under Tennessee law, the only measure of damages was repair cost, and given that Held was Allied/BFI's only evidence that the value of the facility was far less than the cost of repairs, the plan to discontinue use of the facility was irrelevant. The trial judge, Joseph Binkley, agreed with Metro's position, found Held not qualified to offer valuation opinions, and prohibited him from testifying regarding the future plans for the facility and its obsolescence.

Third, and related to the second, regardless of whether the trial court was correct or not, the Levine Orr Defendants were ineffective. If the court was right in prohibiting Held from testifying, they should have retained an expert who was actually qualified to offer the necessary opinion as to

3

the market value of the facility.  If the trial court was wrong, then the Levine Orr Defendants should have taken the necessary steps to prepare and introduce other evidence that the value was far less than the cost of repair.

The alleged shortcomings and mistakes were not limited to the Levine Orr Defendants.  Nor were they limited to pretrial proceedings and the trial, which concluded on October 5, 2010 with the return of the $7.2 million verdict, and the entry of final judgment against Allied/BFI on December 3, 2010, at which point interest began accruing.

Before trial, Allied/BFI retained the law firm Lewis, King, Krieg & Waldrop ("Lewis King") and two of its Members Linda Hamilton Mowles ("Mowles") and Deborah Stevens ("Stevens") as appellate specialists to monitor the trial and take appropriate measures to preserve any and all potential appellate issues for Allied/BFI.  In fact, the Lewis King Defendants sat through the trial, and provided daily trial reports and analysis.   At some point after the jury returned its verdict, Plaintiffs contend, the scope of the Lewis King Defendants' representation was expanded to include providing assistance with the appropriate post-trial motions, as well as an appeal through the Tennessee appellate court system.

In addition to the two firms and four lawyers already mentioned, Allied/BFI retained the law firm Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC ("Weinberg Wheeler") and two of its Members, Defendants Scott A. Witzigreuter ("Witzigreuter") and Terrance Sullivan ("Sullivan"), to provide post-verdict representations.  The Weinberg Wheeler Defendants entered an appearance on October 28, 2010, and were tasked with preparing post-trial motions relating to, among other things, the exclusion of evidence, and preparing to retry the case if post-trial motions were successful.

4

On January 3, 2011, counsel for Allied/BFI filed a Motion for Judgment Notwithstanding the Verdict, Motion for New Trial, and Motion for Suggestion of Remittur ("Motion for New Trial"). That motion was prepared by both Levine Orr and Weinberg Wheeler Defendants, but the Lewis King Defendants are also alleged to have been heavily involved in the drafting, reviewing, and revising of the motion.

The Motion for New Trial was denied in its entirety. On March 9, 2011, the Lewis King Defendants filed a notice of appeal.

The Tennessee Court of Appeals issued an opinion on March 22, 2012, affirming the rulings of the trial court. Metro. Govt. of Nashville & Davidson Cnty. v. BFI Waste Serv., 2012 WL 1018946 (Tenn. Ct. App. Mar. 22, 2012). In doing so, the Court of Appeals found that the issue surrounding the exclusion of Head's valuation testimony was waived because Held was "not named in Defendants' motion for new trial or supporting memorandum nor is the exclusion of his valuation testimony expressly alleged as an error in either," and "objection to jury instructions and requests for offers of proof" did not "preserve[] the issue of the exclusion of Mr. Held's valuation testimony for appeal." Id. at *6. The Court of Appeals also upheld the giving of the negative inference instruction "because the burden was on Defendants to designate" the corporate representative and even though a witness testified in a deposition some two years before trial that her co-employee Eileen Shuler could answer the questions, Metro could not "be responsible for failing to identify Ms. Shuler as the appropriate corporate representative when Defendants, themselves, were admittedly unaware that she was the appropriate designee." Id. at *11.

Leave to take a discretionary appeal to the Tennessee Supreme Court was obviated in July 2012, when the adjusters decided to settle the case for $8 million. This lawsuit followed with the

filing of the Complaint on March 30, 2013.

## II.  DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (Docket Nos. 80, 83 & 85)

All Defendants move for summary judgment and raise two primary arguments: this litigation is barred by the statute or limitations, and their actions (even if malpractice) were not the cause of injury to Allied/BFI.  They also seek summary judgment on the amount of damages to which Plaintiffs may be entitled.  Because the statute of limitations is a primary focus of the briefing and it is potentially dispositive of the entire matter, the Court turns to that issue first.

## A.  Statute of Limitations

"Defenses based on a statute of limitations are particularly amenable to summary judgment motions" because "[m]ost often the facts material to a statute of limitations defense are not in dispute."  Cherry v. Williams, 36 S.W.3d 78, 83 (Tenn. Ct. App. 2000).  "When the facts and the inferences reasonably drawn from the facts are not disputed, the courts themselves can bring to bear the applicable legal principles to determine whether the moving party is entitled to a judgment as a matter of law."  Id.

The relevant statute of limitations for legal malpractice claims (codified at Tenn. Code Ann. § 28-3-104(a)(2) at the time this suit was filed) provides:

> Actions and suits against licensed public accountants, certified public accountants, or attorneys for malpractice shall be commenced within one (1) year after the cause of action accrued, whether the action or suit is grounded or based in contract or tort.

Tenn. Code Ann. § 28-3-104(c)(1).  "A cause of action for legal malpractice accrues and the statute of limitations is triggered when: 1) the defendant committed negligence; 2) the defendant's negligence caused the plaintiff to suffer a 'legally cognizable' or actual injury; and 3) the plaintiff knows, or in the exercise of reasonable care and diligence should have known, that the injury was

6

caused by the defendant's negligence." Hartman v. Rogers, 174 S.W.3d 170, 173 (Tenn. Ct. App. 2005) (citing Carvell v. Bottoms, 900 S.W.2d 23, 28, 30 (Tenn. 1995)).

As with some other claims including medical malpractice, Tennessee law applies the discovery rule to legal malpractice claims. The Tennessee Supreme Court thoroughly discussed the rule's application to legal malpractice as follows:

> In legal malpractice cases, the discovery rule is composed of two distinct elements: (1) the plaintiff must suffer legally cognizable damage—an actual injury—as a result of the defendant's wrongful or negligent conduct, and (2) the plaintiff must have known or in the exercise of reasonable diligence should have known that this injury was caused by the defendant's wrongful or negligent conduct. . . . An actual injury occurs when there is the loss of a legal right, remedy or interest, or the imposition of a liability. . . . An actual injury may also take the form of the plaintiff being forced to take some action or otherwise suffer "some actual inconvenience," such as incurring an expense, as a result of the defendant's negligent or wrongful act. . . . However, the injury element is not met if it is contingent upon a third party's actions or amounts to a mere possibility.

> The knowledge component of the discovery rule may be established by evidence of actual or constructive knowledge of the injury. . . . Accordingly, the statute of limitations begins to run when the plaintiff has actual knowledge of the injury as where, for example, the defendant admits to having committed malpractice or the plaintiff is informed by another attorney of the malpractice. Under the theory of constructive knowledge, however, the statute may begin to run at an earlier date – whenever the plaintiff becomes aware or reasonably should have become aware of facts sufficient to put a reasonable person on notice that an injury has been sustained as a result of the defendant's negligent or wrongful conduct. . . . We have stressed, however, that there is no requirement that the plaintiff actually know the specific type of legal claim he or she has, or that the injury constituted a breach of the appropriate legal standard. . . . Rather, "the plaintiff is deemed to have discovered the right of action if he is aware of facts sufficient to put a reasonable person on notice that he has suffered an injury as a result of wrongful conduct." . . . "It is knowledge of facts sufficient to put a plaintiff on notice that an injury has been sustained which is crucial." . . . A plaintiff may not, of course, delay filing suit until all the injurious effects or consequences of the alleged wrong are actually known to the plaintiff. . . Allowing suit to be filed once all the injurious effects and consequences are known would defeat the rationale for the existence of statutes of limitations, which is to avoid the uncertainties and burdens inherent in pursuing and defending stale claims.

7

John Kohl & Co., P.C. v. Dearborn & Ewing, 977 S.W.2d 528, 532-33 (Tenn. 1998) (internal citations and parenthetical quotations omitted).

The parties agree with the general law governing legal malpractice claims. Not surprisingly, however, they disagree on its application in this case.

Plaintiffs argue that the shot triggering the statute of limitations was the decision of the Court of Appeals. If that is the case, then this litigation is timely because the Complaint was filed within a year thereafter.

Defendants argue that the statute of limitations began to run long before the Court of Appeals rendered its decision. In this regard, they claim that, at the very least, the statute began running on (1) January 20, 2011, when Allied/BFI received the Motion and Memorandum for New Trial which did not contain arguments specifically mentioning the exclusion of Held's testimony; (2) on September 23, 2011, when Lewis King emailed appellate briefs discussing the waiver issue to Michele Casey, a Liability Claims Manager for Allied/BFI who oversaw claims and claims programs for 50% of the United States; or (3) on September 30, 2011, when Allied/BFI processed Lewis King bills that contained entries for research by Mowles on the issue of waiver.

"Determining when a legally cognizable injury has occurred can often be accomplished without too much difficulty when the lawyer's allegedly negligent act or failure to act occurs outside of litigation." Cherry, 36 S.W.3d at 83. "However, the task becomes more difficult when the lawyer's act or failure to act occurs during the course of litigation," partly because "the rules governing when a person suffers legally cognizable injury from litigation malpractice must take into account that not every misstep leads to a fall." Id. at 83 & 84. Nevertheless, "[i]n litigation, the most easily identifiable time when rights, interests, and liabilities become fixed is when a court

8

enters judgment," and, "[a]ccordingly, most courts have made the entry of an adverse judgment the starter pistol for the running of the statute of limitations on litigation malpractice." Id. at 85 (collecting cases).

Plaintiffs' position that the statute of limitations launched when the Court of Appeals rendered its decision has some appeal. Not only is it in keeping with Carter's acknowledgment that most courts consider the clock to begin ticking when a final judgment imposes liability, it makes some sense in this particular case.

Barring the unlikely event of the Tennessee Supreme Court granting a discretionary appeal, Allied/BFI's liability was definitively fixed, and it suffered real harm, when the Court of Appeals affirmed the trial court's rulings. Indeed, it can be said that, up until that point, there was no "loss of a legal right, remedy or interest, or the imposition of liability." John Kohl, 977 S.W.2d at 532. Moreover, "[t]he injury element is not met if the harm is contingent upon a third party's actions or amounts to a mere possibility," Honeycutt v. Wilkes, McCullough & Wagner, 2007 WL 2200285, at *4 (Tenn. Ct. App. Aug.2, 2007), and it can fairly be argued that Metro's assertion that Allied/BFI waived its argument in relation to Held was contingent on the appellate court's agreement with that position. Until then, it was only a possibility because the Court of Appeals would first have to conclude that the issue was, in fact, waived. Compare Porter-Metler v. Edwards, 1998 WL 131515, at *2 (Tenn. Ct. App. Mar. 25, 1998) ("But in this case, where service of process was not time reissued, it was patently clear that plaintiff's claim . . . had become time-barred and there is nothing that could have been done to revive her action").

Further, even if the Court of Appeals did side with Metro on the issue of waiver (as it did), it was not axiomatic that the Held exclusion would be affirmed. While Tennessee Rule of Appellate

9

Procedure (3)(e) provides that issues for appeal must first be stated in a new trial motion or they are waived, "Tennessee Rule of Appellate Procedure 36(b) further provides that 'an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.'" Kennard v. Methodist Hosp. of Memphis, 2012 WL 1372057, at *4 (Tenn. Ct. App. April 8, 2012). In fact, "just as parties must endeavor to specifically state the issues raised so as to avoid any potential for future waiver, appellate courts should not lightly dismiss an issue on appeal under a strict or technical application of Rule 3(e)." Fahey v. Eldridge, 46 S.W.3d 138, 143-44 (Tenn. 2001).

Utilizing the final decision on the merits (or, as here, an appellate affirmance of that decision) as the benchmark for when a statute of limitations begins to run is remarkable in its simplicity because it provides a clear-cut triggering point for the statute of limitations. But it may be too simplistic because, as noted, there can be various missteps during the course of litigation, and the Tennessee Supreme Court has rejected the argument "that where an ongoing lawsuit implicates the conduct of a lawyer, and where the viability of a malpractice claim depends on the outcome of this underlying suit, the statutory period of limitations should be tolled until all the appellate proceedings of the underlying suit have been completed." Carvell v. Bottoms, 900 S.W.3d 23, 29 (Tenn. 1995).

Ultimately, however, the Court need not decide the statute of limitations issue by using the Court of Appeal's decision as the trigger date. Defendants are the ones moving for summary judgment, and they have failed to carry their burden of showing that Plaintiffs discovered, or should have discovered, the basis for a malpractice claim on any of the early dates Defendants propose.

As stated at the beginning of this discussion, deciding statute of limitations defenses are

10

generally resolvable on summary judgment because "[w]hether a claim is barred by an applicable statute of limitations is a question of law." Brown v. Erachem Comilog, Inc., 231 S.W.3d 918, 921 (Tenn. 2007). "However, the issue of when a claim accrued, for purposes of determining whether the statute of limitations has run, can be either a question of fact for the jury or a question of law for the court." Taylor v. Metro. Gov't of Nashville and Davidson Cnty., 2008 WL 5330502, at *8 (Tenn. Ct. App. Dec. 19, 2008). Tennessee courts have "distinguished between situations when the accrual of a cause of action is a question of fact and when it is a question of law:

> The time of the accrual of the cause of action, as affecting the running of the statute of limitations, is frequently a question of fact to be determined by the jury or trier of fact under the evidence, as where the evidence is conflicting or the time is not clearly provided and is a matter of inference from the testimony. On the other hand, if the evidence is undisputed and only one conclusion can be drawn therefrom, the time of the accrual of the cause of action is a question of law to be determined by the Court.

Id. (quoting Osborne Enter., Inc. v. City of Chattanooga, 561 S.W.2d 160, 165 (Tenn. Ct. App. 1977)). Additionally, " the time at which a plaintiff discovers or reasonably should discover a cause of action is typically a question of fact for the trier of fact to decide," Montesi v. Nationwide Mut. Ins. Co., 970 F. Supp.2d 784, 789-90 (W.D. Tenn. 2013) (collecting cases), and "[w]hether the plaintiff exercises reasonable care and diligence in discovering a compensable injury within the period of limitations is a question of fact for the jury where different inferences may be drawn from the proof." Gosnell v. Ashland Chemical, Inc., 674 S.W.2d 737 (Tenn. App. 1984).

Defendants argue that the statute of limitations began to run on January 20, 2011, when Weinberg Wheeler emailed the Motion for New Trial and its Memorandum of Law to Casey and her supervisor Dave Spruance, the Vice President of Risk Management at Republic Services, Inc., the parent holding company of Allied/BFI. It is undisputed that Spruance read the brief because his response email stated, "Very well written; I have read many briefs over the years (and even prepared

11

a few myself) and this one was clear, concise and well-supported." (Docket No. 106 at 10).

However, the fact that Spruance read the brief is not dispositive on the issue of whether the Head exclusion was being waived, not only because Spruance's claimed knowledge of waiver was limited,[2] but also because waiver was not discussed in either the Motion or Memorandum and it is far from clear that anyone would know, or reasonably understand, that waiver was occurring.

Among the issues raised in the Motion for a New Trial as identified by the Court of Appeals were whether:

> C. The Jury Instruction As To The Determination Of The Value Of Loss Was Inconsistent With Tennessee Law And Defendants Should Have Been Permitted to Introduce Evidence of The Pre–Loss Plan for Nashville Thermal
>
> D. The Court Must Allow BFI the Opportunity to Present Offers of Proof on Those Evidentiary Matters Subject to The Court's September 20, 2010 Order Limiting BFI's Presentation of Evidence
>
> E. The Verdict Was Excessive, Against the Weight Of the Evidence and Contrary To Principles of Justice

BFI Waste Serv., Inc., 2012 WL 1018946, at *6. Certainly a jury could conclude that Spruance (or a reasonable person) thought that nothing was amiss in the formulation of the issues, since his own lawyers apparently believed at that time that the characterizations of the issues were sufficient to encompass all issues necessary for appeal.

Moreover, Allied/BFI has submitted an Expert Report from David Smith pursuant to Rule 26 of the Federal Rules of Civil Procedure in which he declares:

> 1. The issue of waiver, specifically as it relates to waiver of issues on appellate

---

[2] Spruance is a law school graduate. He testified in his deposition that he practiced law in Connecticut for about four to five years and "had a fairly basic program of family law, some real estate, a little bit of corporate work, and some criminal defense." (Docket No. 102-4, Spruance Depo. at 13). He claims he understood the concept of waiver primarily from "the criminal side in waiving your rights under the Miranda principle[.]" (Id. at 103).

review pursuant to Tenn. R. App. Proc. 3 and the waiver held by the Tennessee Court of Appeals to have occurred with respect to the issue of Jonathon Held's testimony in the Underlying Lawsuit, is complex.

2. The standard by which issues must be stated in a motion for new trial in order to be preserved on appeal, and the nuanced concept of waiver, are legal topics that only experienced attorneys comprehend.

(Docket No. 99-9 at 1). C. J. Gideon, Jr. has submitted an Expert Report on behalf of Defendants Weinberg Wheeler in which he states that he does "not believe Held's exclusion was waived." (Docket No. 126-1 at 5). Even the Court of Appeals recognized that "'the Rule is silent as to how specific the[] grounds must be,'" so as to avoid waiver. Id. (quoting Fahey v. Eldridge, 46 S.W.3d 138, 142 (Tenn. 2001)).

Given the complexity and lack of specificity regarding the rule surrounding waiver, and given the dispute as to whether waiver even applied, the Court can hardly say as a matter of law that the Motion for New Trial and accompanying Memorandum should have made Spruance aware that a problem was brewing, particularly since waiver had not even been mentioned at that time. This remains so, even though he complemented the briefing because, as he plausibly explained in his deposition, he was simply referring to "how it was laid out," he had "never appealed a case, and it was [Allied/BFI's] practice to rely on outside counsel for the substance of what they were writing[.]" (Docket No. 102-4, Spruance Depo. at 69-20).

On the other hand, Metro's appellee brief raised waiver of the exclusion of Held as the first issue. It also argued that Allied/BFI failed to preserve the issue of the trial court's exclusion of demolition cost testimony from Harvey Gershman, argued that Allied failed to present competent evidence of real estate valuation, and contended that the trial court properly excluded testimony concerning the pre-fire plans and pre-fire condition of the facility. Defendants argue that brief –

13

forwarded to Allied/BFI on September 23, 2011 – coupled with Allied BFI's receipt of billing on September 30, 2011, which included approximately 14 hours of research by Mowles on the issue of waiver, should have placed Allied/BFI on notice of waiver.

When the facts are construed in Allied/BFI's favor, as they must be, the contention that billing for research by Mowles was sufficient itself to provide notice requires little discussion. For one thing, Mowles' research was conducted before Metro filed its brief, and, for another, it is not clear how much time was actually spent researching the waiver issue. Even more fundamentally, Defendants did not send their bill to Allied/BFI, rather they sent it to AIG.

AIG was Allied/BFI's insurer and claims adjuster and it paid invoices on behalf of Allied/BFI. In this regard, "on a monthly basis, Allied/BFI transferred a fixed amount of several millions dollars to AIG from which AIG would deduct various expenses incurred on Allied's behalf, . . . includ[ing] attorneys' fees incurred and charged to AIG for legal services provided to Allied for hundreds of matters pending around the country." (Docket No. 102-8, Casey Decl. ¶¶ 5-8). The invoices that Allied/BFI actually received from AIG merely indicated the payments made by AIG to vendors, but did not indicate the dates on which the services were performed or describe the particular work performed.

The fact that hundreds of cases were pending around the country also plays into Allied/BFI's explanation as to why Metro's brief would not have provided notice – neither Casey nor Spruance read the document. Casey claims that it would have been impossible for her to read all of the documents she received on a given case and stated in her deposition that "Allied hired AIG to handle day-to-day management of the litigation to which Allied was a party[,] Allied supervised AIG, and AIG, in turn, supervised the day-to-day issues of the litigation." ( Id. ¶¶ 12-13).

14

Spruance echoes those sentiments, testifying in his deposition that, given the volume of cases, he "rarely" read filings.[3] He does not recall reading Metro's filing at the time and contends that, even if he had, he would not have understood its import. In fact, he claims that he first became aware that waiver had occurred on March 29, 2012, when Sullivan flew to Arizona to meet both Spruance and Casey, apologized for what had happened and, allegedly, suggested that Allied/BFI should file a legal malpractice action against all of the lawyers involved.

Defendants (more particularly the Weinberg Wheeler Defendants) argue that a "reasonable person would have read the appellee and reply brief," and that a "reasonable person would have also understood the implication of Metro's argument regarding waiver." (Docket No. 125 at 8 & 9). Defendants (more particularly the Lewis King Defendants) also argue that "[h]aving reached a conclusion more than a year before September 23, 2011 that the underlying case was being mishandled, and then having been hit with a $7 million-plus jury verdict on October 5, 2011, it defies logic and common sense for Allied to argue that it. . . started paying less attention to the handling of the underlying litigation" at the time Metro's brief was filed which, itself, was "a watershed moment." (Docket No. 124 at 4 & 7).

However, whether it was reasonable for Spruance and/or Casey not to have read Metro's brief, and whether it is illogical to believe that they did not do so given all that had previously transpired, are determinations only a jury can make. This is particularly so since a jury could find that waiver was never presented to Allied/BFI as a possible problem until Metro's brief, yet, in forwarding the brief, Mowles never flagged the issue. A jury might think she tried to camouflage

---

[3] Any discrepancies between his assertion that he rarely reads filings, yet read the Motion for a New Trial but not Metro's brief, is for the jury to consider.

what turned out to be a huge problem by failing to note it and by sending the opening and reply briefs in quick succession.

A jury might also think that it made sense for Allied/BFI not to be too concerned about the actual substance of the brief because, shortly after Mowles' email attaching the brief, Casey wrote Sullivan asking if he had reviewed all the briefs and inquiring as to who would present oral argument. In response, Sullivan assured here that they had reviewed Metro's brief, told her who would be handling arguments, and observed that "[i]t is my belief that we will be in better shape after the argument, which should lay waste to [Metro counsel's] puffery about their appellate position being 'a lock.' Only a fool would make such a ststement [sic], but every time HE calls us, he blathers about that[.]'" (Docket No. 102-1 at 3).

Finally, on the statute of limitations issue, the Lewis King Defendants and the Weinberg Wheeler Defendants briefly argue that knowledge of the alleged negligence regarding waiver should be imputed to Allied/BFI by virtue of the fact that both firms are alleged to have committed malpractice and both represented Allied/BFI. As a consequence, the argument goes, Plaintiffs had constructive knowledge of Lewis King's alleged mistakes because Weinberg Wheeler's knowledge is imputed to Plaintiffs and the converse is also true – Plaintiffs had constructive knowledge of Weinberg Wheeler's alleged mistakes because they were also represented by Lewis King.

Defendants are correct that "[t]he law is clear that the attorney is the agent for the client, and '[a] client is implied to have notice of facts transmitted to his attorney in the matter and course of his employment for such client,' Wilkins v. Dodson, Parker, Shipley, Behm & Seaborg, 995 S.W.2d 575, 584 (Tenn. Ct. App. 1998)," and that "it is well settled that '[k]nowledge of facts learned by an attorney in the course of his [or her] employment will be imputed to his client,'" Bellar v. Baptist

16

Hosp., Inc., 559 S.W.2d   They are also correct that a "'person generally is held to know what his attorney knows and should communicate to him, and the fact that the attorney has not actually communicated his knowledge to the client is immaterial.' Smith v. Petkoff, 919 S.W.2d 595, 597-98 (Tenn. Ct. App. 1995)."  (Docket No. 83 at 21-22)

But Defendants point to no cases holding that knowledge or notice is imputed to a client because it contemporaneously retains two law firms, both of whom are alleged to have committed malpractice and both of whom allegedly have a vested interest in insuring that the client does not become aware of the malpractice.  Such a result would be perverse.

"The imputation of knowledge from agent to principal is justified because a 'principal's agents link the principal to the external world for purposes of taking action. . . .'"  Wells Ent., Inc. v. Olympic Ice Cream, 2012 WL 256278, at *5 (N.D. Iowa June 29, 2012) (quoting RESTATEMENT (THIRD) OF AGENCY § 5.03, ct. b.); see Smith v. Petkoff, 919 S.W.2d 595, 597 (Tenn. Ct. App. 1994) (imputing liability on client after lawyer involved in case left law firm because "at this point [lawyer] had but a single obligation in this case, and that was totally to plaintiff").  "[N]otice is not imputed for purposes of determining rights and liabilities as between principal and agent" and, "[a]s a consequence, imputation does not furnish a basis on which an agent may defend against a claim by the principal." RESTATEMENT (THIRD) OF AGENCY § 5.03, ct. b.; see, Steuve Bros. Farms, LLC v. Berger Kahn, 166 Cal. Rptr. 3d 116, 126 (Cal Ct. App. 2013) ("[I]n none of the cases [defendant] cites was the attorney's knowledge that he had wronged his client imputed to his law firm and imputed to the client. Rather, in those cases, the attorney's knowledge was imputed to the client where the actions of an unaffiliated third party gave rise to a cause of action on behalf of the client. . . .  Moreover, where a malevolent agent's actions are hostile to his principal, we neither presume

17

that the agent will disclose those actions to his principal nor impute the agent's knowledge of his own misdeeds to his principal."); In re Alijah Q., 7 A.3d 106, 124 (Md. Ct. App. 2010) ("[T]he act of the agent will not bind the principal if the interests of the former in a given transaction are hostile to those of the latter"); Bock v. Am. Growth Fund Sponsors, Inc., 904 P.2d 1381, 1385 (Col. App. 1995) (citation omitted) ("when notice is given to an agent while acting in his or her own personal interest, which is hostile to that of the principal, such notice is not imputed to the principal").

Based on the foregoing, the law firms' request for summary judgment based upon their statute of limitations defense will be denied.

## B. **Limitation on Damages**

Defendants argue that, had the Court of Appeals determined it was error to exclude Held's valuation testimony, the case would have been remanded solely for a new trial on damages because his opinion related to Metro's damages and bore no relation to Allied/BFI's liability. Likewise, the excluded evidence relating to demolition costs and the pre-fire condition of the facility had no bearing on liability, only on the amount of damages. Consequently, Defendants argue, any retrial would, at most, have allowed Plaintiffs to recover $3,927,057 because, prior to the underlying trial, counsel stipulated to damages in that amount, consisting of $2,399,057 for business interruption losses and $1,528,000 for replacement cost of destroyed cranes. Since this amount exceeded Allied/BFI's deductible, Allied/BFI was not damaged by the alleged malpractice because they would have still had to pay their deductible and pro-rata share of litigation costs.

Obviously, and as explained in more detail below, this Court cannot say with certainty what would have happened if the appellate court found error and remanded for a new trial. Still, its seems unlikely that a remand would have led to simply a damages retrial where the stipulated damages

18

would govern.

Not only did Plaintiffs apparently request a new trial as to each of the issues raised in the appellate briefing, the alleged errors (including the Held issue and the adverse inference instruction) appear to have affected both liability and damages. Additionally, when the facts are construed in Plaintiffs' favor, they show that the stipulated damages agreement was reached only after (and because of) the trial court's pre-trial rulings and was based upon Metro prevailing on liability. Further, because comparative fault would be at issue, stipulated damages would be irrelevant if Metro's negligence exceeded Allied/BFI's comparative negligence.

This does not end the amount of damages inquiry, however, because Allied/BFI's damages in this case are not the $7.2 million verdict, the $8 million settlement, or even the $3,927,057 in stipulated damages. Rather, the most that Allied/BFI can recover in this suit is the $2.5 million it paid on its deductible to settle the underlying suit,[4] as well as the fees and expenses incurred in this lawsuit. See, Austin v. Sneed, 2007 WL 3375335, at *11 (Tenn. Ct. App. Nov. 13, 2007) (noting that in addition to direct damages for legal malpractice, consequential damages can include "the expenses incurred in suing the attorney for legal malpractice"). The Court so rules, notwithstanding the fact that Defendants' alleged negligence in the underlying lawsuit arguably led to an extremely large verdict and settlement, and Allied/BFI's contention that the collateral source rule bars admission of its insurance policy.

Tennessee has adopted the collateral source rule as set forth in RESTATEMENT (SECOND) OF TORTS (1977) § 920A. Fye v. Kennedy, 991 S.W.2d 754, 763 (Tenn. 1998). So far as relevant, that

---

[4] Allied/BFI paid its self-insured retention ("SIR") of $2.5 million and a pro-rated share of the litigation costs which, combined, totaled approximately $3.6 million.

19

rule provides: "'Payments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable.'" Id. (quoting RESTATEMENT § 920A(2)). This means that "'[n]ormally . . . in an action for damages in tort, the fact that the plaintiff has received payments from a collateral source, other than the defendant, is not admissible in evidence and does not reduce or mitigate the defendant's liability.'" Id. (quoting Donnell v. Donnell, 415 S.W.2d 127, 134 (1967)).

There is an exception to the collateral source rule in Tennessee for medical malpractice plaintiffs who may not recover for the cost of medical care if that cost was indemnified in whole or in part by insurance. Tenn. Code Ann. § 29–26–119. Allied/BFI highlights this exception specifically because (1) the statute "'is in derogation of the common law and is therefore to be strictly construed'" Steele v. Ft. Sanders Anesthesia Group, P.C., 897 S.W.2d 270, 283 (citing Austin v. Cnty. of Shelby, 640 S.W.2d 852, 854 (Tenn. Ct. App.1982)); and (2) "[t]he common law may not be altered any further by statute than the statute expressly declares and necessity requires," id. (citing Davenport v. Chrysler Credit Corp., 818 S.W.2d 23, 28 (Tenn. Ct. App. 1991)). Given that a statutory exception is made only for medical malpractice, Allied/BFI argues that no such exception to the collateral source rule applies in legal malpractice cases.

Allied/BFI's arguments make for interesting reading, but, in the Court's opinion, they are beside the point. The collateral source rule simply does not apply under the circumstances of this case.

An essential element of a legal malpractice case is "damages resulting from the neglect." Jamison v. Norman, 771 S.W.2d 408 (Tenn. 1989). "When the malpractice occurs in the context of litigation, the direct damages include the difference between the amount actually received or paid

and the amount that would have been received or paid but for the lawyer's negligence."  Austin, 2007 WL 3375335, at * 11.  As one court has more fully explained:

> The gravamen of a legal malpractice action is that the plaintiff had a valid cause of action for injuries caused by a third-party tortfeasor.  The plaintiff would have been recompensed for the injury but for the negligence of the plaintiff's attorney.  Consequently, the attorney who is deemed negligent stands in place of the third-party tortfeasor to recompense the plaintiff. The legal malpractice action places the plaintiff in the same position he or she would have occupied but for the attorney's negligence.  *The operative words are "in the same position."*  The link exists to ensure that the plaintiff is in no better position by bringing suit against the attorney than if the underlying action against the third-party tortfeasor had been successfully prosecuted.

Bloome v. Wiseman, Shaikewitz, McGivern, Wahl, Flavin & Hesi, P.C., 664 N.E.2d 1125, 1131 (Ill. Ct. App. 1996) (emphasis added).  This measure of damages in not unlike that available for a breach of contract action where plaintiff is to be placed "as nearly as possible, in the same position he would have been in had the contract been performed," Hobbs v. Nottingham, 2015 WL 399216, at *11 (Tenn. Ct. App. Jan. 30, 2015), and for which the collateral source rule has been found not to apply,  Drewry v. Continental Casualty Co., 1992 WL 60876, at *5 (Tenn. Ct. App. March 30, 1992).

    The body of law surrounding the applicability of the collateral source rule to legal malpractice claims is hardly substantial, and there appears to be no cases discussing the issue in Tennessee.  Looking elsewhere, one case presents somewhat analogous facts, is worthy of note, and supports this Court's conclusion.

    Ohio Cent. RR. Sys. v. Mason Law Firm Co., L.P.A. involved a situation in which the Ohio Central Railroad sued its lawyers for malpractice after it was found liable for a $1.3 million verdict brought by former employee Matthew Lingo who had lost a leg in a workplace accident. 915 N.E.2d 397 (Ohio App. 2009).  Ohio Central had an insurance policy underwritten by Lloyds of London that

covered the underlying suit and "provided for $100,000 in self-insurance retention ('SIR'), meaning that [Ohio Central] was responsible for paying the first $100,000 of any liability under the policy, including attorney fees, costs, and damages." Id. at 400. Ohio Central sued for the entire amount of the verdict in the underlying lawsuit, asserting that Lloyd's had "ratified" the malpractice suit and it was acting as the authorized agent for Lloyds in connection with the verdict that had been paid. The trial court granted summary judgment, reasoning "that because it was undisputed that [the Ohio Central] would have expended $100,000 in connection with the Lingo litigation regardless of whether [the lawyers] were negligent, and [the Ohio Central] did not expend any more than that amount in connection with the Lingo litigation, it had adduced no evidence that it suffered any damages proximately caused by appellees' alleged negligence." Id. at 401.

On appeal, the Ohio Central argued "that the collateral-source rule demands that the trial court ignore the fact that Lloyds paid any amounts under the policy in connection with the Lingo litigation," and "that when the collateral source rule is applied in this case, the fact that damages were paid pursuant to the policy is irrelevant" making summary judgment inappropriate. Id. In rejecting that argument, the Ohio Court of Appeals wrote:

> The issue that appellant's first assignment of error presents is whether, in ruling on a motion for summary judgment in a legal-malpractice action in which the only plaintiff is the insured against whom a judgment was entered as a result of the alleged legal malpractice, the collateral-source rule precludes courts from considering damages that the *plaintiff's insurer* – not the plaintiff-insured – has paid pursuant to that insurance policy. In our view, the collateral-source rule has no application, and the trial court correctly eschewed consideration of any damages for which Lloyds had indemnified appellant.

> In Cleveland Paint & Color Co. v. Bauer Mfg. Co. (1951), 155 Ohio St. 17, 44 O.O. 59, 97 N.E.2d 545, the Supreme Court of Ohio held, "[A] subrogee who has paid an entire loss suffered by the insured must sue in his own name, as he is the only real party in interest." Id. at 25, 44 O.O. 59, 97 N.E.2d 545. . . .

22

Congruently, we have held that when the plaintiff insured admits that *the insurer has paid all of the damages*, except for the insured's contractually required deductible, and that the insurer is subrogated to the insured's rights, the trial court properly limits the insured's recovery to the amount of the deductible. <u>Ward v. Tea</u> (June 13, 1989), 10th Dist. No. 88AP–1147, 1989 WL 65410. In such a case, the "'insurer may prosecute a separate action against the party causing such injury to the extent of the amount paid under [the insurance policy].'" Id. . . . In other words, the insured is the sole real party in interest with respect to its deductible or, in this case, its SIR, while the insurer is the sole real party in interest with respect to the amounts it paid pursuant to its contract with the insured. Thus, these parties may prosecute separate actions or a single action as coplaintiffs, but in either case, each is the sole real party in interest with respect to the claim for damages that it alone incurred.[5]

This case fits squarely within the holding in <u>Ward</u> because appellant admits that Lloyds has paid all its damages except for the SIR, and it is undisputed that Lloyds is contractually subrogated to appellant's rights for the amounts Lloyds paid. Though appellant and Lloyds share an interest in the sense that they can both seek to impose malpractice liability upon appellees, each has its own distinct and separate interest to pursue. Thus, under <u>Ward</u>, it was proper for the trial court to limit appellant's damages to the amount of the SIR, which, in this context, is analogous to a deductible.

For this reason, appellant was not entitled to seek recovery of amounts that Lloyds paid. Rather, it was entitled to seek recovery of its SIR only.

<u>Id</u>. at 404-05 (emphasis in original).

---

[5]  This is similar to Tennessee law which provides:

> Upon payment by the insurer of a loss, it becomes the real party in interest with respect to the subrogation claim and has the right to bring suit in the name of the insured or in its own name. The insurer may intervene in an action brought by the insured against a wrongdoer and assert its subrogation claim therein but, it cannot bring suit against the wrongdoer after judgment has been rendered in the insured's action. In short, the subrogation claim is the property of the insurer to deal with as it pleases so long as the rights of others, e.g., the insured or the wrongdoer, are not prejudiced.

<u>Travelers Ins. Co. v. Williams</u>, 541 S.W.2d 587, 590 (Tenn. 1976) (internal citations omitted).

This case appears somewhat different in the sense that, had the lawyers not been allegedly negligent in the underlying suit, Allied/BFI may not have been responsible for the $2.5 million deductible because Metro may have lost the case, even though Allied/BFI may have been responsible for substantially the same pro-rata share of the litigation costs. Still, the underlying premise of <u>Ohio Central</u> holds true: the insured in a legal malpractice case is entitled to recover that which it paid in the underlying suit, not the entire amount which was paid to settle or satisfy a verdict. In such circumstance, the collateral source rule simply does not come into play. <u>See also</u>, <u>USF Holland, Inc. v. Radogno, Cameli, and Hoag, P.C.</u>, 24 N.E.3d 97, 122 (Ill. Ct. App. Dec. 15, 2014) (finding "no compelling reason to depart from [earlier decision] holding that the collateral source rule does not apply in legal malpractice actions"); <u>Miller v. Ellis</u>, 126 Cal. Rptr.2d 667, 671 (Cal. Ct. App. 2002) (collateral source rule did not apply where, "aside from a $5,000 insurance deductible, [plaintiff] did not advance any of the damages paid to [claimant] by his insurance carrier to settle the underlying personal injury action"); <u>Meyer v. Dempcy</u>, 740 P.2d 383, 385-86 (Wash. Ct. App. 1987) ("the collateral source rule does not apply where, as here, a plaintiff sustains a 'loss' that is a judgment or settlement in an unrelated lawsuit that he or she is never called on to pay").

In arriving at this conclusion, the Court has considered the authorities relied upon by Plaintiffs. <u>Bloome</u> is inapposite. 664 N.E.2d 1125. While that case acknowledged that the Illinois legislature abolished the collateral source rule for negligence claims against hospitals and physicians, and while it observed that the "legislature could have simply stated that th[e] section was also applicable to legal malpractice cases," but did not, <u>id</u>. at 482, the court did so in an entirely different context. There, "Plaintiff's legal malpractice claim was based upon an underlying medical malpractice" against "the lawyers who committed malpractice by mishandling plaintiff's case

24

against his health care providers," and the "verdict [wa]s based upon the value of his claim against the health care providers." Id. at 1126 & 1133.

Ocean Ships, Inc. v. Stiles is more applicable because the court there rejected the argument that plaintiff's legal malpractice claim was limited to the $5,000 deductible it paid when the underlying case was settled because of the fact that New York follows the collateral source rule. 315 F.3d 111 (2nd Cir. 2002). It did so, however, in the context of discussing subject mater jurisdiction and in the context of the "'rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy.'" Id. at116 (quoting Wolde–Meskel v. Vocational Instruction Project Cmty. Servs., Inc., 166 F.3d 59, 63 (2nd Cir. 1999)). Regardless, to the extent Ocean Ships holds that the amount an insured pays towards a deductible or SIR is irrelevant to the harm that the insured suffers when a verdict goes against it due to an attorney's legal malpractice, the Court simply disagrees with the conclusion.

## C. Legal Malpractice

"In order to make out a prima facie legal malpractice claim, the plaintiff must show (1) that the accused attorney owed a duty to the plaintiff, (2) that the attorney breached that duty, (3) that the plaintiff suffered damages, (4) that the breach was the cause in fact of the plaintiff's damages, and (5) that the attorney's negligence was the proximate, or legal, cause of the plaintiff's damages." Gibson v. Trant, 58 S.W.3d 103, 108 (Tenn. 2001) (citing Lazy Seven Coal Sales, Inc. v. Stone & Hinds, 813 S.W.2d 400, 403 (Tenn.1991)). "When determining whether a lawyer breached a duty, the question becomes whether the lawyer failed to exercise the degree of care, skill, and diligence commonly possessed and exercised by other attorneys practicing in the same jurisdiction." Horton v. Hughes, 971 S.W.2d 957, 959 (Tenn. Ct. App. 1998).

"It is well-settled law that, "[i]n a legal malpractice action, expert testimony is required to establish negligence and proximate cause unless the alleged malpractice is within the common knowledge of laymen."" Strong v. Baker, 2008 WL 859086, at *7 (Tenn. Ct. App. March 31, 2008) (quoting Rose v. Welch, 115 S.W.3d 478, 484 (Tenn. Ct. App. 2003)). "Only in cases involving 'clear and palpable negligence' can legal malpractice be determined without expert testimony." Id. Moreover, "[a] single, statewide professional standard of care exists for attorneys practicing law in Tennessee," and "[t]herefore, experts testifying in legal malpractice cases in Tennessee must be familiar with the professional standard of care for the entire state." Chapman v. Bearfield, 207 S.W.3d 735, 741 (Tenn. 2006).

### 1. The Levine Orr Defendants' Alleged Malpractice

The Levine Orr Defendants move for partial summary judgment insofar as Plaintiffs allege that they deviated from the acceptable standard of practice with regard to seeking to use Held as an expert witness on valuation, failing to request continuance of the trial after Judge Binkley ruled adversely on several matters, and failing to object to the language of the adverse inference instruction that was given to the jury. With regard to each of these matter, the Levine Orr Defendants argue that they are entitled to judgmental immunity.

The judgmental immunity doctrine recognizes that an attorney is not liable for mistakes made during litigation in the honest exercise of professional judgment. It was found to be a "sound rule" and recognized to be a part of Tennessee law by the Sixth Circuit in Woodruff v. Tomlin, 616 F.2d 924 (6th Cir. 1980). Because "the general Tennessee rule [only] holds attorneys liable for losses to client for failure to exercise reasonable skill and care," the Sixth Circuit reasoned, this "can only mean that there can be no liability for acts and omissions by an attorney in the conduct of litigation

which are based on an honest exercise of professional judgment." Id. at 930. "Otherwise, every losing litigant would be able to sue his attorney if he could find another attorney who was willing to second guess the decisions of the first attorney with the advantage of hindsight." Id. This immunity for the exercise of professional judgment, however, is not absolute: an attorney "is still bound to exercise a reasonable degree of skill and care in all his professional undertakings." Id.

As support for its request for partial judgment on these claims, the Levine Orr Defendants rely exclusively upon an expert witness report of William Walton, Esq. in which he opines that their actions met the applicable standard of care. However, Allied/BFI expert Smith opines that the Levine Orr Defendants did not exercise reasonable care in relation to any of these three matters. Summary judgment is therefore unwarranted on Levine Orr's assertions that their decisions were a matter of professional judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) ("at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter"); Morisch v. United States, 653 F.3d 522, 529 (7th Cir. 2011) (citation omitted) ("In a case of dueling experts, such as this one, 'it is left to the trier of fact, not the reviewing court, to decide how to weigh the competing expert testimony.'") State Nat'l Ins. Co. v. Cnty. of Camden, 10 F. Supp.3d 568, 579 (D. N. J. 2014) ("dueling experts alone preclude the entry of summary judgment").

### 2. The Weinberg Wheeler and Lewis King Defendants' Alleged Malpractice

The Weinberg Wheeler Defendants[6] make a more pointed, two-fold argument with respect to the exclusion of Held. First, they claim that the decision not to included Held in the memorandum

---

[6] The Lewis King Defendants rely on the Weinberg Wheeler Defendants' legal malpractice arguments.

supporting the motion for a new trial was a reasoned, tactical decision. Second, they argue that Plaintiffs cannot establish that the failure to preserve the Held exclusion issue caused them injury.

Assuming Defendants are indeed serious about their first argument and present it with a straight face, questions of fact preclude summary judgment. The essence of Plaintiffs' claim is that the Weinberg Wheeler and Lewis King Defendants were negligent in failing to preserve the Held issue for appeal and they have adduced plenty of evidence from which a jury could concluded that the Motion and Memorandum in support of the request for a new trial were not a matter of considered and thoughtful discussion and decision, but rather were a last minute effort. In this regard, they point to evidence which suggest a lack of attention, diligence, and supervision illustrated by the fact that work did not begin on the motion and memorandum until about two weeks before it was due, a large portion of responsibility for the preparation was placed in the hands of a newly-minted associate, a very rough draft was not completed until four days before the due date, the completed draft seeking input was not circulated until after 10:00 p.m. on the day before it was due, and Sullivan reviewed it on the very morning it was due.

Moreover, the present suggestion that the Weinberg Wheeler Defendants did not think the Held exclusion worthy of inclusion appears to run contrary to an email Sullivan sent on November 8, 2010, in which he writes, "[t]he bigger issue, in my view, about Held, is the threshold question of whether he is allowed, under Tennessee law to testify (absent his appraiser's license) which appears to be dictated by statute." (Docket No. 101-8 at 2). Regardless, the Weinberg Wheeler Defendant's explanation contradicts the Lewis King Defendants' recollection. And, even Lewis King's expert, Roger W. Dickson, opines that Weinberg Wheeler breached the standard of care in relation to the motion for new trial, an opinion shared by Allied/BFI's expert Smith.

The Weinberg Wheeler Defendants' second arguments requires a bit more background. Metro moved to exclude Held primarily on the grounds that he was not qualified to testify because he was not a licensed real estate appraiser as required by statute. The statute in question provides:

> it is unlawful for anyone to solicit an appraisal assignment or to prepare an appraisal or an appraisal report relating to real estate or real property in this state without first obtaining a real estate appraiser's license or certificate.

Tenn. Code Ann. § 62-39-103(a).

After a hearing on various pretrial motions, Judge Binkley issued an Order. With regard to Metro's Motion in Limine to preclude Held from testifying, he wrote:

> The Court finds that this motion is well taken and should be GRANTED. Specifically the Court finds that Mr. Held is precluded from testifying about the value of Thermal because this constitutes an appraisal opinion, which he is not qualified to give. Further, the Court finds the [sic] Mr. Held cannot testify regarding the future plans for Thermal or his opinions regarding its obsolescence because this evidence is irrelevant. Further, the probable value of the evidence, if any, is outweighed by its prejudicial effect pursuant to Tenn. R. Evid. 403. Lastly, Mr. Held is precluded from testifying regarding the broad evidence rule since it is inapplicable outside the first-party-insurance context.

(Docket No. 79-4 at 1-2).

The Weinberg Wheeler Defendants take the position that Judge Binkley did not exclude Held on the ground that he was not a licensed appraiser. After all, the Order does not even mention the statute. Among the lawyers involved, the Weinberg Wheeler Defendants appears to be alone in that opinion.

It is true that, as the Weinberg Wheeler Defendants argue, "[i]t is well-settled that a court speaks through its orders, not through written transcripts." Horine v. Horine, 2014 WL 6612557, at *10 (Tenn. Ct. App. Nov. 24, 2014). But this does not mean that the Orders must be read out of context, divorced from the proceedings from which they emanate.

29

At the hearing on Metro's Motion in Limine to exclude Held, focus was placed on the fact that he was not a licensed real estate appraiser and on Tenn. Code Ann § 62-9-103, which Judge Binkley said he read several times, "just to make sure he understood it." (Docket No. 85-2 at 8). He also acknowledged Allied/BFI's position that the Thermal Facility was a "specialty type property," that it could be difficult to appraise, and that Held's testimony "would be helpful to the jury," but stated he was "concerned about" whether allowing Held to testify "follow[ed] the law." (Id. at 10).

Further, Metro quoted from its brief which cited Tenn. Dep't of Trans. v. Wheeler, 2002 WL 31302889, at *2 (Tenn. Ct. App. Oct. 11, 2002) stating:

> We conclude that persons seeking to give an expert opinion regarding the value of real property located in Tennessee must meet both the specific statutory requirements of Tennessee Code Annotated 62-39-103(A) and the general requirements of Tennessee Rules ov Evidence at the time they are called on to testify regarding their expert opinion. Accordingly, the trial court erred in permitting Mr. Harris to give an expert opinion regarding the value of the Wheeler's farm because Mr. Harris was no longer a licensed real estate broker when he testified.

(Id. at 14). Based on that passage, Metro then argued that "the licensing drives both the statute and 702 and that's what the court has told us." Id. It also argued that "the license is critical and it's not – this issue is not driven by the level of the knowledge of the witness." (Id. at 12).

Placed in context, this Court has no hesitation in concluding that Judge Binkley's decision was grounded upon his reading of the statute. The Court also concludes that, respectfully, Judge Binkley simply misread the statute, a conclusion which is supported by the Tennessee Court of Appeals decision in City of Pulaski v. Morris, 2010 WL 3732161 (Tenn. Ct. App. Sept. 23, 2010)

30

that was decided just days before trial commenced in the underlying suit.[7] There, the court held that Tenn. Code Ann. § 62-39-103(a) "is directed toward those who would be asked to prepare an appraisal of real property, not to one who is asked an opinion of the value of property," and that while "licensed appraisers can testify as to value, they are not the only persons properly admitted as experts[.]" Id. at *3.

The Weinberg Wheeler Defendants contend that even if the Court of Appeals concluded that Held had been excluded under the statute, that court would not have found reversible error. They argue that "Held disqualified himself from offering a before and after valuation, i.e. diminution in value, when he agreed under oath that he was not qualified and did not prepare a before and after value opinion." (Docket No. 125 at 13). Consequently, Allied/BFI "cannot prove that the Court of Appeals would have granted a new trial had it considered the Held issue, and Allied cannot prove causation." Id.

To prevail in a legal malpractice action, "a plaintiff must prove that he would have obtained relief in the underlying lawsuit, but for the attorney's malpractice; consequently, the trial of a legal malpractice claim becomes, in effect, a 'trial within a trial.'" Shearon v. Seaman, 198 S.W.3d 209, 214 (Tenn. Ct. App. 2005). "In the first case, the plaintiff must prove that its lawyer's conduct fell below the applicable standard of care." Austion v. Sneed, 2007 WL 3375335, at *5 (Tenn. Ct. App. Nov. 13, 2007) (citing, Mihailovich v. Laatsch, 359 F.3d 892, 904-05 (7th Cir. 2004)). "In the second case, the plaintiff must prove that it had a meritorious claim or remedy that it lost or that it

---

[7] Much ado is made over the question of whether counsel were ineffective in failing to discover City of Pulaski and bringing it to Judge Binkley's attention. This may or may not be a red herring as Weinberg Wheeler suggest, but the Court need not weigh in on the issue. It suffices for present purposes to observe that City of Pulaski was unpublished and not-binding, just as Wheeler was, but, since Wheeler had been brought to Judge Binkley's attention, City of Pulaski may have aided in his understanding of the meaning of the statute.

was found liable when it should not have been due to its attorney's negligence." Id. Where there is an appeal, "plaintiffs must demonstrate that the appeal of the underlying litigation would have been successful, and that upon trial after remand they would have obtained a recovery." Bruce v. Olive, 1996 WL 93580, at *3 (Tenn. Ct. App. March 4, 1996).

Courts and judges are not clairvoyant. It is impossible to determine what a trial or appeals judge would decide, or what verdict a jury on retrial might return. All that can be made is a best guess. Perhaps for this reason, "courts use an objective standard when determining whether a former client would have prevailed in the underlying suit." Austin, 2007 WL 3375335, at *6 (citing Mattco Forge, Inc. v. Arthur Young & Co., 60 Cal. Rptr.2d 780, 793 (Ct. App. 1997)); see also In re Alan Deatley Litigation, 2008 WL 4153675, at *7 (E.D. Wash. Aug. 29, 2008) ("The courts use an objective standard, rather than a subjective standard, when determining whether a former client would have fared better in the underlying suit").

"Under an objective standard, the trier of fact views the underlying suit from the standpoint of what a reasonable judge or jury would have decided but for the attorney's negligence." Id. (citing Phillips v. Clancy, 733 P.2d 300, 303 (Ariz. Ct. App. 1986)). The question is not what the outcome would have been given a particular judge, but rather what it should have been. See Powell v. Potterfield, 2014 WL 2582765, at *3 (S.C. Ct. App. March 19, 2014) (case within a case determination is "based on an objective standard, i.e., what the outcome should have been"); Kranendonk v. Gregory & Swapp, PLLC, 320 P.3d 689, 696 (Utah Ct. App. 2014) (citation omitted, emphasis in original) ("In determining what the outcome of the trial-within-a-trial would have been, an 'objective standard' applies; the purpose of the trial-within-a-trial is to determine 'not what a particular judge or jury *would* have decided (a subjective standard),' but what the result '*should* have

been.'"); <u>Phillips v. Clancy</u>, 733 P.2d 300, 303 (Ariz. Ct. App. 1986) ("Under an objective standard, the trier in the malpractice suit views the first suit from the standpoint of what a reasonable judge or jury would have decided, but for the attorney's negligence").

The Court disagrees with the Weinberg Wheeler Defendants' position that the appeals court would have found no abuse of discretion. "An abuse of discretion occurs when a court strays beyond the framework of the applicable legal standards or when it fails to properly consider the factors customarily used to guide that discretionary decision." <u>Konvalinka v. Chattanooga–Hamilton Cnty. Hosp. Auth.</u>, 249 S.W.3d 346, 358 (Tenn. 2008). "Reviewing courts will find an abuse of discretion only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." <u>State v. Banks</u>, 271 S.W.3d 90, 117 (Tenn. 2008).

Here Judge Binkley's misapplication of the statute effectively gutted Allied/BFI's damages case, particularly since the exclusion of Held had a domino effect on other evidence. Given this situation, the Court believes it more likely than not that a reasonable appeals court would have found an abuse of discretion.

The Court also disagrees with the Weinberg Wheeler Defendants contention that, even if the appeals court had found an abuse of discretion, it would otherwise upheld Held's exclusion because, as they themselves state, "[a]n appellate court is 'not permitted to substitute [its] judgment for that of the trial court.'" (Docket No. 83 at 38) (quoting <u>Caldwell v. Hill</u>, 250 S.W.3d 865, 869 (Tenn. Ct. App. 2007)). The more likely scenario, in the Court's opinion, is that the matter would be remanded to Judge Binkley who observed that, apart from the appraiser issue, Held had an

33

"extremely impressive" resume. (Docket No. 85-2 at 11); see Kennard v. Townsend, 2012 WL 690227, at *1 (Tenn. Ct. App. March 2, 2012) (vacating orders excluding expert's testimony and remanding because his qualifications were not considered under the proper standards as "the admission of expert testimony is a matter of discretion in the trial court"); Goodall v. Akers, 2011 WL 721494, at *1 (Tenn. Ct. App. March 1, 2011) ("Because we have determined that the trial court erred in excluding the expert testimony in question, we reverse and remand"). And, whether Held's excluded testimony would have made a difference in the underlying litigation is a matter for the jury to determine. See Marrs v. Kelly, 95 S.W.3d 856, 861 (Ky. 2003) ("[T]he issue was whether Appellant would have been determined to have a greater disability if vocational expert testimony had been presented in her workers' compensation case. This is a question of fact, and the jury in the legal malpractice case must decide what the result would have been in the underlying case if the omitted evidence had been presented").

## III. LEVINE ORR DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON BREACH OF CONTRACT AND BREACH OF FIDUCIARY DUTY CLAIMS (Docket No. 53)

The Levine Orr Defendants move for summary judgment on Plaintiffs' claims for breach of contract and breach of fiduciary duty. In response, Plaintiffs do not oppose judgment in the Levin Orr Defendants' favor on the breach of contract claim, leaving only the question of whether dismissal of the breach of fiduciary duty claim is proper.

Tennessee courts have apparently not addressed the issue of whether a breach of fiduciary duty can be maintained in the context of a legal malpractice case. The parties, therefore, rely on out-of-state authority to support their respective positions.

The Court need not delve far into the relatively unchartered water because simply stating the

34

Levine Orr Defendants' argument shows why it is not persuasive. They write:

> Courts have the authority to dismiss duplicative claims if they allege the same facts and injury. Barrow v. Blouin, 2014 WL 1856835, at *2 (N.D. Ill. May 7, 2014). Furthermore, when claims for legal malpractice and breach of fiduciary duty are supported by the same operative facts and results in the same injury to the plaintiff, "the breach of fiduciary duty claim is duplicative of the malpractice claim and should be dismissed." Pippen v. Pedersen and Houpt, 986 N.E.2d 697, 704 (Ill. App. Ct. 2013). Similarly, when a legal malpractice and breach of contract claim share the same operative facts and injury to the plaintiff, the breach of contract claim is duplicative of the malpractice claim and should be dismissed. See McKenzie v. Berggren, 99 F. App'x 616, 620-21 (6th Cir. 2004) ("The district court found that McKenzie's breach of contract and fiduciary duty claims were duplicative of his legal malpractice claim . . . a plaintiff cannot prevail on a claim for breach of contract where the alleged facts support a claim for legal malpractice."); Waite, Schneider, Bayless & Chesley Co. L.P.A. v. Davis, 2014 WL 868251, at *4-5 (S.D. Ohio Mar. 5, 2014) ("A failure to represent falls squarely within the realm of malpractice; it is quintessential professional misconduct. Thus, I dismiss Davids's breach of contract claim."). See also Majumdar v. Lurie, 653 N.E.2d 915 (Ill. App. 1995); Calhoun v. Rane, 599 N.E.2d 1318 (Ill. App. 1992). Quintessentially, if the "gist of a complaint sounds in malpractice," then the duplicative claim is to be treated as a claim for malpractice, and the duplicative claim dismissed. Waite, supra at *5.

(Docket No. 54 at 5). They also write that, in contrast to legal malpractice, "fiduciary duty is not a breach of the acceptable standard of practice, but is a breach of the attorney's standard of conduct" which "consists of the attorney's basic fiduciary obligations of undivided loyalty and confidentiality." (Id. at 6) (citing, Klemme v. Best, 941 S.W.2d 400, 407 (Mo. 1997)).

Here, Plaintiffs contend that two assertions support their breach of fiduciary duty claim that are not duplicative of their malpractice claims: (1) the Levine Orr Defendants refused to timely provide a copy of the client file; and (2) they failed to keep Plaintiffs reasonably informed as to critical decisions being made in the litigation, more specifically the "behind-the-scenes decision not to place Geracioti in charge of the litigation despite Plaintiffs' wishes." (Docket No. 61 at 9). This Court agrees that such claims are separate from a legal malpractice claim. See Trousdale v. Henry,

35

261 S.W.3d 221, 223 (Tx. Ct. App. 2008) (plaintiff's "claims for breach of fiduciary duty are separate and independent from her claims for legal malpractice" to the extent she alleges " the firm refused to return her files for almost two years after she asked for their return"); Baldayaque v. United States, 338 F.3d 145, 152 (2nd Cir. 2003) (citation omitted) ("'As a matter of professional responsibility, an attorney owes a duty of loyalty to his client'" and this "'encompasses an obligation to defer to the client's wishes on major litigation decisions'"); Halstead v. Murray, 547 A.2d 202 (N.H. 1988) (stating that if client is not adequately informed "then the client may have recourse to suit against the attorney for breach of his fiduciary duty zealously to protect the interest of his client").

The Court also finds that questions of fact preclude summary judgment on Plaintiffs' breach of fiduciary duty claim to the extent that it is based upon the foregoing two issues. While the Levine Orr Defendants point out that bankers boxes containing 30,000 pages of documents were returned to Plaintiffs (along with 3,252 emails conveyed electronically) in accordance with a series of email exchanges primarily between May and August 2013, the actual transfer occurred after the Amended Complaint had been filed in this case, notwithstanding a letter from Fennemore Craig P.C. dated December 17, 2012, specifically requesting that the client files be made available by January 11, 2013.

As for the selection of trial counsel, while Defendants point to an email from Casey in which she acceded to Orr trying the case, that email was part of an exchange between Mark Piccirillo, claims representative for Plaintiffs' insurance carrier, and Casey dated April 20, 2010, in which Piccirillo wrote, "Looking at my notes in this file, you always wanted Michael Gericoti [sic] to try this case. Is that your desire with Orr saying he will try this case?? [sic]," to which Ms. Casey

responded, "Gericoti [sic] is so far removed, I guess Orr should do it."  (Docket No. 63-1 at 16)

Read in context of both the exchange and the entire litigation, it could be that Casey relented to

allow Orr to try the case because she had little choice given that Geracioti hardly participated up to

that point and trial was set to commence in a matter of months.

### III.  PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON AFFIRMATIVE DEFENSES OF ASSUMPTION OF RISK AND COMPARATIVE FAULT (Docket No. 75)

Plaintiffs move for partial summary judgment as any defenses based on the allegations their

failure to settle the underlying lawsuit constituted an assumption of risk, comparative fault or was

a proximate cause of their injury.  Defendants oppose the motion.

Defendants contend that Plaintiffs refused to settle the underlying litigation and, in doing so,

they assumed the risk of a large verdict, were also at fault, and failed to mitigate damages.

Weinberg Wheeler writes:

> Prior to trial, Allied formed the opinion that it had a claim of malpractice against Levine Orr. Allied's strategy was not to pursue settlement, but to prepare for appeal while preserving a claim of malpractice against Levine Orr. Allied's strategy proved costly. Nevertheless, its opportunity to reduce or prevent its damages did not disappear even after Allied learned facts that it now claims demonstrate legal malpractice against Weinberg Wheeler and the Lewis King Defendants.  Allied continued its strategy because it was concerned it would lose its claim of malpractice against Levine Orr.

(Docket No. 94 at 2).

By way of background, the Court notes the following, which Defendants rely upon in support

of their position that the case should have been settled:

> Over a year before trial in the underlying lawsuit, Orr emailed Piccirillo (with a copy to Casey) stating that potential damages were $9,294,008.00, and that the claimed business loss was $2,421,358.00.

> On September 2, 2010, 25 days before trial, Orr forwarded a copy Metro's settlement demand letter to Casey that indicated Metro would accept $985,000 to settle the case.

37

The letter claimed that Metro could prove damages almost ten times that amount to which an almost like amount of prejudgment interest would attach. The letter also pointed out alleged deficiencies in Allied/BFI's case including that Allied/BFI (1) had not designated a real estate appraiser as a witness as required by law; (2) knew about the fire hazard but did not take appropriate measures; (3) was subject to as yet unspecified sanctions for discovery violations.

On September 9, 2010, Ms. Casey advised Mr. Orr that her offer was zero. That same day, she contacted a representative of BFI/Allied's carrier and advised that the plan was to try the lawsuit.

On September 10, 2010, 17 days before trial, Orr advised Casey of the results of the motion in limine hearing the previous day in which the judge ruled that (1) both Held and Gershman would not be allowed to testify, (2) with the exclusion of Held's testimony Metro's cost of repair estimate would not be opposed (3) there could be no mention of the fact that Nashville Thermal was going to shut down 140 days after the fire occurred; and (4) an adverse inference instruction would be given. Even with those rulings, Orr advised that Metro was amenable to settlement discussions but the ball was in Allied/BFI's court.

On September 15, 2010, 12 days before trial, Piccirillo emailed Casey recommending that she consider making an offer above $250,000, noting that Metro had a 70% to 80% change of prevailing, stating that it was an all or nothing case, and opining that Allied/BFI could justify a settlement in the $1.5 million to $2.8 million dollar range.

On September 16, 2010, Piccirillo advised Orr that Casey refused to approve his suggested offer of $250,000, but indicated that he had authority to make an offer under $100,000.

On September 24, 2010, 3 days before trial, Piccirillo advised Casey that Metro would not consider a settlement of less than $500,000 but, at trial Metro advised that the case could settle for around $500,000.

After the denial of the Motion for a New Trial, Allied/BFI indicated that it was not willing to settle for anything over $999,000. Shortly thereafter, Allied/BFI rejected the insurance adjuster's recommendation that $2.5 million be placed on the table, pointed out that settlement could foreclose the possibility of a malpractice action, and stated that attempts to settle without Allied/BFI's approval could lead to claims against AIG for poor claims administration or bad faith.

Plaintiffs do not dispute that the foregoing communications were made, but claim that they were repeatedly assured that the case could be won. Regardless, they argue that the fact that

38

settlement was a possibility is immaterial because they had no duty to settle the underlying case and thus, they did not assume the risk, were not comparatively at fault, and had no obligation to mitigate by settling the underlying case. This Court agrees.

The parties concede that comparative fault applies to legal malpractice claims. See Wilson v. Pickens, 196 S.W.3d 138, 143-44 (Tenn. Ct. App. 2005) (addressing comparative fault in a legal malpractice claim)  They disagree as to whether a client can be at fault for refusing to settle an underlying claim.

In support of its position, Plaintiffs rely heavily on the majority and dissenting opinions in Am. Int'l Adj. Co. v. Galvin, 86 F.3d 1455 (7th Cir. 1996). Galvin arose from a tractor trailer – car collision in which the attorney bungled the trucking company's defense to plaintiff survival statute claim. Prior to trial, the case could have been settled for $853,000, but was not, and the jury returned a $2.6 million verdict. In the subsequent legal malpractice action brought by the trucking company's insurance carrier, the trial judge refused to allow the jury to consider the defenses of incurred risk and contributory negligence based on the insurer's refusal to settle.

On appeal, the Seventh Circuit remanded for a new trial on damages but pointedly stated that the attorney "may not present his contributory negligence and incurred risk defenses." Id. at 1462. The court wrote:

> Although contributory negligence generally is available as a defense to a legal malpractice action in Indiana . . . , [the attorney's] proffered defense fails as a matter of law. In effect, [the attorney] argues that [the insurer] was negligent in failing to settle the [underlying] case prior to trial. However, there is no legal duty to settle a case. Even assuming that [the insurer's] failure to settle the case was stupid, such stupidity bore no causal connection to the injury it claims.

Id.

Judge Posner penned a dissent in which he disagreed that a new trial was necessary, but "was

39

in agreement with the majority" that "the district court was . . . correct not to let [the attorney] interpose a defense of contributory negligence – or of 'incurred risk'[.]" Id. at 1469. He took the position that the insurer's "negligence, if negligence it was, in refusing to settle the case in advance of trial did not make it more likely that [the attorney] would botch the trial." Id. at 1470. Judge Posner continued:

> . . . had [the insurer] given [the attorney] bad directions on how to conduct the case, it would have made the mishandling of the case more likely. But all [the insurer] did by failing to settle the case was set the stage for [the attorney] to screw up. The stage would have been equally well set if the plaintiff's lawyer had demanded a $10 million settlement and [the insurer] had rightly refused.
>
> [The attorney's] argument for invoking the defense of contributory negligence not only is contrary to common law doctrine but also comes perilously close to arguing that if you turn down a "reasonable" settlement you have no right to complain if your lawyer botches the trial. That is obviously wrong. There is no legal duty to settle a case. Anyone who has a good enough case to get all the way to trial is entitled to fight for victory at trial, and if his lawyer is incompetent he has a right to sue for malpractice.

Id. at 1471.

Obviously, the majority opinion in Galvin is not controlling, and the dissent even less so. But both are persuasive and make sense.

It is true, as Defendants assert, that contributory negligence as opposed to comparative fault was at issue in Galvin, but for all practical purposes that is a distinction without a difference. In this regard, Mercer v. Vanderbilt Univ., Inc. , 134 S.W.3d 121 (Tenn. 2004) is instructive.

In Mercer, the Tennessee Supreme Court was presented with the comparative fault issue of whether "fault may not be assessed against a patient in a medical malpractice action in which a patient's negligent conduct provides only the occasion for the medical attention, care, or treatment which is the basis for the action." Id. at 125. The court concluded that it could not, writing:

> It would be anomalous to posit, on the one hand, that a health care provider is required to meet a uniform standard of care in its delivery of medical services to all patients, but permit, on the other hand, the conclusion that, where a breach of that duty is established, no liability may exist if the patient's own preinjury conduct caused the illness or injury which necessitated the medical care. . . .
>
> We also agree that "patients who may have negligently injured themselves are nevertheless entitled to subsequent non-negligent medical treatment and to an undiminished recovery if such subsequent non-negligent treatment is not afforded." We therefore hold that a patient's negligent conduct that occurs prior to a health care provider's negligent treatment and provides only the occasion for the health care provider's subsequent negligence may not be compared to the negligence of the health care provider.

Id. at 129-30.

Likewise, clients are entitled to non-negligent representation. They are also entitled to undiminished recovery if that representation is not afforded.

It is also true, as Defendants point out, that this case is different because, unlike in Galvin, Defendants are claiming that Allied/BFI intentionally refused to consider settlement in favor of a strategy of pursing a subsequent legal malpractice claim, and did so even after if discovered the alleged malpractice. However, this neglects to consider that the negligence was ongoing, and included not only Levine Orr's alleged pre-verdict negligence, but all Defendants' negligence in failing to properly preserve issues for appeal. In any event, the fact remains that the underlying cause of Allied/BFI's injury in this case is the alleged malpractice, not its refusal to settle.

In so deciding, the Court is not ignoring what Lewis King characterizes as the "elephant in the room"; specifically that Allied/BFI's failure to settle the underlying case constitutes a failure to mitigate damages. However, "the failure to mitigate damages is an affirmative defense" under Tennessee law, Maness v. Collins, 2010 WL 4629614, at *11 (Tenn. Ct. App. Nov. 17, 2010), and has been consider the same under Fed. R. Civ. P. 8(c)(1), Dollar v. Smithway Motor Xpress, Inc.,

710 F.3d 798, 808 (8th Cir. 2013), yet none of the Defendants pled that defense in their Answers to the Amended Complaint. Regardless, and as already stated, litigants have no duty to settle cases which serve as the basis for a subsequent legal malpractice claim. Defendants cannot do indirectly what they cannot do directly: seek to eliminate or reduce damages for there own negligence by seeking to place blame on a client who was not responsible for the negligence.

## IV. CONCLUSION

The Court has covered the waterfront on the issues raised in the pending motions and will enter an Order confirming the conclusions contained herein. The Court will also set this matter for a final pretrial conference and trial.

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE