UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ALLIED WASTE NORTH AMERICA, INC., a Delaware corporation; and BFI WASTE SERVICES, LLC, a Delaware limited liability company,<br><br>      Plaintiffs,<br><br>v.<br><br>WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC, a Georgia limited liability company; and TERRANCE SULLIVAN, an individual,<br><br>      Defendants. | No. 3:13-00254<br>Judge Sharp |

## MEMORANDUM

After a four day trial in this diversity action, a jury returned a verdict finding that the Metropolitan Government of Nashville and Davidson County ("Metro") and its insurer Travelers Insurance Company ("Travelers") were damaged in the amount of $4,540,879.00. Because this was more than the $2.5 million (plus interest and attorneys' fees) insurance deductible that Plaintiffs Allied Waste North America, Inc. ("Allied") and BFI Waste Services LLC ("BFI") (collectively "Allied/BFI") paid to settle an underlying state court action, judgment was entered in favor of Defendants Weinberg, Wheeler, Hudgins, Gunn Dial, LLC and Terrance Sullivan ("Weinberg Wheeler") on Plaintiffs' legal malpractice claim.

Following the entry of final judgment (Docket No. 272), Plaintiffs filed the now-pending "Motion for New Trial or for Remittitur and Renewed Rule 50(a) Motion for Judgment as a Matter of Law Regarding Cost of Repair Damages for the Underlying Lawsuit." (Docket No. 276). The

1

Motion itself is 9 pages long, and is accompanied by a 49-page Memorandum (Docket No. 277) in support thereof. Those filings were followed by Defendants' 40-page Response (Docket No. 287) that, in turn, led Plaintiffs to file a 29-page Reply (Docket No. 291).

## I. Standards of Review

### A. Motion for New Trial

In diversity cases, federal procedural law applies in determining whether a party is entitled to a new trial. Armisted v. State Farm Mut. Auto. Ins. Co., 675 F.3d 989, 994 (6th Cir. 2012). Under Rule 59 of the Federal Rules of Civil Procedure, a court may grant a new trial after a jury verdict "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R. Civ. P. 59(a). The Sixth Circuit has "interpreted this Rule to require a new trial only 'when a jury has reached a 'seriously erroneous result' as evidenced by[ ] (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." Mike's Train House, Inc. v. Lionel, L.L.C., 472 F.3d 398, 405-06 (6th Cir. 2006) (quoting, Holmes v. City of Massillon, 78 F.3d 1041, 1045–46 (6th Cir.1996)).

### B. Renewed Motion for Judgment as a Matter of Law[1]

---

[1] In their response brief, Defendants' make a passing argument to the effect that Plaintiffs' Rule 50(a) request for judgment as a matter of law is untimely because it indisputably was filed more than ten days after the jury was discharged. However, Rule 50(b) provides that "[n]o later than 28 days after the entry of judgment – or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged – the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). According to the Advisory Committee Notes, the requirement that a party file a renewed motion within 28 days of the jury's discharges applies "when the trial ends without a verdict or with a verdict that does not dispose of all issues suitable for resolution by verdict," neither of which occurred here. Moreover, Plaintiffs' Rule 50 motion presented legal issues wholly unrelated to jury issue and their renewed motion filed on August 23, 2016 was within 28 days of then entry o judgment on August 2, 2016.

"[A] renewed motion for a judgment as a matter of law . . . 'may be granted only if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party.'" Arnold v. Wilder, 657 F.3d 353, 363 (6th Cir. 2011) (citation omitted). "In entertaining a motion for judgment as a matter of law, the court is to review all evidence and draw all reasonable inferences in the light most favorable to the non-moving party, without making credibility determinations or weighing the evidence." Jackson v. FedEx Corp. Servs., Inc., 518 F.3d 388, 392 (6th Cir. 2008) (citing, Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 150-51(2000)). "In other words, the decision to grant judgment as a matter of law or to take the case away from the jury is appropriate 'whenever there is a complete absence of pleading or proof on an issue material to the cause of action or when no disputed issues of fact exist such that reasonable minds would not differ.'" Id. (quoting, Jackson v. Quantex Corp., 191 F.3d 647, 657 (6th Cir. 1999)).

## II. **Plaintiffs' Position**

The length of the briefing[2] on the request for a new trial or judgment as a matter of law perhaps stems from the number of errors alleged by Plaintiffs. First, they claim the Court committed prejudicial error in conducting the retrial for at least five reasons. Second, they claim the jury's verdict is against the weight of the evidence or excessive for at least seven reasons. Third, they argue that the Court erred in failing to apply the collateral source rule. As a consequence, Plaintiffs argue that the Court should grant Allied/BFI a new trial on all issues or remit the jury's verdict to no more than $259,147.00.

---

[2] In addition to the voluminous briefs, Plaintiffs submitted 606 pages of attachments to their Motion.

Despite the enormity of the briefing, the Court finds it unnecessary to track the arguments in the order presented. This is because most of what Plaintiffs complain about stems from the Court's decision on how the case would be retried, which, in turn, flowed from the lengthy ruling (Docket No. 132) on the parties' Motions for Summary Judgment, and the rulings on the Motions in Limine (Docket No. 228) at the final pretrial conference. Although this Court assumes familiarity with its prior rulings, some background is, nevertheless, appropriate.

### III. Background

On May 23, 2002, fire destroyed the Nashville Thermal Transfer Facility, a waste-to-energy facility owned by Metro. Thereafter, in a case filed in the Davidson County Circuit Court styled Nashville and Davidson County, *et al.* v. BFI Waste Services, LLC, *et al.*, Case Number 05C390T-5, Metro and Travelers sued multiple defendants, including Allied/BFI, for various causes of action related to the fire. After an adverse $7.2 million jury verdict, an unsuccessful appeal, and a subsequent $8 million settlement, Plaintiffs filed a legal malpractice suit in this Court against three law firms (and some of their members) who had defended Allied/BFI at trial and/or on appeal.

Plaintiffs sued trial counsel, Defendant Levine, Orr & Geracioti, PLLC ("Levine Orr") and two of its Members, alleging that those Defendants failed to exercise reasonable care and breached their retainer contract through a series of errors at trial. Among other things, Levine Orr allegedly erred by (1) failing to timely designate witnesses that had been provided by Allied/BFI, which led to a sanctions hearing and an adverse inference instruction; (2) retaining Jonathan Held, who was not an appraiser, to offer expert testimony about the diminution in value of the facility due to its obsolescence, but who was found by the trial judge, Joseph Binkley, to be unqualified to testify regarding the future plans for the facility; and (3) failing to find another expert or introduce other

4

evidence that would show that market value of the facility was far less than the cost of repair.

Plaintiffs also sued Lewis, King, Krieg & Waldrop ("Lewis King") and two of its Members, as well as Weinberg Wheeler and two of its Members. Both firms had been retained to provided post-trial motion and/or appellate representation, and were alleged to be unsuccessful because the Tennessee Court of Appeals affirmed the rulings of the trial court, Metro. Govt. of Nashville & Davidson Cnty. v. BFI Waste Serv., 2012 WL 1018946 (Tenn. Ct. App. Mar. 22, 2012). In doing so, the Court of Appeals found that the issue surrounding the exclusion of Held's valuation testimony was waived because Held was "not named in Defendants' motion for new trial or supporting memorandum nor [wa]s the exclusion of his valuation testimony expressly alleged as an error in either," and the "objection to jury instructions and requests for offers of proof" did not "preserve[] the issue of the exclusion of Mr. Held's valuation testimony for appeal." Id. at *6. The Court of Appeals also upheld the negative inference instruction because a corporate representative for Allied/BFI had not been properly designated.

It was in this posture that the Court ruled on five dispositive or partially dispositive motions in this case. First, the Court denied Defendants' Motions for Summary, except to the extent they sought to limit Allied/BFI's damages, and said damages were limited to the amount incurred in settling the underlying suit, plus attorney's fees spent in having to pursue this suit. Second, Levine Orr's Motion for Partial Judgment on the Pleadings or alternatively Summary Judgment was granted with respect to Allied/BFI's breach of contract claim, but denied with respect to the breach of fiduciary duty claim. Finally, Allied/BFI's Motion for Partial Summary Judgment on Affirmative Defenses relating to Plaintiffs' failure to settle the underlying suit was granted.

In the accompanying Memorandum, the Court discussed at length the standards underlying

legal malpractice claims and the parties' respective arguments related thereto. That discussion, see Allied Waste N. Am., Inc. v. Lewis, King, Krieg & Waldrop, P.C., 93 F. Supp. 3d 835, 854-57 (M.D. Tenn. 2015), is incorporated herein by reference. The Court also opined that Judge Binkley simply misread the appraisal statute in excluding Held, leaving the question of how that issue would have been addressed had it been properly preserved for appeal. The Court went on to reject the argument that the appeals court would have found no abuse of discretion by Judge Binkley because "misapplication of the statute effectively gutted Allied/BFI's damages case, particularly since the exclusion of Held had a domino effect on other evidence." Id. at 858. Nor was the Court persuaded by the argument that "even if the appeals court had found an abuse of discretion, it would otherwise upheld Held's exclusion" because "[t]he more likely scenario [was] that the matter would be remanded to Judge Binkley who observed that, apart from the appraiser issue, Held had an 'extremely impressive' resume." Id. at 858. "And whether Held's excluded testimony would have made a difference in the underlying litigation is a matter for the jury to determine." Id. at 859.

The summary judgment ruling was entered on March 20, 2015. By the time of the final pretrial conference on February 29, 2016, however, the claims against Lewis, King and Levine, Orr and their members had been settled, leaving only Allied/BFI's claims against Weinburg, Wheeler and Terrance Sullivan, a partner in that firm. The reduction in the number of Defendants, however, did not necessarily simplify the case because, while the remaining Defendant's involvement was limited, their alleged error had potential ramifications beyond the exclusion of Held. This, in turn, presented the question of how best to address the Weinberg Wheeler Defendants' alleged malpractice.

At the start of the final pretrial conference, the Court indicated that the trial would be

bifurcated, with the jury first determining damages and then (if necessary) determining whether Defendants had committed legal malpractice. The Court stated that, even though it "hate[d]" the prospect of the jury having to sit through a day or more of videotaped trial testimony from the state trial because the process would be "brutal," (Docket No. 227, PTC Hrg. at 3) this was the only feasible approach that would avoid the Court having "to sit up here and think, now, wait what would or what did Judge Binkley do in the face of this?" and the possible "different evidentiary rulings" were the Court to rule on admissibility issues. This process, in the Court's opinion, avoided trying what would effectively be "a different trial" and preclude the parties from "tak[ing] another bite at the apple." (Id. at 4). The Court also recognized, however, that at some point the jury would have to hear from Held in order to determine if his testimony would have made a difference.

At trial, the Weinberg Wheeler Defendants played the role of Metro, while Plaintiffs played the role of Allied/BFI. Defendants played video portions of the trial testimony from the underlying trial that the jury heard during Metro's case, and provided expert testimony relating to lost business income and damages to cranes via videotaped deposition testimony that had been taken for purposes of the underlying suit.

For its part, Allied presented the testimony of Held and Gershman. Held provided expert testimony regarding damages to real property, while Gershman provided facts regarding the functional capacity of the facility, the pre-fire decision to close the facility, and the costs of demolition. Allied/BFI also presented the videotaped testimony of Floyd Mitchell who indicated that, by the day of the fire, the facility had only two cranes working, one boiler online and one door open.

As indicated, the jury returned a verdict that was more than the deductible Plaintiffs paid to

7

settle the underlying case, and, as a consequence, judgment was entered in favor of the Wheeler Weinberg Defendants.

## IV. Analysis

**A. Alleged Prejudicial Error in Conducting Retrial**

Plaintiffs argue "the retrial here was prejudicial and unfair to [them] for several reasons." (Docket No. 277 at 8). This error allegedly included: (1) failing to conduct the retrial in accordance with an objective standard; (2) restricting Plaintiffs' ability to present evidence or cross-examine witnesses; (3) admitting the underlying state court trial transcript; (4) limiting the retrial to the issue of damages; and (5) refusing to allow Plaintiffs to present liability evidence once Defendants did so. All of those arguments flow from the method the Court selected to try the malpractice case against the Wheeler Weinberg Defendants.

In support of their arguments, Plaintiffs cite several cases that stand for the proposition that "upon reversal by an appellate court, parties get an unlimited retrial – they are not forced to adhere to what happened during the first case; rather, **they are placed in the position as if the prior proceedings never occurred.**" (Id. at 8-9, emphasis in original). They also argue that "[a] new trial following remand is governed and controlled by the same principles, practices, and procedures as at the original trial." (Id. a 9) (citation omitted).

Plaintiffs' arguments have some purchase in the context of a true retrial. But, even then, the rule is not absolute. For example, "[w]hen a general verdict is affirmed as to the issue of liability but reversed on the award of damages, [the Tennessee Supreme Court] normally remand[s] for a new trial on all of the elements comprising the monetary award." Rothstein v. Orange Grove Ctr., Inc., 60 S.W.3d 807, 814 (Tenn. 2001). That is, "[w]here the trial court errs as to only specific issues,

[the appeals court] may remand for a new trial and limit the new trial to those issues affected by the trial court's error." Iloube v. Cain, 397 S.W.3d 597, 606 (Tenn. Ct. App. 2012). Thus, present Plaintiffs may be overreaching when they argue that "the Court should have conducted Retrial entirely anew just as the trial court would have done upon a remand from the Tennessee Court of Appeals." (Docket No. 277 at 10).

Regardless, the Court was not tasked with retrying the underlying case. Rather, the Court tried a legal malpractice case, the parameters of which were discussed at length in this Court's ruling on Defendants' Motions for Summary Judgment:

> To prevail in a legal malpractice action, "a plaintiff must prove that he would have obtained relief in the underlying lawsuit, but for the attorney's malpractice; consequently, the trial of a legal malpractice claim becomes, in effect, a 'trial within a trial.'" Shearon v. Seaman, 198 S.W.3d 209, 214 (Tenn. Ct. App. 2005). "In the first case, the plaintiff must prove that its lawyer's conduct fell below the applicable standard of care." Austion v. Sneed, 2007 WL 3375335, at *5 (Tenn. Ct. App. Nov. 13, 2007) (citing, Mihailovich v. Laatsch, 359 F.3d 892, 904-05 (7th Cir. 2004)). "In the second case, the plaintiff must prove that it had a meritorious claim or remedy that it lost or that it was found liable when it should not have been due to its attorney's negligence." Id. Where there is an appeal, "plaintiffs must demonstrate that the appeal of the underlying litigation would have been successful, and that upon trial after remand they would have obtained a recovery." Bruce v. Olive, 1996 WL 93580, at *3 (Tenn. Ct. App. March 4, 1996).
>
> Courts and judges are not clairvoyant. It is impossible to determine what a trial or appeals judge would decide, or what verdict a jury on retrial might return. All that can be made is a best guess. Perhaps for this reason, "courts use an objective standard when determining whether a former client would have prevailed in the underlying suit." Austin, 2007 WL 3375335, at *6 (citing Mattco Forge, Inc. v. Arthur Young & Co., 60 Cal. Rptr.2d 780, 793 (Ct. App. 1997)); see also In re Alan Deatley Litigation, 2008 WL 4153675, at *7 (E.D. Wash. Aug. 29, 2008) ("The courts use an objective standard, rather than a subjective standard, when determining whether a former client would have fared better in the underlying suit").
>
> "Under an objective standard, the trier of fact views the underlying suit from the standpoint of what a reasonable judge or jury would have decided but for the attorney's negligence." Id. (citing Phillips v. Clancy, 733 P.2d 300, 303 (Ariz. Ct. App. 1986)). The question is not what the outcome would have been given a

9

particular judge, but rather what it should have been. See Powell v. Potterfield, 2014 WL 2582765, at *3 (S.C. Ct. App. March 19, 2014) (case within a case determination is "based on an objective standard, *i.e.*, what the outcome should have been"); Kranendonk v. Gregory & Swapp, PLLC, 320 P.3d 689, 696 (Utah Ct. App. 2014) (citation omitted, emphasis in original) ("In determining what the outcome of the trial-within-a-trial would have been, an 'objective standard' applies; the purpose of the trial-within-a-trial is to determine 'not what a particular judge or jury *would* have decided (a subjective standard),' but what the result '*should* have been.'"); Phillips v. Clancy, 733 P.2d 300, 303 (Ariz. Ct. App. 1986) ("Under an objective standard, the trier in the malpractice suit views the first suit from the standpoint of what a reasonable judge or jury would have decided, but for the attorney's negligence").

Allied Waste, 93 F. Supp. 3d at 857-85. [3]

Effectively, "[t]he case-within-a-case or trial-within-a-trial approach applied in legal malpractice cases "[is] an objective approach to decide what should have been the result in the underlying proceeding or matter.'" Ambriz v. Kelegian, 53 Cal. Rptr. 3d 700, 708-09 (Cal. App. 2007) (citation omitted). "Recreating the underlying action requires calling and examining those persons who would have been witnesses and presenting the demonstrative and documentary evidence that would have been presented but for the attorney's negligence." Yager v. Clauson, 139

---

[3] Although "the case-within-a-case approach is the accepted and traditional approach for resolving the issues involved in the underlying proceeding," Austin v. Sneed, 2007 WL 3375335, at *6 (Tenn. Ct. App. Nov. 13, 2007), it may not be a talisman. As one court has explained:

> "[A] legal malpractice case may proceed in any number of ways depending on the issues. Included among those options are a 'suit within a suit,' any 'reasonable modification thereof,' and a suit based on 'expert testimony.' . . . [T]he proper approach in each case will depend upon the facts, the legal theories, the impediments to one or more modes of trial, and, where two or more approaches are legitimate, to plaintiff's preference. Courts are not to become involved in determining how a legal malpractice case is tried unless the parties disagree, in which case the final determination of the court is a discretionary judgment that is entitled to deference.

Garcia v. Kozlov, Seaton, Romanini & Brooks, P.C., 845 A.2d 602, 604 (N.J. 2004) (citation omitted). There is no "a hierarchy among those approaches nor [is] there is a presumption in favor of the 'suit within a suit' scheme." Id.

A.3d 1127, 1131 (N.H. 2016). Plaintiffs in this case effectively concede as much by arguing that "[t]he goal of conducting a trial-within-a-trial in the context of a legal malpractice action is to establish what the result of the underlying litigation should have been under an objective standard." (Docket No. 277 at 8).

Weinberg Wheeler's alleged malpractice had to do with the failure to preserve the Held exclusion for appellate review and whatever ramifications that failure may have had on the state court verdict. At the pretrial conference, the Court voiced the opinion that the best way to present this issue would be for the jury to watch designated portions of the state court trial (which had been videotaped) supplemented by Held's testimony. The Court then asked for counsel's thoughts on the proposed procedure.

Weinberg Wheeler voiced no real objection, but Allied/BFI argued that the issue was broader than the exclusion of Held and had a "domino affect" on other evidence. For example, because of Held's exclusion, Harvey Gershman, a Metro consultant, was not allowed to testify that the facility was unable to process trash because the boilers and cranes were not working, and this allowed the trash to build up, which led to the fire in the first place. This "skewed the liability case" against Allied/BFI resulted in a "big windfall" for Metro because "the jury needed to know that [the] cost of repair was really a farce," instead of being led to believe that "this was just a perfectly functioning facility and then one day it burned down, and it got all rebuilt and everything was nice and shining and new[.]" (Id. at 5, 8, 9). Effectively, Allied/BFI took the position that the case needed to be retried in its entirety on both liability and damages. In other words, it was entitled to a complete do-over.

After taking a break to consider the arguments presented, the Court stated:

11

I'm, basically, back to where I started. But we're going to do this: The trial is going to be bifurcated. We are going to play the tape of the first trial. The issue is damages, but that means that after the point where the trial stops and Mr. Held comes on, other damages related to testimony will be included, and that will include Gershman.

\*         \*         \*

I think [the liability] issue has been decided, and that doesn't flow back to Held. That's not what his testimony was about. And I realize there were rulings that were made by Judge Binkley that kind of – you know, looking back in hindsight, predetermined how that was going to come out, but the only issue that relates to Weinberg's alleged malpractice relates to Held.

(Id. at 25-26). [4]

The Court's decision to conduct the trial in the manner that it did was made after considerable thought. And, having considered the matter anew in the context of Plaintiffs' present Motion, the Court believes that the decision was sound and was the fairest and most accurate way to present to the jury the critical question of whether Held's testimony would have made a difference. Retrying the entire case, as Plaintiffs desired, would not have isolated the Weinberg Wheeler Defendants' alleged malpractice. Instead, it would have given Plaintiffs a second bite at the apple, even though the ultimate question in this legal malpractice action was not what the

---

[4] This ruling was subsequently confirmed in writing in the context of the ruling on a Motion in Limine filed by Weinberg Wheeler:

First, the underlying case will be retried on the issue of damages based upon the video tape from state court, supplemented by the testimony of Jonathan Held and Harvey Gershman, along with other damages witnesses who were not called in the underlying proceeding due to the state trial court's exclusion of Held, including the damage witness for Defendant. Second, and if necessary after the jury returns its verdict in the first trial, trial before the same jury will be held on the malpractice claim.

(Docket No. 228 at 2).

Tennessee Court of Appeals would have done were the Held exclusion properly appealed, but rather what effect his exclusion had on the outcome of the state court case. Thus, the Court created what it believed to be the closest facsimile to the underlying trial, while affording Plaintiffs the opportunity to supplement that evidence through the testimony of Held and Gershman.

During the pretrial conference the Court stated that if it was wrong in the manner selected for trying the case, one or both of the parties could "take that to the Sixth Circuit[.]" (Docket No. 227 at 18). The statement was not intended to be flippant or trite, but rather was a reflection of the Court's belief that the method it chose was the best possible given the issues presented and the posture of the case. The Court maintains that belief and will deny Plaintiff's Motion for a New Trial based upon the method used to try the case and the related arguments which have as their basis the manner in which the case was tried.

**B. Weight of the Evidence and Excessive Verdict**

Plaintiffs claim that the jury's verdict was against the weight of the evidence because (1) no competent evidence supports (a) the claim for damages for business interruption and extra expenses, (b) the damages based on the costs for crane replacement or consultants, or (c) other costs of repair damages; and (2) the measure of damages should have been based on diminution of value instead of cost of repair. Additionally, Plaintiffs argue that the verdict is excessive and beyond the range of proof because (1) the only competent evidence supports a finding of zero damages with respect to the facility, cranes, and business interruption; and (2) the total damages based on competent evidence cannot exceed $259,147.00.

Once again, the manner the Court chose to try the malpractice case against the Weinberg Wheeler Defendants impacts many of these arguments because some of the damages evidence came

13

from deposition testimony and stipulated damages in the underlying case that was read to the jury in this case. Obviously, this was not ideal for either party, but the goal of the trial was to measure the effect of the exclusion of Held's opinion. The goal was not to test Weinberg Wheeler's ability to track down almost a dozen witnesses from several state and have them testify as to facts, opinions, and documents related to a fire that occurred fourteen years earlier.

Regardless, the Court is not convinced that the jury's verdict was either against the weight of the evidence or excessive. "[P]roof of damages need not be exact or mathematically precise." Overstreet v. Shoney's, Inc., 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999) (collecting cases). "Rather, the proof must be as certain as the nature of the case permits and must enable the trier of fact to make a fair and reasonable assessment of the damages." Id. Moreover, "[t]he amount of damages is not controlled by fixed rules of law. . . or mathematical formulas," but "is instead left to the sound discretion of the trier of fact." Id.[5]

Here, the jury returned a verdict of $4,540,879.00, but did not indicate how it calculated that figure or on which components of damages it relied. This is hardly surprising given that the jury form was agreed to by the parties and simply asked, "What amount of damages (if any) do you find were sustained by Metro? (The burden of proof is on Metro)." (Docket No. 240 at 2). Regardless, the jury heard damages testimony that included: (a) business interruption loss – $1,900,000.00; (b)

---

[5] Overstreet was a tort case involving personal injury, but the same general principles hold true in breach of contract cases. In such cases,

> damages become too speculative only when the existence of damages is uncertain, not when the precise amount is uncertain. . . . Damages need not be calculated with mathematical precision. . . . In fact, damages can be awarded in breach of contract cases when it is impossible to prove the exact amount of damages. . . . The evidence need only be reasonably certain to establish the amount of damages.

Elliott v. Barrett Enterprises, LP, 2015 WL 9946387, at *14 (Tenn. Ct. App. Aug. 14, 2015).

14

extra expense of natural gas – $1,900,000.00; (c) cost of repairing the facility – $1,992,201.98; (d) cost of demolishing the burned building – $951,518.00; (e) cost of replacing cranes – $750,000.00; (f) professional consulting fees – $203,000.00; (g) extra expenses to Metro caused by the fire – $1,694,274.00; (h) cleanup costs – $21,882.00, $25,185.00, and $9,078.00; (i) cost of repair minus depreciation – $1,434,023.00; and (j) cost to remove the crane bay – $209,725.00. Although it does not appear that adding any combination of these numbers would result in the exact figure returned by the jury, combining the demolition costs, consultant costs, the cost of the extra expense portion of adjusted loss, the demolition costs, the costs for crane bay removal, the consultant costs, the cost of repair minus depreciation, and two of the three figures for fire cleanup would result in a figure that is very close to that returned by the jury.[6]

If more precision was required, Plaintiffs should not have agreed to a general verdict, inasmuch as the "use of special interrogatories . . . avoid[s] the 'inscrutable mystery of a general verdict (and) impenetrable uncertainty.'" Petes v. Hayes, 664 F.2d 523, 526 (5th Cir. 1981) (citation omitted); see Skidmore v. Baltimore & O.R. Co., 167 F.2d 54, 60 (2d Cir. 1948) (observing that "the general verdict is as inscrutable and essentially mysterious as the judgment which issued from the ancient oracle of Delphi"). And, "[a]lthough the actions of a jury are sometimes inscrutable, a verdict is not infirm where there is sufficient evidence upon which the verdict can be based." State v. Millbrooks, 819 S.W.2d 441, 446 (Tenn. Ct. App. 1991).

As it stands, the amount returned was within the realm of reasonableness under the facts presented at trial, meaning that Plaintiffs are not entitled to a new trial or judgment as a matter of

---

[6] Adding those damages would result in a figure of $4,539,607 ($1,694,274 + $951,518 + $209,725 + $203,000 + $1,434,023 + $21,882 + $25,185), which is just $1,272 less that the verdict the jury reached.

law based upon the amount of the verdict. Nor are they entitled to remittitur.

Under Tennessee law,[7] "the trial court acts as the thirteenth juror and therefore may . . . suggest a remittitur of the jury award . . . to correct an excessive jury verdict without the time and expense of a new trial." Palanki ex rel. Palanki v. Vanderbilt Univ., 215 S.W.3d 380, 386 (Tenn. Ct. App. 2006). "While the amount of the verdict is primarily for the jury to determine, the trial judge who presided at the trial and heard the evidence is the next most competent person to pass upon the matter," Burlison v. Rose, 701 S.W.2d 609, 611 (Tenn. 1985), and this Court cannot say that the verdict was excessive or contrary to law.

The decision not to grant a remittitur, new trial, or judgment as a matter of law necessarily means that the Court is unpersuaded by any of the myriad of arguments raised by Plaintiffs in relation to the various components of the damages evidence presented by Defendants at trial. Plaintiffs' position, in essence, is that (1) no competent evidence supported Metro's damages claims (in whose shoes Weinberg Wheeler stood) for (a) business interruption and extra expenses, (b) crane replacement, (c) consultant costs, or (d) other costs of repair damages; and (2) the measure of damages was required to be based on diminution of value, instead of the cost of repair.

However, Dayne Grey, a CPA and forensic accountant who was hired to participate in Traveler's adjustment of Metro's loss, conducted a walk-through of the facility and reviewed "hundreds" of documents before opining that the business interruption loss and increased gas expenditure for the 140-days following the fire, was approximately $1.9 million.[8] Even Held, who

---

[7] In diversity actions, federal courts apply the substantive law of the forum state concerning remittitur. See Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 427-26 (1996); Zander v. Katz, Sapper & Miller LLP, 2015 WL 136819, at *1 (M.D. Tenn. Jan. 8, 2015).

[8] Although Grey generated a file, he testified that, "as a part of our file maintenance, we disposed of it in 2007, 2008." (Docket No. 257 at 36). There is no suggestion that Weinberg, Wheeler is responsible

16

had been retained by Allied/BFI, admitted to opining in the underlying case that, "because the plant had limited utility and a finite time – life at the time of loss, the loss can be no more than the amount expended under the extra expense portion of the adjusted loss by Travelers in the amount of $1,694,274," and that this figure had "nothing to do with real estate value" but "with running a business." (Docket No. 258 at 126, 129).

David Egarian, provided a foundation for the loss of the three cranes because of the fire, testifying that the replacement costs for each was $275,000. In arriving at that figure, Mr. Egarian examined the remnants of the cranes, and observed that the clamshells were not destroyed but that the insular facilities were. While Plaintiffs insist that Mr. Egarian's testimony (presented by deposition) offered nothing but a bottom line figure, his qualification to express his opinions were not challenged in the underlying suit.

Further, the approximately $200,000 in consulting fees that the jury could have found is also supported by the record. Even if Mr. Egarian's "bottom line" figure of approximately $197,000 is insufficient, Mr. Held testified that he was of the opinion that Travelers "reasonably adjusted" the consultant fees in the amount of $203,000. (Docket No. 258 at 131).

And there was sufficient support for the jury to determine cost of repair. Randy Creech, the president of the consulting division for Belfor USA and an expert in determining the amount of property damage to disaster-damaged buildings, testified that the reasonable repair costs for the damaged building was close to $2 million. For his part, Held testified that Travelers had, "for the most part" had properly calculated the cost to repair the building and that the adjusted building loss on a replacement cost basis was $1,914,637.55, but that with depreciation the value would be

---

for Grey's document retention policy.

$1,434,023.

To be sure, there is a significant difference between the replacement cost figures and Held's depreciated physical loss value. But a jury is not required to accept an expert's opinion. Rather, "[e]xpert testimony is not ordinarily conclusive, but is purely advisory in character, and the trier of fact may place whatever weight it chooses upon such testimony and may retract it if it finds that it is inconsistent with the facts or otherwise unreasonable." England v. Burns Stone Co., 874 S.W.2d 32, 38 (Tenn. Ct. App. 1993).

Admittedly, the presentation of damages was cabined by this Court's ruling on the method for trying the malpractice case. But, again, whether that decision was correct or incorrect is a matter for the appeals court to determine.

Finally, Plaintiffs argue that "cost of repair was an improper measure of damages where repairs never occurred and never were going to occur because the owner determined its property was obsolete and, in fact, planned to destroy the property before the incident giving rise to the litigation." (Docket No. 291 at 24). For this reason, Plaintiffs contend that the proper measure of damages was diminution in value and the jury should not have been allowed to consider costs of repair.

"*Generally*, the measure of damages will be the cost or repair *unless* the repairs are not feasible or the cost is disproportionate to the dimunition [sic] in value." GSB Contractors, Inc. v. Hess, 179 S.W.3d 535, 543 (Tenn. Ct. App. 2005) (emphasis in original). Put somewhat differently, "[t]he proper measure of damages to real property in Tennessee is the 'difference between the reasonable market value of the premises immediately prior to and immediately after the injury, but if the reasonable cost of repairing the injury is less than the depreciation in value, the cost of repair is the lawful measure of damages.'" Reavis v. Friedmann, 1992 WL 141047, at *2 (Tenn. Ct. App.

18

June 24, 1992) (quoting Redbud Cooperative Corp. v. Clayton, 700 S.W.2d 551, 560-61 (Tenn. Ct. App. 1985)). While "[t]he choice of the proper measure of damages is a question of law to be decided by the court, . . . '[d]eterminations concerning the amount of damages are factually driven," and "the amount of damages to be awarded in a particular case is a question of fact." Ray v. Sadler Homes, Inc., 2012 WL 2150752, at *4 (Tenn. Ct. App. June 13, 2012).

Here, the jury heard evidence about both types of damages, and was presented with proof and arguments regarding the future of the Thermal Plant Facility.[9] It was for this reason that the Court instructed the jury:

> The measure of damages to Metro's property in the underlying lawsuit is the lesser of the following amounts:
>
> 1. The reasonable cost of repairing the damage to the property, or --
>
> 2. The difference between the fair market value of the property immediately prior to and immediately after the damage.

(Docket No. 259 at 60). Except for replacing "real property" with the phrase "Metro's property in the underlying lawsuit," this instruction is identical to Tennessee Pattern Jury Instruction 14.45, and

---

[9] For example, in closing argument Plaintiffs' counsel argued:

We know that the building was demolished as scheduled. . . . [D]on't forget, the city had budgeted two-and-a-half million dollars to tear that building down long, long before this fire ever happened. So tearing the building down was not a damage or cost to Metro because they already were planning on doing that. They had already budgeted for that. . . .

Now, in terms of the purported damages in this case, how do they stand in front of you with a straight face and say, give us damages that are the cost of repairing this facility when everybody knows that was never intended to be the case, and it never happened? What happened was a transition to natural gas and demolition of the facility as Mayor Purcell had decided back in 2000.

(Docket No. 259 at 41-42).

19

is in keeping with the Proposed Jury Instructions (Docket No. 238 at 18) agreed to by the parties .

**C. Collateral Source Rule**

Finally, Plaintiffs argue that the Court erred in failing to apply the collateral sources rule. This rule was discussed in detail in the context of the Court's ruling on the Motion for Summary Judgment, and that discussion, too, is incorporated herein by reference. See, Allied Waste N. Am., 93 F. Supp. at 850-53. The Court held that "[t]he collateral source rule simply does not apply under the circumstances of this case," id. at 851, and Plaintiffs' present arguments do nothing to change the Court's conclusion on this issue.

## V. Conclusion

On the basis of the foregoing, Plaintiffs' "Motion for New Trial or for Remittitur and Renewed Rule 50(a) Motion for Judgment as a Mater of Law Regarding Cost of Repair Damages for the Underlying Lawsuit" will be denied.

An appropriate Order will enter.

_Kevin H. Sharp_
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE